**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE

LARRY WHISTLER                    )
a/k/a LARRY ZBYSZKO               )
a/k/a THE LIVING LEGEND,          )
an individual,                    )
                                  )      Civil Action No. 1 02-CV-1008-CC
          Plaintiff,              )
                                  )
   vs.                            )
                                  )
WORLD WRESTLING                   )
ENTERTAINMENT, INC., a Delaware)
Corporation, VINCE MCMAHON, an )
individual, CHRIS IRVINE a/k/a    )
CHRIS JERICHO, a/k/a JERICHO, an )
individual,                       )
                                  )
          Defendants.             )
_____  )

## MOTION TO DISMISS CLAIMS AGAINST
## DEFENDANTS VINCE McMAHON AND CHRIS IRVINE
## FOR LACK OF PERSONAL JURISDICTION

Defendants Vince McMahon and Chris Irvine hereby respectfully move this

Court, pursuant to Fed. R. Civ. P. 12(b)(2), to dismiss the claims against them on the

basis that they are not subject to personal jurisdiction in this forum. In support of this

Motion, Messrs. McMahon and Irvine respectfully submit the following Exhibits:

Exhibit 1   -   First Interrogatories on Personal Jurisdiction Issue
                Submitted by Defendants Vince McMahon and Chris
                Irvine

Exhibit 2   -   Plaintiff's Response to First Interrogatories on Personal
                Jurisdiction Issue

19

Exhibit 3   -   Deposition of Larry Whistler

Exhibit 4   -   Deposition of Vince McMahon

Exhibit 5   -   Videotape of January 20, 2002 Royal Rumble (filed separately)

Exhibit 6   -   Deposition of Chris Irvine

Exhibit 7   -   Affidavit of Melissa Manso

This Motion is based on the foregoing Exhibits, the pleadings herein, and all other matters of record. The grounds for this Motion are set forth more fully in the Memorandum filed contemporaneously herewith. Messrs. McMahon and Irvine hereby respectfully reserve their defense of lack of personal jurisdiction and make this appearance solely for the limited purpose of asserting that defense.

Respectfully submitted,

_John L. Taylor, Jr. (CCM)_

Attorneys for Defendants
Vince McMahon, and Chris Irvine, a/k/a
Chris Jericho, a/k/a Jericho

John L. Taylor, Jr.
Georgia Bar No. 700400
Celeste McCollough
Georgia Bar No. 487013
CHOREY, TAYLOR & FEIL
The Lenox Building, Suite 1700
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404) 841-3200
Telecopier: (404) 841-3221

Of Counsel:

Jerry S. McDevitt
Curtis B. Krasik
Kirkpatrick & Lockhart
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500
(412) 355-6501 (fax)

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LARRY WHISTLER<br>a/k/a LARRY ZBYSZKO<br>a/k/a THE LIVING LEGEND,<br>an individual,<br><br>          Plaintiff,<br><br>     vs.<br><br>WORLD WRESTLING<br>ENTERTAINMENT, INC., a Delaware<br>Corporation, VINCE MCMAHON, an<br>individual, CHRIS IRVINE a/k/a<br>CHRIS JERICHO, a/k/a JERICHO, an<br>individual,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1 02-CV-1008-CC |

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served opposing counsel(s) of record with the

foregoing *MOTION TO DISMISS CLAIMS AGAINST DEFENDANTS VINCE*

*McMAHON AND CHRIS IRVINE FOR LACK OF PERSONAL JURISDICTION*

via U.S. First Class Mail postage pre-paid to the following address:

> Joel D. Myers, Esq.
> **Myers and Associates, P.C.**
> 1827 Powers Ferry Road
> Building 3, Suite 200
> Atlanta, Georgia 30339

Ben C. Brodhead, Esq.
**Ben C. Brodhead, P.C.**
235 Peachtree Street, N.E.
Suite 400
Atlanta, Georgia  30303


This 13th day of February 2003.

_____

Attorneys for Defendants
Vince McMahon, and Chris Irvine, a/k/a
Chris Jericho, a/k/a Jericho


Celeste McCollough
Georgia Bar No. 487013
CHOREY, TAYLOR & FEIL
The Lenox Building, Suite 1700
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone:  (404) 841-3200
Telecopier: (404) 841-3221



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LARRY WHISTLER                      )
a/k/a LARRY ZBYSZKO                 )
a/k/a THE LIVING LEGEND,            )
an individual,                      )
                                    )
                                    )     Civil Action No. 1 02-CV-1008-CC
          Plaintiff,                )
                                    )
                                    )
     vs.                            )
                                    )
WORLD WRESTLING                     )
ENTERTAINMENT, INC., a Delaware     )
Corporation, VINCE MCMAHON, an      )
individual, CHRIS IRVINE a/k/a      )
CHRIS JERICHO, a/k/a JERICHO, an    )
individual,                         )
                                    )
          Defendants.               )

**FILE COPY**

## FIRST INTERROGATORIES
## ON PERSONAL JURISDICTION ISSUE
## SUBMITTED BY DEFENDANTS VINCE McMAHON AND CHRIS IRVINE

Defendants Vince McMahon and Chris Irvine, by and through their

undersigned attorneys, without waiving their defense of lack of personal

jurisdiction, but in express reliance thereon, pursuant to Rules 26 and 33 of the

Federal Rules of Civil Procedure and this Court's Order dated November 25, 2002,

serve the following First Interrogatories on Personal Jurisdiction Issue for response

by Plaintiff within thirty (30) days. You are requested and required to answer these

Interrogatories separately and fully in writing under oath and to serve a copy of said answers upon the undersigned within 30 days after service hereof.

## DEFINITIONS AND INSTRUCTIONS

The following definitions are applicable to terms employed in these Interrogatories:

1. "You" and "your" refer to the party to whom these interrogatories are addressed, as well as said party's agents, servants, employees or representatives. Information sought in these Interrogatories from you shall include information within the knowledge or possession of your agents and employees, attorneys, accountants, investigators (including investigators for your attorneys), and any other persons or firms directly or indirectly subject to your control in any way whatsoever.

2. "Person" or "persons" shall include any partnership, corporation, joint venture or other entity and shall also include any natural person or any government or governmental body, commission, board or agency.

3. "Document" means any written, recorded or graphic matter, however produced or reproduced, and whether or not now in existence, including but not limited to, correspondence, telegrams, photographs, notes or sound or visual recordings of any type of personal or telephone conversations, or of meetings or conferences, electronic mail, minutes of directors or committee meetings,

memoranda, inter-office communications, studies, analyses, reports, results of investigations, reviews, contracts, agreements, working papers, statistical records, ledgers, books of account, financial statements and journals, vouchers, bank checks, invoices, receipts, computer data, stenographer's notebooks, desk calendars, appointment books, and diaries or papers similar to any of the foregoing, however denominated. It includes all matter that relates or refers in whole or in part to the subjects referred to in an Interrogatory. If a document has been prepared in several copies, or additional copies have been made, and the copies are not identical (or which, by reason of subsequent modification, are no longer identical), each non-identical copy is a separate "document."

4. "Identify" or a request to state the "identity" of some person or thing means:

(a) Wherever in these Interrogatories you are asked to "identify" or state the "identity" of a document, you shall specifically designate the type of document (i.e., letter, interoffice memorandum, report, etc.) and shall state information sufficient to enable the undersigned to identify the document, such as its date, the name of the addressee or addressees, the name of the signer or signers, the title or heading of the document, and its approximate number of pages; the identity and the address or addresses of the persons to whom copies were sent; and the present or

3

last known location of the possessor of the original of the document (or, if that is unavailable, the most legible copy).

(b) Wherever in these Interrogatories you are asked to "identify" or state the "identity" of a person, you shall furnish information sufficient to enable the undersigned to identify the person, including: (i) in the case of a natural person, the person's name, present whereabouts (home address, employment address, telephone number), present position, prior relevant positions the person had held and similar identifying information; and (ii) in the case of an unnatural person or entity, the person's name, address, principal place of business, and the identity of any officer, representative, or agent of such person having knowledge or information concerning the subject matter of this Interrogatory.

(c) Wherever in these Interrogatories you are asked to "identify" or state the "identity" of a communication, you shall indicate the date thereof, whether the communication was oral or written, (or, if the oral communication was recorded in any manner in a document) identify the person or persons who sent, received or had knowledge of the communication, and state the information communicated.

5. If you cannot answer any portion of the following Interrogatories in full, after exercising due diligence to secure the information to do so, so state, and answer to the extent possible, specifying your inability to answer the remainder,

4

and stating whatever information or knowledge you have concerning the unanswered portions.

6. If you claim privilege as to any document or communication as to which information is requested by these Interrogatories or as to any answer requested by these Interrogatories, specify the privilege claimed, the document, communication and/or answer as to which that claim is made, the topic discussed in the document or communication, and the basis on which you assert that claim.

7. Each Interrogatory should be separately answered, Interrogatories should not be combined for the purpose of supplying a common answer, and answers should not be supplied by reference to the answers of another Interrogatory, unless the answer is completely identical to the answer referred to.

8. These Interrogatories are continuing in nature, so as to require you to file supplementary answers if you obtain further or different information before trial.

9. Unless otherwise indicated, these Interrogatories refer to the time, place and circumstances of the occurrences mentioned or complained of in the pleadings.

<u>INTERROGATORIES</u>

1.

State each and every fact upon which you base your contention that the Defendant Vince McMahon is subject to personal jurisdiction in this Court.

5

2.

State each and every fact upon which you base your contention that the

Defendant Chris Irvine a/k/a Chris Jericho a/k/a Jericho is subject to personal

jurisdiction in this Court.

Respectfully submitted,

John L. Taylor, Jr.
Georgia Bar No. 700400
Celeste McCollough
Georgia Bar No. 487013
CHOREY, TAYLOR & FEIL
The Lenox Building, Suite 1700
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404) 841-3200
Telecopier: (404) 841-3221

Attorneys for Defendants
Vince McMahon, and Chris Irvine, a/k/a
Chris Jericho, a/k/a Jericho

Of Counsel:
(Applications to appear *pro hac vice* in process)
Jerry S. McDevitt
Curtis B. Krasik
Kirkpatrick & Lockhart
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
(412) 355-6500
(412) 355-6501 (fax)

6

## CERTIFICATION

Pursuant to Local Rule 7.1D, counsel for Defendants hereby certify that this document has been prepared with Book Antigua (13 point).

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LARRY WHISTLER                      )
a/k/a LARRY ZBYSZKO                 )
a/k/a THE LIVING LEGEND,            )
an individual,                      )
                                    )   Civil Action No. 1 02-CV-1008-CC
            Plaintiff,              )
                                    )
      vs.                           )
                                    )
WORLD WRESTLING                     )
ENTERTAINMENT, INC., a Delaware     )
Corporation, VINCE MCMAHON, an      )
individual, CHRIS IRVINE a/k/a      )
CHRIS JERICHO, a/k/a JERICHO, an    )
individual,                         )
                                    )
            Defendants.             )
_____)

## CERTIFICATE OF SERVICE

A copy of the First Interrogatories on Personal Jurisdiction Issue Submitted by Defendants Vince McMahon and Chris Irvine was served by telecopier and hand delivery upon the following:

> Joel D. Myers, Esq.
> Myers and Associates, P.C.
> 1827 Powers Ferry Road
> Building 3, Suite 200
> Atlanta, Georgia 30339
> Telecopier: (770) 541-7448

This 18th day of December, 2002.

Celeste McCollough
Georgia Bar No. 487013
CHOREY, TAYLOR & FEIL
The Lenox Building, Suite 1700
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404) 841-3200
Telecopier: (404) 841-3221

101688.1

3



# EXHIBIT / ATTACHMENT

## 2

(To be scanned in place of tab)

**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LARRY WHISTLER                     )
a/k/a LARRY ZBYSZKO                )
a/k/a THE LIVING LEGEND,           )
an individual,                     )
                                   )
          Plaintiff,               )
                                   )   Civil Action
                                   )   No. 1-02-CV-1008
     v.                            )
                                   )
WORLD WRESTLING FEDERATION         )
ENTERTAINMENT, INC., a Connecticut )
Corporation, VINCE MCMAHON,        )
an individual, CHRIS IRVINE a/k/a  )
CHRIS JERICHO, a/k/a JERICHO, an   )
individual,                        )
                                   )
          Defendants.              )
_____

## PLAINTIFF'S RESPONSE TO FIRST INTERROGATORIES ON PERSONAL JURISDICTION ISSUE SUBMITTED BY DEFENDANTS VINCE MCMAHON AND CHRIS IRVINE

COMES NOW the Plaintiff, LARRY WHISTLER a/k/a LARRY ZBYSZKO

a/k/a THE LIVING LEGEND (hereinafter "Plaintiff") in the above

referenced action and responds to Defendants Vince McMahon and

Chris Jericho's (hereinafter "Defendants") First interrogatories

to Plaintiff as follows:

## RESPONSES TO SPECIFIC NUMBERED PARAGRAPHS:

**1.**

Defendant McMahon made a personal appearance and personally wrestled at ROYAL RUMBLE 2002 in Atlanta, Georgia on or about January 20, 2002 at Philips Arena. Defendant Vince McMahon has transacted business within the State of Georgia on or about January 20, 2002 at Philips Arena. Defendant McMahon derived revenues from his personal appearance within the State of Georgia on or about January 20, 2002. As chairman of WWE, Defendant Vince McMahon has participated and caused the unauthorized infringement of Plaintiff's mark within the State of Georgia by broadcasting pay-per-view events and televised weekly shows on MTV, TNN and UPN, wherein said pay-per-view and weekly televised shows are broadcast within the State of Georgia. Defendant McMahon has authorized pay-per-view events broadcast within the State of Georgia. Defendant McMahon has directed that magazines be distributed (i.e., WORLD WRESTLING MAGAZINE) within the State of Georgia, wherein the July 2002 issue of WORLD WRESTLING MAGAZINE (page 10) makes unauthorized use of Plaintiff's mark. Defendant Vince McMahon has personally appeared in said pay-per-view wrestling events and said weekly

2

televised shows that have been broadcast within the State of Georgia.

**2.**

Defendant Irvine personally wrestled at ROYAL RUMBLE on January 20, 2002 in Atlanta, Georgia at Philips Arena. Defendant Irvine has participated in wrestling events broadcast into Georgia via television and pay-per-view as specified above. Defendant Irvine has promoted himself as the "LIVING LEGEND", wherein he knew or should have known was to be broadcast or sent into the State of Georgia.

Respectfully submitted,

Myers & Kaplan,
Intellectual Property Law L.L.C.

Dated: January 21, 2003    By: _____

Joel D. Myers
Attorney for Plaintiff
State of Georgia Bar No. 533147
Barry E. Kaplan, Of Counsel
Georgia Bar No. 406805

1827 Powers Ferry Road
Building 3, Suite 200
Atlanta, Georgia 30339
Phone: 770-541-7444
Fax: 770-541-7448
Email: jmyers@mkiplaw.com

3

CERTIFICATION

Pursuant to Local Rule 7.1D, counsel for Defendants hereby certify that this document has been prepared with Courier New (12 point).



# EXHIBIT / ATTACHMENT

## 3

(To be scanned in place of tab)

# In The Matter Of:

*LARRY WHISTLER, et al.   v.*
*WORLD WRESLTING FEDERATION, et al.*

---

*LARRY WHISTLER*
*January 27, 2003*

*VIDEOTAPE*
*DEPOSITION*

---

*BROWN REPORTING, INC.*
*ATLANTA, AUGUSTA, COLUMBUS, MACON, ROME & SAVANNAH*
*1740 PEACHTREE STREET, N.W.*
*ATLANTA, GA  USA  30309*
*(404) 876-8979   or   (800) 637-0293*

*Original File 0127WHIS.ASC, 62 Pages*
*Min-U-Script® File ID: 2415824577*

**Word Index included with this Min-U-Script®**

LARRY WHISTLER, et al. v.
WORLD WRESTLING FEDERATION, et al.
Case 1:02-cv-01008-CC   Document 19   Filed 02/13/03   Page 23 of 131
VIDEOTAPE
DEPOSITION
LARRY WHISTLER
January 27, 2003

Page 1

[1]    IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF GEORGIA
[2]          ATLANTA DIVISION
[3]
       LARRY WHISTLER a/k/a                    )
[4]  LARRY ZBYSZKO a/k/a                       )
       THE LIVING LEGEND, an                   )
[5]  individual,                              )
[6]       Plaintiff,                          )
                                              )  CIVIL ACTION
[7]       vs.                                 )
                                              )  FILE NO. 1-02-CV-1008
[8]  WORLD WRESTLING FEDERATION )
       ENTERTAINMENT, INC., a                  )
[9]  Connecticut corporation,                 )
       VINCE MCMAHON, an                       )
[10]  individual, CHRIS IRVINE                 )
       a/k/a CHRIS JERICHO, a/k/a )
[11]  JERICHO, an individual,                  )
[12]      Defendants.                         )
[13]
             VIDEOTAPE DEPOSITION OF
[14]
             LARRY WHISTLER
[15]
[16]          January 27, 2003
[17]          12.00 noon
[18]
             Building 3, Suite 200
[19]         1827 Powers Ferry Road
             Atlanta, Georgia
[20]
[21]  Colleen B. Seidl, CCR-B-1113, RPR, CRR
[22]
[23]
[24]
[25]

Page 2

[1]              APPEARANCES OF COUNSEL
[2]
[3]  On behalf of the Plaintiff:
[4]      BEN C. BRODHEAD, Esq.
         Law Offices of Ben C. Brodhead, P.C.
[5]      Suite 400
         235 Peachtree Street, N.E.
[6]      Atlanta, Georgia 30303
[7]
         JOEL D. MYERS, Esq.
[8]      Meyers & Kaplan
         Building 3, Suite 200
[9]      1827 Powers Ferry Road
         Atlanta, Georgia 30339
[10]
[11]  On behalf of the Defendants:
[12]     CURTIS B. KRASIK, Esq.
         Kirkpatrick & Lockhart, LLP
[13]     Henry W. Oliver Building
         535 Smithfield Street
[14]     Pittsburgh, PA  15222-2312
[15]     CELESTE McCOLLOUGH, Esq.
         Chorey, Taylor & Feil
[16]     The Lenox Building, Suite 1700
         3399 Peachtree Road, N.E.
[17]     Atlanta, Georgia  30326-1148
[18]
       THE VIDEOGRAPHER: Mr. John Tyler
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**LARRY WHISTLER**
January 27, 2003

Case 1:02-cv-01008-CC    Document 19    Filed 02/13/03    Page 24 of 131

VIDEOTAPE
DEPOSITION

**LARRY WHISTLER, et al.    v.
WORLD RESTLING FEDERATION, et al.**

---

Page 3

[1] (Reporter disclosure made pursuant to
[2] Article 8.B. of the Rules and Regulations
[3] of the Board of Court Reporting of the
[4] Judicial Council of Georgia.)
[5]     LARRY WHISTLER,
[6] having been first duly sworn, was examined and
[7] testified as follows:
[8]         **EXAMINATION**
[9]       **BY MR. KRASIK:**
[10]    **Q:** Good morning, Mr. Whistler. As I
[11] introduced you outside, my name is Kirk Krasik, my
[12] colleague is Celeste McCollough. Together we're
[13] counsel for World Wrestling Entertainment, Inc.,
[14] Vince McMahon and Chris Irvine.
[15]    Before we get started, some technical
[16] matters for the record. By appearing today we
[17] obviously are not waiving our arguments of personal
[18] jurisdiction with respect to Mr. McMahon and
[19] Mr. Irvine, and we are specifically appearing
[20] pursuant to the Court's order of December 31, 2002,
[21] governing discovery on the personal jurisdiction
[22] issue.
[23]    Mr. Whistler, as your counsel may have
[24] explained to you, today's deposition will be limited
[25] to personal jurisdiction whether Mr. McMahon and

Page 4

[1] Mr. Irvine should appear in court in Georgia; and
[2] once that issue is resolved, we will take your
[3] deposition again on the merits of the case as a
[4] whole.
[5]    Pursuant to Georgia procedure, I guess I'm
[6] notifying that this is a deposition for
[7] cross-examination. Any other technicalities?
[8]    **MS. McCOLLOUGH:** No, I think that's
[9] all.
[10]    **Q:** (By Mr. Krasik) Mr. Whistler, have
[11] you been deposed before?
[12]    **A:** No.
[13]    **Q:** No. This is a question and answer. As
[14] may have been explained to you, this is a question
[15] and answer session. Please make sure that your
[16] responses are audible even though we are on video so
[17] that madame court reporter can take down what you're
[18] saying.
[19]    I would also ask that you let me finish my
[20] question; that I, of course, will let you finish your
[21] answer so that we're not talking over each other.
[22]    **A:** It sounds fair.
[23]    **Q:** And if you have any questions, please
[24] don't hesitate to ask and I will try to restate the
[25] question more clearly for you. And of course, if you

Page 5

[1] would like to take a break at any point, please let
[2] us know and we'll try to accommodate your question.
[3]    Do you have any questions at this point?
[4]    **A:** No.
[5]    **Q:** Can you tell us where you live,
[6] Mr. Whistler?
[7]    **A:** 425 Red Jacket Way, Alpharetta, Georgia.
[8]    **MR. BRODHEAD:** I apologize for, but I
[9] would like to interject that by agreement
[10] of counsel, all objections except to the
[11] form of the question and the responsiveness
[12] of the answer are reserved until the time
[13] of the use of the deposition, if that's
[14] agreeable with counsel?
[15]    **MR. KRASIK:** Agreed.
[16]    **MR. BRODHEAD:** Thank you.
[17]    **Q:** (By Mr. Krasik) For those of us not from
[18] around here, could you generally describe where
[19] Alpharetta is?
[20]    **A:** Alpharetta is about — a suburb 30 miles
[21] north of Atlanta, 25 miles north.
[22]    **Q:** And so presumably you stayed at your house
[23] last night, you didn't have to stay at a hotel for
[24] this deposition; is that right?
[25]    **A:** Right.

Page 6

[1]    **Q:** About how long did it take you to drive
[2] here today?
[3]    **A:** Well, 400 is a nasty road sometimes, but
[4] today wasn't too bad, so about 35 minutes.
[5]    **Q:** And do you have homes anywhere else in the
[6] country, Mr. Whistler?
[7]    **A:** No, not at this time.
[8]    **Q:** Where you have had homes in the past? Let
[9] me rephrase the question. As your — when your
[10] primary residence was in Alpharetta, did you ever
[11] have homes anywhere else in the country?
[12]    **A:** No.
[13]    **Q:** Can you tell us what your employment is
[14] today, sir?
[15]    **A:** Well, I'm a professional wrestler and
[16] that's what I have been my whole life, and right now
[17] I'm still wrestling for independent shows. I wrestle
[18] for the NWAT out of Nashville every Wednesday now.
[19] And still because of my name, I do appearances and
[20] autograph sessions and memorabilia shows, and then my
[21] livelihood like it's always been.
[22]    **Q:** And you said, sir, that you're wrestling
[23] in Nashville every Wednesday?
[24]    **A:** Yeah. We started that last week and we'll
[25] be doing it every Wednesday for the NWA group that's

Page 7

[1] recently sprouted up.

[2] **Q:** Are you — other than the one day in
[3] Nashville, are you on average, do you travel at any
[4] other days of the week?

[5] **A:** Yeah. I mean I fly out and go all over
[6] the place. It depends who calls. There's
[7] independent promoters all over the country, sometimes
[8] overseas. But this Friday I'm flying out to do a
[9] show out in Cincinnati, Ohio.

[10] **Q:** On the average, sir, out of a 30-day
[11] month, could you tell us how many days you're on the
[12] road?

[13] **A:** It varies, because, you know, the
[14] independents — a lot of people run the shows, but
[15] they all want you to Saturday. So anywhere from
[16] maybe three to six, you know, shots a month.

[17] **Q:** And, sir, are you the owner of any
[18] corporations?

[19] **A:** No.

[20] **Q:** Let me be more specific. I know that a
[21] lot of talent in the industry have loan out
[22] corporations for their services. Do you have any
[23] kind of loan out corp? Are you the owner of any loan
[24] out corporation for your services?

[25] **A:** No.

Page 8

[1] **MR. BRODHEAD:** And did you understand
[2] what a loan out corporation is?

[3] **THE WITNESS:** Not really.

[4] **MR. BRODHEAD:** Okay, and I'm going to
[5] just for the record here, because he's not
[6] been in a deposition before. If there's
[7] ever a time that you don't understand a
[8] question or a term, it's important that you
[9] ask him to explain that term.

[10] **THE WITNESS:** Okay.

[11] **MR. BRODHEAD:** And so if you don't
[12] understand a loan out corporation, I'm
[13] certain that we'll explore that now.

[14] **Q:** (By Mr. Krasik) My definition, if you're
[15] not the owner of any corporation, you're not familiar
[16] with it, I think that answers the question.

[17] That would be a corporation of which you
[18] were the owner, principal owner, that enters into
[19] contracts for your services. You're not involved in
[20] any kind of relationship like that?

[21] **A:** Well, I'm an independent contractor.
[22] Right now I'm not under contract to anybody
[23] specifically. I just independently for different
[24] people all the time.

[25] **Q:** Okay. Thank you, sir.

Page 9

[1] **A:** If that makes any sense.

[2] **Q:** Mr. Whistler, can you tell us, have you
[3] had any communication, have you spoken to Vince
[4] McMahon in the last five years?

[5] **A:** I haven't spoken to Vince McMahon in 20
[6] years.

[7] **Q:** Have you spoken to Chris Irvine in the
[8] last five years?

[9] **A:** Maybe a wee bit when he was with WCW down
[10] here out of Atlanta, when Turner/Time Warner and
[11] Jericho was one of our younger guys starting off and
[12] I was, you know, with WCW for twelve years. So I
[13] probably did talk to him some years ago.

[14] **Q:** Since Mr. Irvine came to WWE, have you
[15] spoken to him?

[16] **A:** No, I haven't.

[17] **Q:** Sir, have you spoken to anyone at World
[18] Wrestling Entertainment about this lawsuit?

[19] **A:** About the lawsuit, no.

[20] **Q:** Have you spoken to anyone — Strike that.
[21] Have you spoken to anyone at World
[22] Wrestling Entertainment about the facts underlying
[23] this lawsuit, your allegation that the company, the
[24] defendants have used your trademark "Living Legend"?

[25] **A:** Well, I have. When they first started

Page 10

[1] using my trademark, I spoke to Mr. Jim Ross, who is
[2] your vice president and an associate of
[3] mine, you know, from years and years and at that time
[4] I said "Jim, you know you guys are using my
[5] trademark, my phone is ringing off the wall." I
[6] said, "People think I'm coming up to work for you
[7] guys," I said, "but because your ratings are low and
[8] your business is down," I said, "we've got a hell of
[9] a shot to do some good business here."

[10] And I talked to Jim and ran some ideas by
[11] him, and he said he would run it by Vince, because
[12] Vince is the guy. But then, of course, I didn't get
[13] a reply from Jim. I just got a call from
[14] Mr. Kaufman. So that was the last I talked to
[15] anybody in the WWE.

[16] **Q:** And do you recall approximately when that
[17] took place, that conversation took place?

[18] **A:** With J.R.?

[19] **Q:** Yes.

[20] **A:** December.

[21] **Q:** And that would be December 2001?

[22] **A:** That would be December 2001. Probably
[23] sometime, I'm not exactly sure, middle, second, third
[24] week in December. I'm pretty sure it was before
[25] Christmas.

LARRY WHISTLER
January 27, 2003
Case 1:02-cv-01008-CC   Document 19   Filed 02/13/03   Page 26 of 131
VIDEOTAPE
DEPOSITION
LARRY WHISTLER, et al.   v.
WORLD RESTLING FEDERATION, et al.

Page 11

[1]   **Q:** And when you refer to some ideas that you
[2] discussed with Mr. Ross, can you be any more spec —
[3] what did those ideas pertain to?
[4]   **MR. BRODHEAD:** And I'm going to
[5] object at least just to question this. I
[6] know that we're limited to jurisdiction
[7] only in this one, and this seems to be
[8] going into substantive matters that are —
[9] and if there's some basis for this being
[10] related to jurisdiction, I understand, but
[11] I think this sounds more like substantive
[12] questions.
[13]   **MR. KRASIK:** I don't intend to get
[14] into substance and I don't intend to take
[15] this very far. I was just now asking what
[16] the substance of that communication with
[17] Mr. Ross was and then we're going to leave
[18] the topic.
[19]   **MR. BRODHEAD:** Okay.
[20]   **THE WITNESS:** Should I answer that?
[21]   **MR. BRODHEAD:** Yes. Go ahead.
[22]   **THE WITNESS:** Well, the subject was
[23] basically how the WWF at the time, now the
[24] WWE, and myself could work out a business
[25] deal and make a lot of money together;

Page 12

[1] because when they had taken my trademark,
[2] they opened the door to a great
[3] possibility. Obviously they just refused
[4] to use it and then started the legalities.
[5]   **Q:** (By Mr. Krasik) And when you say "make a
[6] great deal of money together," are you referring to
[7] you performing for WWE?
[8]   **A:** Oh, yeah. I ran by ideas involving my
[9] participation in the WWE.
[10]   **MR. KRASIK:** Do you have exhibit
[11] stickers?
[12]   **THE COURT REPORTER:** What kind would
[13] you like? I have Plaintiff's, I have —
[14]   **MR. KRASIK:** These would be
[15] Defendants.
[16]   **THE COURT REPORTER:** Okay.
[17]   **MR. KRASIK:** Thank you.
[18]   (Whistler Exhibits 1 and 2 were marked
[19] for identification.)
[20]   **MR. KRASIK:** This is going to be
[21] Exhibit 1 and Exhibit 2, I'm going to hand
[22] them to the witness together.
[23]   **MR. BRODHEAD:** Go ahead.
[24]   **Q:** (By Mr. Krasik) Mr. Whistler, I'm going
[25] to show you two documents that have been marked as

Page 13

[1] Zbyszko Exhibit 1 — Strike that.
[2]   **MR. BRODHEAD:** Should we just go with
[3] Defendant's 1 and Defendant's 2.
[4]   **MR. KRASIK:** I prefer to mark it by
[5] name just because I find it's easier to run
[6] through, if that's okay.
[7]   **Q:** (By Mr. Krasik) Whistler Exhibit 1 are
[8] the first interrogatories of personal jurisdiction
[9] issues submitted by defendants Vince McMahon and
[10] Chris Irvine.
[11]   Whistler Exhibit 2 are Plaintiff's
[12] response to first interrogatories on personal
[13] jurisdiction issues submitted by defendants Vince
[14] McMahon and Chris Irvine.
[15]   Take a minute, sir, to refresh your, to
[16] read the documents.
[17]   **A:** Plaintiff's response.
[18]   **Q:** If I could specifically direct your
[19] attention, sir. Please take as much time as you
[20] need, but to specifically direct your attention to
[21] page 5 of Whistler Exhibit 1, what's marked as
[22] Interrogatory 1. Is it clear to you where we are,
[23] sir?
[24]   **A:** I think I wasn't very good in school
[25] either.

Page 14

[1]   **MR. BRODHEAD:** It's going to be this
[2] interrogatory here.
[3]   **THE WITNESS:** Okay.
[4]   **MR. BRODHEAD:** And then it's going to
[5] be the response. This will be the response
[6] to that question.
[7]   **THE WITNESS:** Okay.
[8]   **Q:** (By Mr. Krasik) And, sir, since it's
[9] long, I'll read it into the record, but I want you to
[10] confirm that it's what I'm reading is accurate, if
[11] you would, please.
[12]   **A:** Okay.
[13]   **Q:** That Interrogatory 1 reads:
[14]   "State each and every fact upon which
[15] you base your contention that the defendant
[16] Vince McMahon is subject to personal
[17] jurisdiction in this court."
[18]   Is that accurate, sir? And the response
[19] says, reads:
[20]   "Defendant McMahon made a personal
[21] appearance and personally wrestled at Royal
[22] Rumble 2002 in Atlanta, Georgia, on or
[23] about January 20, 2002, at Phillips Arena.
[24] Defendant Vince McMahon has transacted
[25] business within the State of Georgia on or

LARRY WHISTLER, et al. v. WORLD WRESTLING FEDERATION, et al.
Case 1:02-cv-01008-CC Document 19 Filed 02/13/03 Page 27 of 131
VIDEOTAPE DEPOSITION
LARRY WHISTLER
January 27, 2003

Page 15

[1] about January 20, 2002, at Phillips Arena.
[2] Defendant McMahon derived revenues from his
[3] personal appearance within the State of
[4] Georgia on or about January 20, 2002. As
[5] chairman of WWE, defendant Vince McMahon
[6] has participated and caused the
[7] unauthorized infringement of Plaintiff's
[8] mark within the State of Georgia by
[9] broadcasting Pay-Per-View events and
[10] televised weekly shows on MTV, TNN and UPN,
[11] wherein said Pay-Per-View and weekly
[12] televised shows are broadcast within the
[13] State of Georgia. Defendant McMahon has
[14] authorized Pay-Per-View events broadcast
[15] within the State of Georgia. Defendant
[16] McMahon has directed that magazines be
[17] distributed, parenthesis, i.e. World
[18] Wrestling Magazine, close parenthesis,
[19] within the state of Georgia. Wherein the
[20] July 2002 issue of World Wrestling
[21] Magazine, parenthesis, page 10, close
[22] parenthesis, makes unauthorized use of
[23] Plaintiff's mark, Defendant Vince McMahon
[24] has personally appeared in said
[25] Pay-Per-View wrestling events and said

Page 16

[1] weekly televised shows that have been
[2] broadcast within the State of Georgia."
[3]     Did I read that response accurately, sir?
[4]     A: Yes, you did.
[5]     Q: And if I could ask you to please look back
[6] to Whistler Exhibit 1 for a moment to page 6
[7] underneath the two at the top.
[8]                 Interrogatory 2 reads:
[9]     "State each and every fact upon which you
[10] base your contention that the Defendant
[11] Chris Irvine a/k/a Chris Jericho a/k/a
[12] Jericho is subject to personal jurisdiction
[13] in this court."
[14]     Did I read that correctly, sir?
[15]     A: Yes.
[16]     Q: That's Interrogatory 2. And then if I
[17] could ask you, please, to look back at Whistler
[18] Exhibit 2 to the response, and again confirm that I'm
[19] reading accurately.
[20]     A: Okay.
[21]     Q: "Defendant Irvine personally wrestled at
[22] Royal Rumble a January 20, 2002, in
[23] Atlanta, Georgia at Phillips Arena.
[24] Defendant Irvine has participated in
[25] wrestling events broadcast into Georgia via

Page 17

[1] television and Pay-Per-View as specified
[2] above. Defendant Irvine has promoted
[3] himself as, quote, Living Legend, close
[4] quote, wherein he knew or should have known
[5] was to be broadcast or sent into the State
[6] of Georgia."
[7]     Is that accurate?
[8]     A: You read that accurately.
[9]     Q: Have you seen either Whistler Exhibit 2 or
[10] Whistler Exhibit — I'm sorry — Whistler Exhibit 1
[11] or Whistler Exhibit 2?
[12]     A: Wait. Have I seen it?
[13]     Q: Before today?
[14]     A: Have I read this before today?
[15]     Q: Correct.
[16]     A: Yes.
[17]     Q: Yes?
[18]     A: Yes, I did.
[19]     Q: And that would be, did you read the
[20] response that I read from Whistler Exhibit 2?
[21]     A: Yes.
[22]     Q: Okay. And did you review these responses
[23] before they were sent to us by your attorneys?
[24]     A: Yes.
[25]     MR. KRASIK: Counsel, we would ask

Page 18

[1] for a signed verification on the
[2] interrogatories. We didn't get that in the
[3] ordinary course.
[4]     MR. BRODHEAD: Yes.
[5]     Q: (By Mr. Krasik) Sir, as you listen to me
[6] read the responses to Interrogatory 1 and
[7] Interrogatory 2, do these reflect all facts of which
[8] you were aware that, on which you base your argument
[9] that Mr. McMahon and Mr. Irvine are subject to
[10] jurisdiction in Georgia?
[11]     MR. BRODHEAD: I'm going to object to
[12] the form of the question in that I believe,
[13] and I apologize, I started to get a little
[14] bit lost in there. It sounded like it was
[15] a mixture of a compound and calling for
[16] legal conclusion.
[17]     Q: (By Mr. Krasik) Well, I'm asking, sir,
[18] whether you were aware of any facts that are not in
[19] here on which you base your argument that Mr. McMahon
[20] and Mr. Irvine can be sued in Georgia.
[21]     A: I'm not sure I'm clear on that.
[22]     MR. BRODHEAD: You can answer to the
[23] extent that you understand the question. I
[24] mean, and if it's not clear, you can
[25] explain — do you understand which part is

Page 19

[1] not clear to you?

[2]    THE WITNESS: Well, I just — would

[3] you repeat that, please?

[4]    Q: (By Mr. Krasik) Sure. Mr. Whistler, I'm

[5] in no way trying to confuse you. I'm just trying to

[6] determine —

[7]    A: I'm just a wrestler.

[8]    Q: I understand.

[9]    A: Quite a wrestler in your day, of course.

[10]    MR. BRODHEAD: And I think the issue

[11] is, is that you're asking him on what

[12] arguments he is currently making about

[13] personal jurisdiction; and in all honesty,

[14] the arguments that are being made are legal

[15] arguments. And I think that if we're

[16] asking about underlying facts that perhaps

[17] supported such as —

[18]    MR. KRASIK: I tried to ask it that

[19] way. If it was confusing, I apologize.

[20]    MR. BRODHEAD: No, I understand.

[21]    MR. KRASIK: And I'm only asking as

[22] to facts.

[23]    MR. BRODHEAD: And I understand that

[24] and I was thinking that maybe you could ask

[25] facts specific to the question, like do you

Page 20

[1] know of things that were said in Georgia,

[2] times that he was in Georgia, things along

[3] those lines or however. But just when it's

[4] coming to a legal argument, I think that's

[5] where we're — I think that's where the

[6] problem is and I think that's where he's

[7] having confusion.

[8]    Q: (By Mr. Krasik) Mr. Whistler, all I'm

[9] trying to establish is that these responses are

[10] complete, are comprehensive, there's nothing else out

[11] there that you know of factwise.

[12]    Do you know of any facts that aren't in

[13] these responses that go to Mr. McMahon or

[14] Mr. Jericho's contacts with Georgia?

[15]    A: Well, I would say that the facts that are

[16] in here, you know, the fact that they wrestled here

[17] and promoted here and showed television shows here

[18] and sell products here and et cetera, that I think

[19] pretty much covers it.

[20]    Q: Are you aware of anything else as you sit

[21] here today that is not in here?

[22]    A: Not at this specific moment in time.

[23]    Q: Okay. Mr. Whistler, you claim here that

[24] the Royal Rumble 2002 took place in Atlanta on or

[25] about January 20, 2002; is that right?

Page 21

[1]    A: Well, it did.

[2]    Q: And how do you know that?

[3]    A: Well, it's on video.

[4]    Q: Did you go to the event?

[5]    A: I didn't go to the event in person. no,

[6] but, you know —

[7]    Q: Have you watched it?

[8]    A: — I saw it on tape.

[9]    Q: You've seen it on video?

[10]    A: Oh, certainly.

[11]    Q: And did you watch — have you seen the

[12] entire tape or only excerpts of the tape?

[13]    A: Mainly just the exciting parts. I mean, I

[14] skipped the preliminary bouts.

[15]    Q: Other than the preliminary bouts, would

[16] you say you watched substantially all the tape?

[17]    A: No, not all of it. I've seen, you know, a

[18] million wrestling matches, so I kind of just got to

[19] the point.

[20]    Q: Okay. Did you see the bout in which

[21] Mr. McMahon wrestled during that show?

[22]    A: No, I didn't see it. I heard about it,

[23] but I didn't specifically watch Vince wrestle Flair.

[24]    Q: But you are aware that he wrestled Ric

[25] Flair, aren't you?

Page 22

[1]    A: Oh, yes.

[2]    Q: Do you have any knowledge, Mr. Whistler,

[3] whether Mr. McMahon spoke the words "Living Legend"

[4] during his performance?

[5]    A: During his performance at the Royal

[6] Rumble?

[7]    Q: Yes.

[8]    A: I don't believe he used it at that time.

[9]    Q: Well, I was going to get to this in a

[10] moment, but since you referenced it that way, do you

[11] have firsthand knowledge that Mr. McMahon at any time

[12] personally spoke the words "Living Legend"?

[13]    A: Oh, yes, sir, I do. I have it on video.

[14]    Q: And when were those times?

[15]    A: In January, February, March — I believe

[16] it was in April and Mr. McMahon came on the

[17] television during the Smack Down Show, which was

[18] taped on Tuesday. Then it's edited on Wednesday and

[19] shown on UPN Thursday evening, and at that particular

[20] time Mr. McMahon declared to everybody in Georgia and

[21] all over the country that the Chris and Jericho, and

[22] I quote, is wrestling "The Living Legend."

[23]    Q: And your best recollection was that was in

[24] April 2002?

[25]    A: Yes, sir, because he did it after he was

LARRY WHISTLER, et al. v.
WORLD WRESTLING FEDERATION, et al

VIDEOTAPE
DEPOSITION

LARRY WHISTLER
January 27, 2003

Case 1:02-cv-01008-CC Document 19 Filed 02/13/03 Page 29 of 131

Page 23

[1] served with the complaints.

[2] **Q:** As you sit here today, are you aware of
[3] any other instances in which Vince McMahon personally
[4] spoke the words "Living Legend"?

[5] **A:** Not on television.

[6] **Q:** Going back to the Royal Rumble 2002, do
[7] you have any knowledge that Ric Flair spoke the words
[8] "Living Legend" during his match with Vince McMahon?

[9] **A:** I don't know.

[10] **Q:** Do you have any personal knowledge that
[11] anyone spoke the words "Living Legend" during Vince
[12] McMahon's match with Ric Flair?

[13] **A:** I don't know that specifically.

[14] **Q:** Do you know, sir, whether Chris Jericho,
[15] Mr. Irvine appearing as the character Chris Jericho,
[16] was involved in Mr. McMahon's match with Mr. Flair in
[17] any way?

[18] **A:** I don't believe he was.

[19] **Q:** Do you know, sir, who Chris Jericho
[20] wrestled at that Royal Rumble?

[21] **A:** Oh, yeah, he was the main event of the
[22] world championship against the Rock.

[23] **Q:** And did you watch that match, sir?

[24] **A:** Parts of it. I fast forward. I invented
[25] matches.

Page 24

[1] **Q:** Sir, do you recall — Strike that.
[2] Would you agree, sir, that Mr. McMahon's
[3] match with Ric Flair was part of a story line going
[4] on at that time?

[5] **A:** Well, I don't know what the WWE story
[6] lines were. I know why Vince wrestled Flair here,
[7] but I don't know what their story line was.

[8] **Q:** What is your understanding, sir?

[9] **A:** Well, Vince McMahon because of who he is
[10] and his television notoriety is probably one of the
[11] biggest stars the WWE has. So Vince McMahon
[12] purposely put himself on the show at the Phillips
[13] Arena in Atlanta to wrestle Ric Flair who for years
[14] and years was known as a WCW kind of southern guy.
[15] So now you had the conflict between Vince McMahon,
[16] the big chief of the north, against Flair, the nature
[17] boy of the south, and it was done specifically
[18] because that was the match that would help draw the
[19] most money possible for the WWE and their buy rate.

[20] **Q:** Were you aware at the time that in the WWE
[21] story line Vince McMahon was being portrayed — Vince
[22] McMahon and Ric Flair were being portrayed as
[23] co-owners of the WWE?

[24] **A:** I remember the time Flair was pretending
[25] to be, you know, one of the owner things, but I don't

Page 25

[1] remember their exact story line.

[2] **Q:** But you generally remember that there was
[3] a time when Ric Flair and Vince McMahon were being
[4] portrayed on air as co-owners of the WWE?

[5] **A:** Something like that. It's kind of
[6] confusing. When they bought WCW, they kind of messed
[7] up the program.

[8] **Q:** To your knowledge, sir — Strike that.
[9] Do you have any knowledge, sir, that Ric
[10] Flair actually was co-owner of the WWE for any time?

[11] **A:** Flair doesn't have any money.

[12] **Q:** So that —

[13] **A:** I mean, no.

[14] **Q:** So to your understanding, sir, that was
[15] just part of the story line?

[16] **A:** Yes, sir.

[17] **Q:** And did anything about that story line
[18] involve Chris Jericho?

[19] **A:** I really don't recall. I mean, I don't
[20] believe so, because Jericho was getting his push as
[21] "the Living Legend" and "The New Undisputed Champion"
[22] against the Rock and then Austin and then for Wrestle
[23] Mania, so.

[24] **Q:** Going back to Chris Jericho's match with
[25] the Rock, which I believe you said you watched

Page 26

[1] portions of. During that performance at the Royal
[2] Rumble 2002, did Mr. Irvine speak the words "Living
[3] Legend"?

[4] **A:** I don't recall if he spoke the words
[5] "Living Legend," but I recall that there was footage
[6] added or something that used the term "the Living
[7] Legend" of a promotional footage.

[8] **Q:** You recall promotional footage?

[9] **A:** Within the Pay-Per-View tape.

[10] **Q:** And do you have any knowledge, sir, how
[11] that promotional footage was put together?

[12] **A:** I don't. You have to ask Mr. Dunn that.

[13] **Q:** Do you have any knowledge, sir, of from
[14] where the audio portion of that footage would have
[15] been taken?

[16] **A:** No.

[17] **Q:** Would it be fair to say, sir, that from
[18] what you saw, Mr. Irvine standing in the arena never
[19] spoke the words "Living Legend"?

[20] **A:** I don't believe he personally did that
[21] night.

[22] **Q:** To your knowledge, sir, did anyone else
[23] speak the words "Living Legend" other than the
[24] promotional video you referred to during the 2002
[25] Royal Rumble?

LARRY WHISTLER          VIDEOTAPE          LARRY WHISTLER, et al. v.
January 27, 2003          DEPOSITION          WORLD RESTLING FEDERATION, et al.

Case 1:02-cv-01008-CC    Document 19    Filed 02/13/03    Page 30 of 131

Page 27

[1]  **A:** I'm not positive.

[2]  **Q:** To your knowledge, sir?

[3]  **A:** I mean to my knowledge, I don't think so.

[4]  **Q:** Do you have any knowledge, sir, of whether

[5] Mr. McMahon personally participated in Chris Jericho

[6] and The Rock's match that night?

[7]  **A:** I don't know. I don't think so.

[8]  **Q:** You're familiar with the term "agent" in

[9] the wrestling business, sir?

[10]  **A:** Yeah.

[11]  **Q:** For the record, can you explain what

[12] "agent" means, what your understanding of "agent"

[13] means?

[14]  **A:** Well, I'm not sure if my definition of a

[15] wrestling agent is the same as how Vince uses them.

[16] I mean I know some guys who are agents, but I don't

[17] know exactly what their responsibilities are as

[18] agents.

[19]  **Q:** However you would describe it, sir?

[20]  **A:** Well, I guess an agent would be somebody

[21] like who was behind the scenes that, from my

[22] understanding, they kind of help the younger guys put

[23] their match together, because the agents are usually

[24] older guys.

[25]  **Q:** Would it be fair to say they script, they

Page 28

[1] put together high points of a match?

[2]  **A:** Yeah, it would be fair to say they help

[3] the guys put together a match that makes sense.

[4]  **Q:** And they communicate the finish of the

[5] match to the talent usually?

[6]  **A:** Sometimes.

[7]  **Q:** Do you have any knowledge that Mr. McMahon

[8] acted as agent for Jericho — Chris Jericho's match

[9] with Rock that night?

[10]  **A:** I wouldn't know what happened behind the

[11] scenes.

[12]  **Q:** You're familiar with the term "promos,"

[13] Mr. Whistler?

[14]  **A:** Uh-huh.

[15]  **Q:** How would you define "promos" for the

[16] record?

[17]  **A:** Well, promos like an interview.

[18]  **Q:** Do you have any information that

[19] Mr. McMahon scripted any promos for Chris Jericho's

[20] performance that night?

[21]  **A:** I wouldn't know. I mean Mr. McMahon hires

[22] writers, so they write and then Vince yeas or nays or

[23] interjects; but I really wouldn't know what happened

[24] that night. They wouldn't let me in the building.

[25]  **Q:** Did you attempt to go to the match?

Page 29

[1]  **A:** No.

[2]  **Q:** So when you said "they didn't let you in

[3] the building," that was just being facetious?

[4]  **A:** They wouldn't have, yes.

[5]  **Q:** Mr. Whistler, would you — do you have any

[6] knowledge of whether Mr. McMahon had any involvement

[7] in putting together the promotional footage that you

[8] referred to earlier that was played during Mr. — the

[9] Chris Jericho-Rock match?

[10]  **A:** I have no knowledge of, you know, that.

[11]  **Q:** Sir, do you have any personal knowledge of

[12] whether Mr. McMahon was paid money for his

[13] performance that night?

[14]  **A:** I don't know anything about Mr. McMahon's

[15] personal accounts.

[16]  **MR. KRASIK:** Let me mark another document.

[17]  (Whistler Exhibit 3 was marked

[18] for identification.)

[19]  **Q:** (By Mr. Krasik) Mr. Whistler, I've marked

[20] these documents that were produced to us by your

[21] attorneys as Whistler Exhibit 3. Take a moment to

[22] look at those.

[23]  Can you tell us what those are, sir?

[24]  **A:** Well, I believe this is the copy of the

[25] cover of the Royal Rumble videotape.

Page 30

[1]  **Q:** And did you purchase this videotape, sir,

[2] yourself?

[3]  **A:** No.

[4]  **Q:** If I could direct your attention to the

[5] second page at the list of matches below the 30 Man

[6] Royal Rumble, the first listed match after the Royal

[7] Rumble reads "Undisputed WWF championship Chris

[8] Jericho versus the Rock" —

[9]  **A:** Right.

[10]  **Q:** — is that accurate?

[11] And sir, is it fair to say that the words

[12] "Living Legend" do not appear anywhere in connection

[13] with that match?

[14]  **A:** Well, I don't see it on this.

[15]  **Q:** On this sheet, okay. And, sir, if you

[16] look at the next listed match, it reads "Street

[17] fight, parenthesis, no DQ," which would refer to

[18] disqualification?

[19]  **A:** Right.

[20]  **Q:** "No count out, close parenthesis, Vince

[21] McMahon versus Ric Flair." Is that accurate?

[22]  **A:** Yes.

[23]  **Q:** And on this sheet in connection with the

[24] listing of this match, is it fair to say that you

[25] don't see the words "Living Legend" anywhere?

LARRY WHISTLER, et al. v.
WORLD WRESTLING FEDERATION, et al.
Case 1:02-cv-01008-CC   Document 19   Filed 02/13/03   Page 31 of 131
VIDEOTAPE
DEPOSITION
LARRY WHISTLER
January 27, 2003

Page 31

[1]  A: No, I don't see them on this.
[2]  Q: And, sir, if you would, would you take a
[3] moment to look at the, this listing as a whole and
[4] could you tell us, please, whether you see the words
[5] "Living Legend" anywhere on the list of matches that
[6] took place that night?
[7]  A: Not on the box, no.
[8]  Q: Thank you, sir.
[9] Earlier, Mr. Whistler, I asked you whether
[10] you had any knowledge whether Mr. McMahon had any
[11] involvement in putting together the promotional
[12] footage that you spoke about. Do you have any
[13] knowledge whether Mr. Irvine/Chris Jericho had any
[14] involvement in putting together that footage?
[15]  A: I wouldn't know.
[16]  Q: Sir, earlier you testified that Vince
[17] McMahon had used the word "Living Legend" on a Smack
[18] Down program you thought was in April 2002?
[19]  A: Well, it was in April. I don't know the
[20] exact date.
[21]  Q: Do you know where that Smack Down taping
[22] was taking place?
[23]  A: Where it was filmed at? I don't recall
[24] offhand.
[25]  Q: And when we were talking about that

Page 32

[1] earlier, you said that was the only instance you
[2] could recall Mr. McMahon speaking the words "Living
[3] Legend" on television. Are there other instances not
[4] on television you're aware of in which Mr. McMahon
[5] spoke those words?
[6]  A: Not on television?
[7]  Q: Not on television.
[8]  A: No. I'm not aware of anything he says in
[9] private or.
[10]  Q: Anything at a live show that you're aware
[11] of?
[12]  A: No. I haven't gone to any live shows.
[13]  Q: And, sir, are you aware of Mr. Irvine as
[14] Chris Jericho using the words "Living Legend" on WWE
[15] television programs?
[16]  A: Am I aware of it? Oh, yeah.
[17]  Q: Could you tell us which ones you're aware
[18] of as you sit here today?
[19]  A: Which specific shows?
[20]  Q: Time period, any specific you can be?
[21]  A: Well, the time period started somewhere
[22] around the middle of December. I mean these are all
[23] on videotapes. In December, January, February and
[24] then into March and then after March. I mean I've
[25] got them all copied on videotapes, all the shows, but

Page 33

[1] he was on Smack Down for a while. Then he moved, you
[2] know, when they did the Raw Smack Down split, then he
[3] moved over to Raw. He might have quit using it by
[4] then. I don't know exactly. All I know is I got
[5] about four and a half months worth of tapes somewhere
[6] around there of all the shows where he used it.
[7]  Q: And can you describe for us, sir — Strike
[8] that.
[9]      Mr. Whistler, do you have any knowledge
[10] that Mr. McMahon was personally involved in any of
[11] those times Mr. Irvine used the words "Living
[12] Legend," spoke the words "Living Legend"?
[13]  A: Say that one more time.
[14]  Q: The question was: Do you have any
[15] knowledge that Mr. McMahon had any involvement in any
[16] of the times Mr. Irvine used or spoke the words
[17] "Living Legend"?
[18]  MR. BRODHEAD: I think I'm going to
[19] object to that being vague as in what
[20] involvement. I mean like moving his lips
[21] or I don't know what you mean by that. I
[22] mean you can answer that, I guess, but to
[23] the extent that you can answer that, but.
[24]  THE WITNESS: Well, I don't know what
[25] happens back stage. I mean I don't know if

Page 34

[1] Vince ever went up to Jericho and said make
[2] sure you go out and say, you know, you are
[3] the Living Legend or not. I don't know
[4] what happens behind or at the production
[5] meetings or, I just was not there. I just
[6] see, you know, what they did on TV.
[7]  Q: (By Mr. Krasik) So you don't have any
[8] personal knowledge of whether Mr. McMahon directed
[9] Chris Jericho to speak the words "Living Legend"?
[10]  A: Well, I don't know if he directed him to
[11] do that.
[12]  Q: And you don't have any personal knowledge
[13] whether Mr. McMahon scripted any promos in which
[14] Chris Jericho spoke the words "Living Legend"?
[15]  A: I don't have any.
[16]  Q: Sir, wouldn't you agree — would you agree
[17] that World Wrestling Entertainment programs are not
[18] broadcast only in Georgia?
[19]  A: Well, they are broadcast all over the
[20] world.
[21]  Q: They are broadcast all over the world, and
[22] the broadcast including the world and all over the
[23] United States; right?
[24]  A: (Witness nods head.)
[25]  Q: And is it fair to say that MTV and TNN are

---

Page 35

[1] basic cable networks?

[2]   A: I guess. I'm not an expert on cable

[3] systems, but yeah.

[4]   Q: Well, sir, don't be too modest, you worked

[5] for a long time for World Championship Wrestling —

[6]   A: Yeah.

[7]   Q: — which was owned by Turner Broadcasting?

[8]   A: You know, but like I said, I was a

[9] wrestler. You know, whether the correct term is

[10] cable or network, I mean it's not CBS or NBC, but.

[11]   Q: You can see it all over the country on

[12] cable?

[13]   A: But — yeah.

[14]   Q: And UPN is a broadcast network you can see

[15] all over the country?

[16]   A: I believe that's even bigger than TNN, I

[17] think.

[18]   Q: So would it be fair to say that WWE

[19] doesn't direct its programs anywhere in particular?

[20]   MR. BRODHEAD: I'm going to object to

[21] the extent that that's calling for a legal

[22] conclusion, I believe, and that's calling

[23] for something that's clearly outside of the

[24] witness's, well, scope of knowledge. I

[25] mean, and I've put my objection, obviously

Page 36

[1] he can answer.

[2]   Q: (By Mr. Krasik) You can answer if you

[3] understand the question.

[4]   A: Okay. The question is what?

[5]   Q: The question was whether you would agreed

[6] that WWE programs aren't directed anywhere in

[7] particular?

[8]   MR. BRODHEAD: Same objections.

[9]   THE WITNESS: They are directed everywhere

[10] specifically. I mean they play in all

[11] states, but they play in all states for one

[12] reason and that is, you know, to take their

[13] money out and ship it up to Connecticut.

[14]   Q: (By Mr. Krasik) They are on at a

[15] particular time and if you want to watch them, you

[16] turn on the TV and they're there; right?

[17]   A: If you want to watch wrestling, it's on

[18] TV.

[19]   Q: And if you get cable television in

[20] Georgia, you can turn on MTV or TNN and get the cable

[21] wrestling shows; right?

[22]   A: Yes.

[23]   Q: And if you have access to Pay-Per-View

[24] programs in Georgia, you can turn on the TV and get

[25] WWE Pay-Per-View shows; right?

Page 37

[1]   A: Well, that's right. Every month, you

[2] know, buy rates, you know, money again is coming out

[3] of Georgia to Connecticut. So every month. With the

[4] Pay-Per-View, whether it's here or not, they are

[5] doing business in Georgia.

[6]   Q: And you could do that if you were sitting

[7] in Nashville for your TNA tapings as well; right?

[8]   A: Yep.

[9]   Q: And, sir, would it be fair to say that

[10] Mr. McMahon does not have a personal broadcast

[11] network?

[12]   A: I don't understand "personal broadcast

[13] network."

[14]   Q: Well, he didn't own a television station

[15] to your knowledge, right?

[16]   A: I don't think he does, but you never know

[17] with Vince.

[18]   Q: To your knowledge, sir, does Chris Irvine

[19] as Chris Jericho have any control over where WWE

[20] programs are seen?

[21]   A: No.

[22]   Q: Would Mr. McMahon have any control over

[23] where WWE programs are seen?

[24]   A: Mr. McMahon has control over everything.

[25]   Q: But you'd agree, sir, it's not his

Page 38

[1] broadcast company; isn't that right?

[2]   A: He doesn't own TNN or UPN. I don't, you

[3] know.

[4]   Q: Do you have any knowledge, sir, that he

[5] would, that Mr. McMahon could restrict the broadcast

[6] of WWE shows in Georgia?

[7]   A: The only way he could restrict any shows

[8] in Georgia is what he would edit off his pretaped

[9] shows.

[10]   Q: And you have personal knowledge of this,

[11] sir?

[12]   A: Well, I don't know what he specifically

[13] does, but what I'm saying is if he showed a show in

[14] Georgia and he didn't want something to show on it,

[15] he could edit it out. So he does have the power to

[16] choose whether he leaves things in or edits things

[17] out. But other than that, I don't know what exactly

[18] he does.

[19]   Q: And if Mr. McMahon were to edit things in

[20] or out, that would be available all over the country?

[21]   A: If he did it on, yeah. You mean if — I

[22] guess. There's a lot of tricks you can do, you know,

[23] on TV.

[24]   Q: Mr. Whistler, earlier you referenced that

[25] Chris Jericho's character spoke the words "Living

---

LARRY WHISTLER, et al. v.
WORLD WRESTLING FEDERATION, et al.
Case 1:02-cv-01008-CC   Document 19   Filed 02/13/03   Page 33 of 131
VIDEOTAPE
DEPOSITION
LARRY WHISTLER
January 27, 2003

Page 39

[1] Legend" on programs between approximately — not
[2] holding you to anything — December and March.
[3] That's December 2001 to March 2002?
[4] A: Yeah, roughly through December and in
[5] through April.
[6] Q: And do you recall, sir, whether other —
[7] excepting/leaving out the Royal Rumble, did any of
[8] those shows take — tape from Georgia?
[9] A: Excluding the Royal Rumble, I mean I don't
[10] know. I know they run the shows in Georgia other
[11] than Atlanta, but I don't recall whether they did any
[12] tapings in Augusta or Macon or Columbus or, you know,
[13] anything like that.
[14] Q: As you sit here today, you don't know?
[15] A: Yeah.
[16] MR. KRASIK: Why don't we take a
[17] five-minute break.
[18] MR. BRODHEAD: Okay.
[19] (A recess was taken.)
[20] Q: (By Mr. Krasik) Mr. Whistler, just to go
[21] back briefly to one thing you said earlier. In
[22] describing your conversation with J.R., Jim Ross, up
[23] at the WWE, I believe you testified that you
[24] presented some ideas to him and he said he would talk
[25] to Vince about them. Did Mr. Ross say anything else

Page 40

[1] during that conversation that you recall?
[2] MR. BRODHEAD: And I think I'm going
[3] to object to this being outside the scope
[4] of —
[5] MR. KRASIK: And as I said, this is
[6] for just the very limited purpose of
[7] nailing down what was said in the
[8] conversation.
[9] MR. BRODHEAD: Right, and how does
[10] that relate to jurisdiction?
[11] MR. KRASIK: Well, it may. I mean
[12] they might use it.
[13] MS. McCOLLOUGH: It depends on what
[14] was said.
[15] MR. BRODHEAD: Okay. I mean, is
[16] that — that's the extent of the question
[17] that we're going into?
[18] MR. KRASIK: (Nods head.)
[19] MR. BRODHEAD: Go ahead.
[20] THE WITNESS: Well, basically, like I said
[21] before, when they started, you know, using
[22] my trademark and my phone started ringing
[23] and, you know, because I'm a professional,
[24] I have been in this so long, bless you, I,
[25] you know, looked on upon it as a perfect

Page 41

[1] situation for a hell of a unique angle,
[2] which means money in the wrestling
[3] business. So I called J.R. and ran it past
[4] him and, you know, all I can say is "I'll
[5] ran it by Vince." And I ran by a couple of
[6] ideas, I'm going to get into all the ideas
[7] because they are good. But, you know, his
[8] response was "Well, I'll run it by Vince,"
[9] which is all J.R. can do, and that was the
[10] last I heard from J.R.
[11] Q: (By Mr. Krasik) And did J.R. say anything
[12] else in the conversation that you recall?
[13] A: No, not really. No. I mean we're usually
[14] a lot more friendly; but after they took the
[15] trademark and I called Jim, you could tell he was
[16] tentative on what he wanted to say because he knew
[17] what they did.
[18] Q: Sir, do you have any knowledge that
[19] Mr. McMahon ever used the words "Living Legend" in a
[20] WWE magazine?
[21] A: Did Mr. McMahon use the words in a
[22] magazine?
[23] Q: Yes.
[24] A: I mean I know in the WWE magazine "the
[25] Living Legend" was used in conjunction with Chris

Page 42

[1] Jericho, but I don't know if it was with Vince.
[2] Q: We'll get to that in one second. The
[3] first question was whether you have any knowledge
[4] that Mr. McMahon in an interview, quote, anything,
[5] used the word "Living Legend"?
[6] A: I have no knowledge.
[7] MR. KRASIK: Let me mark Whistler
[8] Exhibit 4. The documents are produced by
[9] your attorneys in discovery.
[10] (Whistler Exhibit 4 was marked
[11] for identification.)
[12] Q: (By Mr. Krasik) And would you agree this
[13] is the cover and page 10 from the July 2002 World
[14] Wrestling Magazine?
[15] A: It looks like that to me.
[16] Q: Thank you. And sir, for the record, can
[17] you read the reference to "Living Legend" on the
[18] page, 10?
[19] A: "Chris Jericho, 2001, the self-proclaimed
[20] Living Legend was the first to unify the World
[21] Wrestling Federation in WCW world titles."
[22] Q: Does it appear anywhere else on this page?
[23] A: Certainly not that one. The gain, the
[24] rattle snake, the run. No, I don't see it anywhere
[25] else on this page, just Jericho.

**LARRY WHISTLER**
January 27, 2003    Case 1:02-cv-01008-CC    VIDEOTAPE DEPOSITION    Document 19    Filed 02/13/03    Page 34 of 131    **LARRY WHISTLER, et al.** v.
**WORLD WRESTLING FEDERATION, et al.**

Page 43

[1] Q: Other than this page, are you aware as you
[2] sit here today of any other references to "Living
[3] Legend" in any WWE magazines?
[4] A: I don't know about all the magazines. I
[5] know they have been in magazines, but I don't know
[6] exactly or if they were in all the magazines, but
[7] they have been in magazines.
[8] Q: So it's your understanding other magazines
[9] refer to "Living Legend"?
[10] A: Well, we have a copy of one that does
[11] here.
[12] Q: Okay. Well, let's look at that then for a
[13] second, if that would be helpful.
[14] MR. KRASIK: Mark this Whistler
[15] Exhibit 5.
[16] (Whistler Exhibit 5 was marked
[17] for identification.)
[18] Q: (By Mr. Krasik) Is this the other
[19] magazine to which you're referring?
[20] A: Yeah, this is an another one. This is
[21] Inside Wrestling.
[22] Q: And this was another — other documents
[23] produced in discovery, cover page and pages 50
[24] through 53 of Inside Wrestling Magazine.
[25] Sir, to your knowledge, is Inside

Page 44

[1] Wrestling affiliated with World Wrestling
[2] Entertainment?
[3] A: Well, to be honest with you, I'm not sure.
[4] I mean, I think it used to be like a private
[5] magazine. But whether Vince is involved over the
[6] years with them or not, I don't know.
[7] Q: You don't have any knowledge whether it's
[8] affiliated with World Wrestling Entertainment or not?
[9] A: I mean I'm not positive. It could be or
[10] it may not. It might be a private magazine because
[11] there are those too, but I don't know.
[12] Q: As you sit here today, you're not sure?
[13] A: Yeah.
[14] Q: Looking back at Whistler Exhibit 4, which
[15] is the excerpt from the July 2002 World Wrestling
[16] Magazine. Is it fair to say, sir, that the reference
[17] to "Living Legend" here is not a quote of Chris
[18] Irvine or Chris Jericho?
[19] A: Would it be fair to say it's not a quote?
[20] Q: Yes.
[21] A: Well, professionally speaking in terms of
[22] the wrestling business, the wrestling magazines quote
[23] what the stars say on television or what the
[24] announcers say about the stars or how they promote
[25] the stars. Chris Jericho has been promoted as the

Page 45

[1] Living Legend, so whether he specifically said it
[2] here or the guy who sits in the office writing up the
[3] magazine on the magazine staff, you know, would write
[4] it down that way just because that's what is heard on
[5] television.
[6] Q: Sir, is this Chris Jericho speaking on
[7] this page 10 of World Wrestling Magazine?
[8] MR. BRODHEAD: I'm going to object to
[9] the extent the document speaks for itself
[10] and to the extent that it's argumentative
[11] in that I think you're asking him to
[12] contradict the plain language of what's
[13] listed in the document.
[14] Q: (By Mr. Krasik) Is this Chris Jericho
[15] speaking on this page 10?
[16] A: Well, it sounds like somebody in the WWE
[17] magazine is writing about him.
[18] Q: Okay. Is it fair to say this is not an
[19] interview with Chris Jericho on this page 10?
[20] A: It doesn't sound like an interview.
[21] Basically it's the WWE putting it in writing for all
[22] of its fans that Chris Jericho is the self-proclaimed
[23] Living Legend.
[24] Q: Okay.
[25] A: So one way or another, it's a form of

Page 46

[1] advertising Jericho as "the Living Legend."
[2] Q: But all my question was, sir, is very
[3] simple, was, this isn't an interview with Jericho on
[4] this page, is it?
[5] A: It doesn't look like one.
[6] Q: And do you have any knowledge, sir, that
[7] Chris Jericho himself wrote this Evolution of the
[8] Gold article on page 10?
[9] A: I doubt he wrote it.
[10] Q: Do you have any knowledge, sir, that Chris
[11] Jericho was involved in putting together this article
[12] in any way?
[13] A: I don't think so.
[14] Q: Do you have any knowledge, sir, that Chris
[15] Jericho knew this Evolution of the Gold story was
[16] going to be in the World Wrestling Magazine?
[17] A: I don't know what Chris Jericho thinks.
[18] Q: Sir, do you know, personally know what
[19] involvement Vince McMahon — Strike that.
[20] Do you have any personal knowledge that
[21] Vince McMahon has involvement with World Wrestling
[22] Magazine?
[23] A: I'm not sure.
[24] Q: Do you have any personal knowledge that
[25] Vince McMahon has involvement of where World

LARRY WHISTLER, et al.
WORLD WRESTLING FEDERATION, et al.

Case 1:02-cv-01008-CC   Document 19   Filed 02/13/03   Page 35 of 131

VIDEOTAPE
DEPOSITION

LARRY WHISTLER
January 27, 2003

---

Page 47

[1] Wrestling Magazine is distributed?

[2] A: Well, he's not — Vince isn't going to

[3] drive around distributing magazines to, you know, all

[4] the stores. But, you know, Vince hires the

[5] department and makes sure they do their jobs by

[6] getting these magazines every possible place they can

[7] get these magazines.

[8] Q: So Vince as chairman of World Wrestling

[9] Entertainment supervises the people who do the

[10] magazine?

[11] A: Well, yeah.

[12] Q: Is that fair to say?

[13] A: I mean he's hired the people to do the

[14] magazine.

[15] Q: And do you have any knowledge, sir, that

[16] Vince McMahon specifically directed World Wrestling

[17] Magazine to be distributed in Georgia?

[18] A: I don't know. He would not be happy if it

[19] wasn't distributed in Georgia.

[20] Q: It's distributed all over; right?

[21] A: Yes.

[22] Q: As broadly as possible?

[23] A: Anyplace he could make a dollar.

[24] Q: Sir, if I could ask you to, please, look

[25] at Whistler Exhibit 5, the Inside Wrestling Magazine.

Page 48

[1] And if you would, please, take a moment to

[2] familiarize yourself with the article on pages 50

[3] through 53?

[4] A: I cannot end the Living Legend at the same

[5] time. Amazing. Okay. I read it over.

[6] Q: Okay. If you look right above the bold

[7] quote on page 50, would you agree that the writer is

[8] named Dan Murphy?

[9] A: Dan Murphy. Why don't I see it?

[10] Q: I think — let me help you out there.

[11] A: Oh, senior writer. Okay.

[12] Q: Is that accurate?

[13] A: That's what it says.

[14] Q: It says here. Do you know Dan Murphy?

[15] A: No. Not really.

[16] Q: Do you know who he is?

[17] A: No, not really. I mean there's been so

[18] many magazine guys.

[19] Q: You don't recall whether you've ever had a

[20] conversation with Dan Murphy?

[21] A: I don't recall. I do so many radio shows.

[22] Q: Okay. Would you agree, sir, you don't

[23] have any personal knowledge that Chris Jericho, Chris

[24] Irvine as Chris Jericho actually said the things that

[25] are attributed to him here?

Page 49

[1] A: Well, I have personal knowledge that, you

[2] know, of what I read in this article.

[3] Q: You weren't there when he was being

[4] interviewed?

[5] A: But I was not there when he was being

[6] interviewed.

[7] Q: And you didn't hear him actually say these

[8] things; is that right?

[9] A: I didn't hear him actually say these

[10] things.

[11] Q: Sir, in your experience in professional

[12] wrestling, isn't it true that wrestling magazines

[13] sometimes make up interviews?

[14] A: I've never written for a wrestling

[15] magazine. I mean I don't — I don't know. I mean

[16] I've read some things in wrestling magazines that,

[17] you know, that people say I said that I didn't say.

[18] I really don't know.

[19] Q: So in your experience, you're not familiar

[20] with a wrestling magazine making up an interview?

[21] A: I'm not familiar with it. I mean I don't

[22] work with magazines. I do what Jericho does. They

[23] interview me, I say things to put me in my angle

[24] over, like he did here, and then we move on.

[25] Q: Have you heard of wrestling magazines

Page 50

[1] making up interviews with wrestlers?

[2] A: I've never really heard of it. I mean I

[3] never went out of my way to ask anybody, but I have

[4] no knowledge of exactly, you know, what writers do

[5] with wrestling magazines.

[6] Q: Do you have any knowledge, sir, from your

[7] experience in wrestling of wrestling magazines doing

[8] interviews where the talent doesn't know they are

[9] talking to a writer?

[10] A: No. No, because, you know, writers will

[11] make sure the word gets back to the wrestlers that

[12] they are a writer, because they want to get a story

[13] in. Guys, you know, aren't going to stop and just

[14] talk to any fan. They are going to want to make sure

[15] the guy is a writer.

[16] Q: You've never heard of that happening?

[17] A: Never heard of?

[18] Q: That practice happening, a talent talking

[19] to someone, not knowing it was an interview for a

[20] wrestling magazine?

[21] A: Well, I can't speak for all the talent. I

[22] never heard of it.

[23] Q: Okay. And I assume, sir, that you

[24] couldn't — you have no personal knowledge of whether

[25] Mr. Murphy made up this interview here?

LARRY WHISTLER
January 27, 2003

VIDEOTAPE
DEPOSITION

LARRY WHISTLER, et al. v.
WORLD RESTLING FEDERATION, et al.

Page 51

[1] **A:** I have no personal knowledge of Mr. Murphy
[2] whatsoever.
[3] **MR. KRASIK:** Are we on 6?
[4] **MR. BRODHEAD:** I believe so, yes.
[5] **MR. KRASIK:** Would you like me to
[6] mark the box?
[7] **MR. BRODHEAD:** I prefer not. Why
[8] don't you mark the receipt. Or actually,
[9] why don't we just — we can identify that.
[10] Is there a place you want to mark it?
[11] **MR. KRASIK:** We'll mark the
[12] photocopy, but we're looking at the box.
[13] **MR. BRODHEAD:** That's fine.
[14] **MR. KRASIK:** And Plaintiff's counsel
[15] will hold the exhibit.
[16] **MR. BRODHEAD:** Yes.
[17] (Whistler Exhibit 6 was marked
[18] for identification.)
[19] **Q:** (By Mr. Krasik) Sir, I'm marking as
[20] Whistler Exhibit 6 a toy set, the packaging of which
[21] was produced to us in discovery as a black and white
[22] copy, but we're looking at the actual toys here in
[23] the deposition, which are going to be held by
[24] Plaintiff's counsel.
[25] Would you take a moment to look at those.

Page 52

[1] **A:** Okay.
[2] **Q:** And for the record, can you describe the
[3] reference to "Living Legend" that you see on that
[4] product, sir?
[5] **A:** Describe? You mean say what the
[6] advertising is here?
[7] **Q:** Sure.
[8] **A:** It says "I'm a Living Legend."
[9] **Q:** And that's next to a picture?
[10] **A:** It's right on the abdominal muscles of
[11] Chris Irvine.
[12] **Q:** Perfect. And sir, looking at I believe
[13] the upper left corner — I'm sorry, upper right
[14] corner of the product, is it fair to say that's a
[15] product made by a company called JAKKS Pacific?
[16] **A:** I'm not an expert on products, but it says
[17] JAKKS Pacific, Inc. in the corner.
[18] **Q:** And do you have any knowledge, sir, of
[19] JAKKS Pacific's relationship to World Wrestling
[20] Entertainment?
[21] **A:** I have no knowledge of that.
[22] **Q:** You have no knowledge, sir, whether JAKKS
[23] Pacific is a separate corporation?
[24] **A:** I don't know.
[25] **Q:** Or whether World Wrestling Entertainment

Page 53

[1] owns any stake in JAKKS Pacific?
[2] **A:** I wouldn't know that.
[3] **Q:** And do you have any knowledge, sir,
[4] whether Mr. McMahon had any personal involvement in
[5] the design of the packaging of this toy?
[6] **A:** I wouldn't know that.
[7] **Q:** Do you have any knowledge, sir, whether
[8] Mr. Irvine had any personal involvement in the
[9] packaging of this toy?
[10] **A:** I wouldn't know.
[11] **MR. KRASIK:** Let's take a five minute
[12] break. We might be done.
[13] (A recess was taken.)
[14] **Q:** (By Mr. Krasik) Mr. Whistler, for the
[15] record, can you tes— did you personally purchase
[16] this toy product?
[17] **A:** I did not personally purchase this one. I
[18] saw them in Wal-Mart, but I refused to give Vince my
[19] 20 bucks.
[20] **Q:** Or JAKKS Pacific as the case may be?
[21] **A:** Or whatever.
[22] **Q:** I think your counsel represented that they
[23] purchased the product and that the receipt is on the
[24] box and if, just for the record, you can read where
[25] it was purchased, please?

Page 54

[1] **A:** Wal-Mart.
[2] **Q:** Yes, and where? What city? State?
[3] **A:** Let's see. Wal-Mart, manager Charles
[4] Singleton; Douglasville, Georgia.
[5] **Q:** Thank you. Sir, other than his appearance
[6] at the Royal Rumble, which we discussed earlier, and
[7] the broadcast of WW programming, do you have any
[8] knowledge of any other ways that Mr. McMahon
[9] participated and caused the infringement, alleged
[10] infringement of your "Living Legend" mark?
[11] **MR. BRODHEAD:** And objection to the
[12] extent that it calls for a legal
[13] conclusion, but you can answer that.
[14] **THE WITNESS:** Well, yeah, outside of the
[15] Royal Rumble and Mr. McMahon's Smack Down
[16] declaration, I haven't heard him use "the
[17] Living Legend" other, you know, than that.
[18] **MR. KRASIK:** That's the end of the
[19] deposition for today. Mr. Whistler, thank
[20] you for your time.
[21] And we reserve our rights, obviously,
[22] for a deposition on the merits —
[23] **MR. BRODHEAD:** Absolutely.
[24] **MR. KRASIK:** — once this issue is
[25] resolved.

LARRY WHISTLER, et al.  v.                    VIDEOTAPE                    LARRY WHISTLER
WORLD WRESTLING FEDERATION, et al.           DEPOSITION                   January 27, 2003

Case 1:02-cv-01008-CC   Document 19   Filed 02/13/03   Page 37 of 131

Page 55

[1]    MR. BRODHEAD: Thanks.
[2]    MR. KRASIK: Off the record.
[3]      (Deposition concluded at 1:27 p.m.)
[4]      (Pursuant to Rule 30(e) of the
[5] Federal Rules of Civil Procedure and/or
[6] O.C.G.A. 9-11-30(e), the deponent and/or a
[7] party having requested the right to review
[8] the deposition, making corrections and/or
[9] changes and signing, for that purpose the
[10] errata pages have been annexed hereto.)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 56

[1]           INDEX TO EXAMINATIONS
[2]
[3]       Examination            Page
[4]
[5] Examination by Mr. Krasik          3
[6]
[7]
[8]           INDEX TO EXHIBITS
[9]
[10] Whistler
     Exhibit    Description       Page
[11]
       1   First Interrogatories on Personal
[12]        Jurisdiction Issue Submitted by
           Defendants Vince McMahon and Chris
[13]       Irvine                12
[14]   2   Plaintiff's Response to First
       Interrogatories on Personal Jurisdiction
[15]       Issue Submitted by Defendants Vince
           McMahon and Chris Irvine      12
[16]
       3 Cover of the Royal Rumble videotape  29
[17]
       4   Cover and page 10 from the July 2002
[18]       World Wrestling Magazine      42
[19]   5   Cover page and pages 50 through 53
           of Inside Wrestling Magazine  43
[20]
       6   JAKKS Pacific Toy set, the packaging
[21]   which is a black and white copy    51
[22]
         (Original Exhibits 1 through 6 have been
[23] attached to the original transcript.)
[24]
[25]

LARRY WHISTLER
January 27, 2003

Case 1:02-cv-01008-CC

VIDEOTAPE
DEPOSITION

Document 19    Filed 02/13/03    Page 38 of 131

LARRY WHISTLER, et al.    v.
WORLD RESLTING FEDERATION, et al.

Page 57

[1]
[2]                    **CERTIFICATE**
[3]
[4]
[5]              **STATE OF GEORGIA:**
[6]              **COUNTY OF FULTON:**
[7]     I hereby certify that the foregoing
[8] transcript was taken down, as stated in
[9] the caption, and the questions and answers
[10] thereto were reduced to typewriting under
[11] my direction; that the foregoing pages 1
[12] through 55 represent a true, complete, and
[13] correct transcript of the evidence given
[14] upon said hearing, and I further certify
[15] that I am not of kin or counsel to the
[16] parties in the case; am not in the regular
[17] employ of counsel for any of said parties;
[18] nor am I in anywise interested in the result
[19] of said case.
[20]     This, the 28th day of January, 2003.
[21]
[22]
[23]     COLLEEN B. SEIDL, CCR-B-1113
     My commission expires on the
[24] 7th day of October, 2006.
[25]

Page 58

[1]          COURT REPORTER DISCLOSURE

[2] DEPOSITION OF.  LARRY WHISTLER

[3]     Pursuant to Article 8.B. of the Rules and
    Regulations of the Board of Court Reporting of the

[4] Judicial Council of Georgia which states: "Each court
    reporter shall tender a disclosure form at the time

[5] of the taking of the deposition stating the
    arrangements made for the reporting services of the

[6] certified court reporter, by the certified court
    reporter, the court reporter's employer, or the

[7] referral source for the deposition, with any party to
    the litigation, counsel to the parties or other

[8] entity.  Such form shall be attached to the
    deposition transcript," I make the following

[9] disclosure:

    I am a Georgia Certified Court Reporter.  I am

[10] here as a representative of Brown Reporting, Inc.
    Brown Reporting was contacted by the offices of

[11] Chorey, Taylor & Feil to provide court reporting
    services for the deposition.  Brown Reporting will

[12] not be taking this deposition under any contract that
    is prohibited by O.C.G.A. 15-14-37(a) and (b).

[13]     Brown Reporting has no contract/agreement to
    provide reporting services with any party to the

[14] case, any counsel in the case, or any reporter or
    reporting agency from whom a referral might have been

[15] made to cover this deposition.  Brown Reporting will
    charge its usual and customary rates to all parties

[16] in the case, and a financial discount will not be
    given to any party to this litigation.

[17]

[18] /s/ Colleen B. Seidl, CCR-B-1113     1/27/03

[19] Signature of attorneys present:     Date:

[20] /s/

[21] /s/

[22] /s/

[23] /s/

[24] Return this form after review and/or signatures to
    the court reporter for inclusion in the record.

[25] Please use reverse side for additional signatures.

LARRY WHISTLER, et al., v.
WORLD WRESTLING FEDERATION, et al.
Case 1:02-cv-01008-CC   Document 19   Filed 02/13/03   Page 39 of 131
VIDEOTAPE
DEPOSITION
LARRY WHISTLER
January 27, 2003

Page 59

[1]        DEPOSITION OF LARRY WHISTLER/CBS
[2]     I do hereby certify that I have read all
questions propounded to me and all answers given
[3] by me on the 27th day of January, 2003, taken before
Colleen B. Seidl, and that:
[4]
        1)  There are no changes noted.
[5]     2)  The following changes are noted:
[6]    Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
[7] Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
[8] make shall be entered upon the deposition...with a
statement of the reasons given...for making them.
[9] Accordingly, to assist you in effecting corrections,
please use the form below:
[10]
[11] Page No.     Line No.     should read:
[12]
[13] Page No.     Line No.     should read:
[14]
[15] Page No.     Line No.     should read:
[16]
[17] Page No.     Line No.     should read:
[18]
[19] Page No.     Line No.     should read:
[20]
[21] Page No.     Line No.     should read:
[22]
       Page No.     Line No.     should read:
[23]
[24] Page No.     Line No.     should read:
[25]

Page 60

[1]        DEPOSITION OF LARRY WHISTLER/CBS
[2] Page No.     Line No.     should read:
[3]
[4] Page No.     Line No.     should read:
[5]
[6] Page No.     Line No.     should read:
[7]
[8] Page No.     Line No.     should read:
[9]
[10] Page No.     Line No.     should read:
[11]
[12] Page No.     Line No.     should read:
[13]
[14] Page No.     Line No.     should read:
[15]
[16] Page No.     Line No.     should read:
[17]
[18] Page No.     Line No.     should read:
[19]
[20] Page No.     Line No.     should read:
[21]
[22] Page No.     Line No.     should read:
[23]
[24] Page No.     Line No.     should read:
[25]

Page 61

[1]        DEPOSITION OF LARRY WHISTLER/CBS
[2] Page No.     Line No.     should read:
[3]
[4] Page No.     Line No.     should read:
[5]
[6] Page No.     Line No.     should read:
[7]
[8] Page No.     Line No.     should read:
[9]
[10] Page No.     Line No.     should read:
[11]
[12] Page No.     Line No.     should read:
[13]
[14] Page No.     Line No.     should read:
[15]
[16] Page No.     Line No.     should read:
[17]
[18] Page No.     Line No.     should read:
[19]
[20] Page No.     Line No.     should read:
[21]
[22] Page No.     Line No.     should read:
[23]
[24] Page No.     Line No.     should read:
[25]

Page 62

[1]        DEPOSITION OF LARRY WHISTLER/CBS
[2] Page No.     Line No.     should read:
[3]
[4] Page No.     Line No.     should read:
[5]
[6] Page No.     Line No.     should read:
[7]
[8] Page No.     Line No.     should read:
[9]
[10] Page No.     Line No.     should read:
[11]
[12] Page No.     Line No.     should read:
[13]
[14] If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
[15] deposition.
[16]
[17]        LARRY WHISTLER
[18] Sworn to and subscribed before me,
    this the        day of        , 20   .
[19]
[20] Notary Public
    My commission expires:
[21]
[22]
[23]
[24]
[25]

**Lawyer's Notes**





DEFENDANT'S
EXHIBIT





# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

Page 1

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
 3                         ATLANTA DIVISION
                                       )
 4    LARRY WHISTLER a/k/a             )
      LARRY ZBYSZKO a/k/a              )
 5    THE LIVING LEGEND,               )
      an individual,                   )
 6                    Plaintiff,       )
                                       )         Civil Action
 7                                     )         No. 1-02-CV-1008
              v.                       )
 8                                     )
      WORLD WRESTLING FEDERATION       )
 9    ENTERTAINMENT, INC., a           )
      Connecticut Corporation,         )
10    VINCE MCMAHON, an individual, )
      CHRIS IRVINE a/k/a CHRIS         )
11    JERICHO, a/k/a JERICHO, an       )
      individual,                      )
12                                     )
                      Defendants.      )
13    ----------------------------)
14                          Day, Berry & Howard, LLP
                            One Canterbury Green
15                          Stamford, Connecticut 06901
16                          January 29, 2003
                            3:30 p.m.
17
18        DEPOSITION OF DEFENDANT, VINCE MCMAHON, pursuant
19   to Agreement, taken at the above place, date and
20   time, before Dawn Tedesco, a Registered Professional
21   Reporter and Notary Public within and for the State
22   of Connecticut.
23
24                     SULLIVAN REPORTING
                       388 Tarrytown Road
25               White Plains, New York 10607
                      (914) 949-4545
```

Page 2

1
APPEARANCES
2
3
LAW OFFICES OF BEN C BRODHEAD
4    Attorney for Plaintiff
     235 Peachtree Street
5    Atlanta, Georgia 30303
6
7  MYERS & KAPLAN
   Intellectual Property Law, L L C
8    Attorneys for Plaintiff
     1827 Powers Ferry Road
9    Building 3, Suite 200
     Atlanta, Georgia 30339
10 BY   JOEL D MYERS, ESQ
11
   KIRKPATRICK & LOCKHART, LLP
12   Attorneys for Defendants
     Henry W  Oliver Building
13   535 Smithfield Street
     Pittsburgh, Pennsylvania 15222
14 BY   CURTIS B KRASIK, ESQ
15
16
17 ALSO   PRESENT
18 Michael Bennett, Videographer
19
20
21
22
23
24
25

Page 3

1           Proceedings
2        THE VIDEOGRAPHER:  We are now on the
3   record beginning, approximately 3:29 p.m.,
4   January 29th, 2003.
5        This is the deposition of Vince
6   McMahon in the matter of Larry Whistler a/k/a
7   Larry Zbyszko a/k/a The Living Legend, an
8   individual. Plaintiff versus World Wrestling
9   Federation Entertainment, Inc. a Connecticut
10  Corporation, Vince McMahon, an individual,
11  Chris Irvine a/k/a Chris Jericho, a/k/a
12  Jericho, an individual, Defendants, in the
13  United States District Court for the Northern
14  District of Georgia. Atlanta Division, civil
15  action No. 1-02-CV-1008.
16       The location at which this deposition
17  is being taken is the offices of Day, Berry &
18  Howard, located at One Canterbury Green in
19  Stamford, Connecticut.
20       Present along with Mr. McMahon are the
21  stenographic reporter Dawn Tedesco, and
22  currently speaking, the videographer Michael
23  Bennett, with Sullivan Reporting, 388
24  Tarrytown Road, White Plains, New York.
25       Would counsel please identify

Page 4

1            Proceedings
2   themselves.
3        MR  BRODHEAD:  This is Ben Brodhead
4   for the Plaintiff Larry  Whistler.
5        Along with me is Joel Myers for the
6   Plaintiff Larry Whistler.
7        MR. KRASIK:  Kurt Krasik of
8   Kirkpatrick & Lockhart, counsel for World
9   Wrestling Entertainment. Inc., Vince McMahon
10  and Chris Irvin.
11       THE VIDEOGRAPHER:  And would the
12  reporter please swear in the witness.
13  VINCE MCMAHON, a Defendant herein, having been first
14  duly sworn by a Notary Public within and for the
15  State of Connecticut, was examined and testified as
16  follows:
17  EXAMINATION BY MR. BRODHEAD:
18       MR. BRODHEAD:  At the outset, can we
19  make the agreement that WWE references WWE
20  and WWF just for convenience, or would you
21  prefer a, those to be split up?
22       MR. KRASIK:  WWE is the current name
23  of World Wrestling Federation Entertainment.
24  Inc.
25       MR. BRODHEAD:  So it would be agreed

Page 5

1            Vince McMahon
2   that any reference to WWE includes the
3   predecessor name?
4        MR. KRASIK:  That's correct.
5        MR. BRODHEAD:  This is the deposition
6   of Vince McMahon taken pursuant to Federal
7   Rules of Civil Procedure as for purposes of
8   Cross-Examination and discovery, and all of
9   the purposes permissible under the Federal
10  Rules of Civil Procedure.
11       The objections, with the exception of
12  the form of the question and responsiveness
13  of the answer, are reserved until the time of
14  use of the deposition.
15       The deposition is by agreement of
16  counsel. And all formalities such as notice,
17  time and place of taking and filing are
18  hereby waived provided that all those
19  stipulations are acceptable.
20       MR. KRASIK:  Agreed.
21    Q.    Would you please state your name for
22  the record?
23    A.    Vincent Kennedy McMahon.
24    Q.    Have you ever given a deposition
25  before?

2 (Pages 2 to 5)

Page 6

1              Vince McMahon
2     A.    Yes, I have.
3     Q.    How many times have you given a
4  deposition?
5     A.    I don't recall exactly the number of
6  times.
7     Q.    Would you say it's more or less than
8  10?
9     A.    Yes, more.
10    Q.    More or less than 50?
11    A.    Probably less.
12    Q.    So you're familiar with the process?
13    A.    Yes.
14    Q.    And as I notice, you are using verbal
15 responses, and I would ask you to use verbal
16 responses because although we are on video, an
17 uh-huh or uh-uh, or shaking of the head may not be
18 translated properly on paper; is that acceptable?
19    A.    Yes, it is.
20    Q.    Will you also agree with me that if
21 one of my questions is not understood by you, you
22 will tell me?
23    A.    Yes.
24    Q.    Are you currently under the influence
25 of any drugs or alcohol?

Page 7

1              Vince McMahon
2     MR. KRASIK: Objection.
3     A.    No.
4     Q.    Is there anything that would prevent
5  you from truthfully and completely answering my
6  questions today?
7     A.    Nothing.
8     Q.    Have you been known by any other names
9  other than Vince McMahon?
10    A.    Yes.
11    Q.    What other names have you been known
12 by?
13    A.    Before I was 12, I was Vince Lupton,
14 L-U-P-T-O-N, living with a stepfather who never
15 adopted me.
16    Q.    Since the age of 18, have you been
17 known by any names other than Vince McMahon?
18    A.    No.
19    MR. KRASIK: I'm not sure what
20 relevance this has to the jurisdiction issue,
21 but the answer is no.
22    A.    No.
23    Q.    What's your current address?
24    MR. KRASIK: He stated the business
25 address. He'll state it again.

Page 8

1              Vince McMahon
2     MR. BRODHEAD: Okay. This is also
3  about personal jurisdiction, personal
4  address, obviously goes to personal
5  jurisdiction, that's why I'm asking for his
6  personal address.
7     MR. KRASIK: If you would --
8     A.    I live in Connecticut.
9     MR. KRASIK: That's fine.
10    A.    I reside in Connecticut. My only
11 permanent address is in Connecticut. How's that?
12    Q.    That's fine.
13    MR. BRODHEAD: I think we're entitled
14 to the actual address. This is done pursuant
15 to a confidentiality agreement. I have no
16 interest in the address.
17    MR. KRASIK: Mr. McMahon is a public
18 figure. I think he would prefer not to give
19 his personal information, such as his
20 personal address. I can't see the relevance
21 of what his specific address is.
22    MR. BRODHEAD: Well, we could resolve
23 this by --
24    A.    I have no problem. 14 Hurlingham
25 Drive in Greenwich, Connecticut.

Page 9

1              Vince McMahon
2     Q.    Zip code?
3     A.    I don't know the zip code.
4     Q.    Okay. How long have you been at that
5  address?
6     A.    About 15 years.
7     Q.    And if you would, I just want to make
8  sure it gets taken down on the record: State your
9  work address.
10    A.    1241 East Main Street in Stamford,
11 Connecticut.
12    Q.    How long have you been at that
13 address?
14    A.    Approximately 10 years.
15    Q.    What's your current employment?
16    A.    My current employment?
17    Q.    What is your job?
18    A.    My job? I'm the Chairman of the Board
19 of Titan Entertainment, World Wrestling
20 Entertainment.
21    Q.    Did you say Titan Entertainment?
22    A.    It's really World Wrestling
23 Entertainment. It's formerly known as Titan. We've
24 had a couple of former names.
25    MR. KRASIK: And we can agree that the

3 (Pages 6 to 9)

Page 10

1 Vince McMahon
2 WWE refers to all former names?
3 MR. KRASIK: Yes.
4 THE WITNESS: Yes, we can.
5 Q. Okay. And as Chairman of the Board,
6 what do your duties entail?
7 A. Basically, overseeing all of the
8 entire operations.
9 Q. Are you compensated for that job?
10 A. Yes, I am.
11 Q. You also perform as a wrestler for WWE
12 from time to time?
13 A. Yes, I do.
14 Q. Do you receive compensation for your
15 performance as a wrestler?
16 A. Separate than that from Chairman?
17 Q. Yes, separate from being Chairman.
18 A. I'm not exactly sure how that's set
19 up. I think I do.
20 Q. Do you know if there is a contract
21 between you and WWE for your appearances as a
22 wrestler for WWE?
23 A. There could very well be. I'm not
24 certain.
25 MR. BRODHEAD: Is that something that

Page 11

1 Vince McMahon
2 could be produced provided that it exists?
3 MR. KRASIK: We'll take a look for it.
4 MR. BRODHEAD: Can you write down the
5 items that we're requesting?
6 MR. MYERS: Sure.
7 (Production request for contract
8 between Mr. McMahon and WWE for appearing as
9 a wrestler indexed.)
10 Q. How many employees are there of WWE?
11 A. Approximately, 400.
12 Q. As the Chairman of the Board, do you
13 have the authority to fire employees, if you want
14 to?
15 A. Sure.
16 Q. As Chairman of the Board, can you
17 override the decision of any other employee of WWE?
18 A. Yes.
19 MR. KRASIK: Objection.
20 Q. Do you own any residences in the State
21 of Georgia?
22 A. No.
23 Q. Do you own any property in the State
24 of Georgia?
25 A. No.

Page 12

1 Vince McMahon
2 Q. Do you own any businesses in the State
3 of Georgia?
4 A. No.
5 Q. Do you own any part of any businesses
6 in the State of Georgia?
7 A. No.
8 Q. Do you own any vehicles registered in
9 the State of Georgia?
10 A. No.
11 Q. Have you ever personally been in the
12 State of Georgia?
13 A. Yes.
14 Q. Have you ever entered into any
15 contracts in Georgia?
16 MR. KRASIK: Objection. I think it
17 calls for a legal conclusion, but to the
18 extent that you understand, you can answer
19 that.
20 A. I'm not certain. We bought Georgia
21 Championship Wrestling at one time years ago, but I
22 don't know if that was, if that was, if that fits
23 your criteria or not.
24 Q. That would.
25 Do you know of any other contracts

Page 13

1 Vince McMahon
2 that WWE— sorry, that you personally have signed
3 in Georgia?
4 MR. KRASIK: Let me object. I think
5 when Mr. McMahon said "we bought," it was not
6 necessarily he personally.
7 A. No. We're talking about the
8 corporate, the company?
9 Q. That's correct. That's why I'm
10 correcting the question so it would be clear: Have
11 you personally signed any contracts in Georgia?
12 A. No.
13 Q. Do you know who would have signed the
14 contract for the purchase of Georgia Championship
15 Wrestling?
16 A. I might have in my official capacity
17 at the company.
18 Q. Do you know if you would have
19 personally signed any other agreements in Georgia?
20 MR. KRASIK: Objection. That
21 mischaracterizes what he said.
22 MR. BRODHEAD: But it's a new
23 question. I'm asking does he know of any
24 contracts.
25 MR. KRASIK: You said any other

4 (Pages 10 to 13)

Page 14

1      Vince McMahon
2   contracts in Georgia. Mr. McMahon said he
3   may have signed the contract, but that's not
4   necessarily true.
5      MR. BRODHEAD:  Agreed.
6      Q.  Do you know of any contracts with
7   exclusion of the reference to the one for Georgia
8   Championship Wrestling that you might have signed in
9   the State of Georgia?
10     A.  No.
11     Q.  When was the last time you were in
12  Georgia?
13     A.  A couple of months ago.
14     Q.  What was the purpose of that visit?
15     A.  A television taping.
16     Q.  And what was the TV taping for?
17     A.  Either RAW or SmackDown, I don't
18  recall which.
19     Q.  And both RAW and SmackDown are
20  broadcast shows of WWE?
21     A.  Yes.
22     Q.  Were you appearing there as a wrestler
23  two months ago?
24     A.  I don't think so.
25     Q.  Do you know how many times you've been

Page 15

1      Vince McMahon
2   to the State of Georgia?
3      A.  Since when?
4      Q.  Since ever.
5      A.  Since ever?
6      Q.  I mean, has it been tens of times,
7   hundreds of time?
8      A.  No, tens.
9      Q.  So you would assume less than 100
10  times in your life?
11     A.  Oh, yes.
12     Q.  Less than 50 times in your life?
13     A.  Yes.
14     Q.  Less than 20 times?
15     A.  Probably, somewhere in that
16  neighborhood.
17     Q.  Do you have any regularly planned
18  trips that you go to Georgia every year?
19     A.  No. By that, do you mean personally
20  or professionally?
21     Q.  Well, actually, personally or
22  professionally at this point.
23     A.  From a personal standpoint, no. From
24  a professional standpoint, Atlanta is a major
25  metropolitan area in which our company would play

Page 16

1      Vince McMahon
2   sometimes television, sometimes house shows, but
3   probably would hit Georgia or Atlanta at least once
4   a year as a regular scheduled stop along our
5   television production path, in which, chances are, I
6   would be there for that.
7      MR. KRASIK:  To clarify, when you say
8   "trips," do you mean vacations?
9      MR. BRODHEAD:  No, I mean any time you
10  would have entered Georgia.
11     Q.  And I think that was included in your
12  response; is that correct?
13     A.  That's correct.
14     Q.  With the exception of work that you've
15  done in Georgia as a wrestler, or work that you've
16  done in association with WWE, have you done any
17  other work in the State of Georgia?
18     A.  No.
19     Q.  Did you work in Georgia on January
20  20th of 2002, which was the date of the Royal
21  Rumble?
22     A.  Yes.
23     Q.  Did you work there as a wrestler?
24     A.  Yes. I did.
25     Q.  And did you work there in your

Page 17

1      Vince McMahon
2   capacity as Chairman of the Board of WWE, as well?
3      A.  Of course.
4      Q.  Were you compensated separately from
5   your salary as Chairman of the Board for your
6   appearance as a wrestler on the Royal Rumble on
7   January 20th, 2002?
8      A.  I think you asked me that question
9   earlier, and I responded the same way I will respond
10  at this time:  I'm not certain if there is a
11  separate contract or not that separates my
12  personality pay -- you call it wrestler pay -- with
13  that of my function as Chairman of the Board.  So
14  I'm not certain of that same answer to the same
15  question.
16     Q.  Okay.  Is it generally referred to as
17  personality pay in the industry?
18     A.  No.
19     Q.  Is it referred to as anything other --
20     A.  Wrestler is fine.  You know, it's just
21  that I don't wrestle that often, but I'm generally a
22  television personality sometimes, which it doesn't
23  always mean that I'm wrestling.  But I'm fine with
24  your term, making it a determination as a wrestler.
25     Q.  Well, actually, that leaves me that I

5 (Pages 14 to 17)

Page 18

Vince McMahon

1       Vince McMahon
2   need to expand the question, as well.
3           So when you do appear — tell me all
4   the capacities that you might appear -- well, I
5   guess I'll just leave it at that. Tell me all the
6   capacities you may appear, by that I mean, we
7   described Chairman of the Board of WWE, as a
8   wrestler and as a TV personality. Are there any
9   other capacities?
10      A.   Let me clarify those for you because
11  you're mixing it up.
12          As the Chairman of the Board, that has
13  nothing to do with anything that's my television
14  personality.  I have a character known as
15  Mr. McMahon on television, who is, in fact, the
16  owner, although it's a public company, and I don't
17  own -- it's a public company, but nonetheless, my
18  character is the portrayal of one who is a very
19  dogmatic, egotistical owner who throws his weight
20  around quite a bit.  Sometimes that personality role
21  sometimes will lead to a match.
22          MR. KRASIK:  I object to the form of
23  that last question.
24      Q.   Is it correct that you have, in fact,
25  trademarked the name Vince McMahon?

Page 19

Vince McMahon

1       Vince McMahon
2           MR. KRASIK:  Objection.  Who are you
3   speaking of, Vince, personally, or the
4   company?
5           MR. BRODHEAD:  Well, actually, I'll
6   speak of Vince, personally.
7       Q.   Have you personally trademarked your
8   name Vince McMahon?
9       A.   I don't know.
10      Q.   Has the company WWE trademarked your
11  name?
12      A.   I don't know.
13      Q.   And actually, by that I mean
14  trademarked the name Vince McMahon, which I assume
15  is the same answer; that you don't know?
16      A.   I don't know.
17          MR. BRODHEAD:  If you could mark this
18  as McMahon 1.
19          (McMahon Exhibit 1, copy of cover of
20  the Royal Rumble video, was marked for
21  identification as of this date.)
22          MR. BRODHEAD:  Let the record reflect
23  I'm showing the deponent what's been marked
24  as McMahon 1.
25      Q.   Would you take a look at that, both

Page 20

Vince McMahon

1       Vince McMahon
2   pages.
3       A.   Okay.
4           (Witness complies.)
5       Q.   Do you recognize that as the, as a
6   copy of the cover of the Royal Rumble video?
7       A.   No, I wouldn't recognize that.  I've
8   seen this before, but I don't know if it's the cover
9   of the Royal Rumble video or not.
10      Q.   In what context have you seen that
11  before?
12      A.   This was our Pay-Per-View poster,
13  which can be used for multiple things.  And if you
14  tell me this poster was used for the cover of our
15  video, I'll accept that.
16      Q.   Okay.  If you look at the second page,
17  please.  About in the middle it says "Street fight,
18  no DQ, no count out."  And it has "Vince McMahon TM
19  versus Rick Flair TM."  Do you see that portion?
20      A.   Yes, I do.
21      Q.   Do you know what the "TM" stands for
22  next to your name?
23      A.   It seems to be next to everyone's
24  name, doesn't it?
25      Q.   Yes.

Page 21

Vince McMahon

1       Vince McMahon
2       A.   I guess trademark, but --
3       Q.   Are you familiar with what a trademark
4   is?
5       A.   Yes, I am.
6       Q.   Have you ever been involved in
7   securing trademarks for any names?
8           MR. KRASIK:  By "you," who are you
9   referring to?
10          MR. BRODHEAD:  Well, I'm actually
11  referring to him, personally.
12      A.   Me, personally?
13      Q.   Yes.
14      A.   Have I ever trademarked some name
15  personally?  No.  The answer is no.
16      Q.   Have you ever as the Chairman or as an
17  employee of WWE made efforts to have a name
18  trademarked?
19      A.   I'm sure we have.
20      Q.   Okay.  And I think I need to restate
21  that question.
22          Your response was "I'm sure we have."
23          My question actually to you was:  In
24  your capacity, have you in your capacity as
25  Chairman, or any other employee of WWE, ever

6 (Pages 18 to 21)

Page 22

```
1              Vince McMahon
2   assisted in obtaining trademarks?
3       A.   I'm not an attorney, much less a
4   trademark one, so I wouldn't be doing that in any
5   capacity. That's not my job.
6            But in terms of protecting our
7   intellectual properties. I would expect those that
8   are charged with, with protecting WWE intellectual
9   properties would do their jobs.
10      Q.   Who makes the decision regarding what
11  names will be trademarked and which names will not
12  be trademarked?
13      A.   I guess that would be a legal, a legal
14  discussion.
15      Q.   Have you in your capacity as an
16  employee of WWE ever suggested that a particular
17  name be trademarked?
18      A.   Again, if we put someone on our air,
19  and they have a name, then hopefully, we will be
20  protected in whatever way we should be protected.
21  I'm not an attorney. It's just a normal course of
22  doing business. Someone comes on our air,
23  naturally, you want to protect your intellectual
24  property in whatever way you can, or sometimes you
25  cannot do. We do the best we can.
```

Page 23

```
1              Vince McMahon
2       Q.   I apologize for asking this again, but
3   I'm really looking for your conduct in this matter.
4            I understand that WWE would take
5   efforts to protect its trademark and protect its
6   intellectual property.
7            My question was with regard to your
8   conduct as a representative or employee of WWE, have
9   you ever directed that a particular name be sent
10  through the process to become trademarked?
11      A.   In generalities, as a part of the
12  creative process we come up with a number of names,
13  not just about individuals. For instance, Royal
14  Rumble. That's a name of a Pay-Per-View. And
15  hence, the name of a video that follows the
16  Pay-Per-View, et cetera.
17           So when I come up with, or whomever
18  comes up with a name, it would go through a normal
19  process. Chances are, I would not specifically say
20  to our trademark guys, "Hey, go trademark this."
21  Because once we come up with it, and once we start
22  to use it, the normal process is that the legal
23  folks do their jobs.
24           Whether or not I personally have said
25  something about go, make sure this one particular
```

Page 24

```
1              Vince McMahon
2   name is trademarked or not, I can't remember. It's
3   not anything that I would under normal circumstances
4   do.
5       Q.   Okay. Are you familiar with an
6   individual named Chris Irvine?
7       A.   Yes.
8       Q.   How do you know him?
9       A.   He's one of the WWE Superstars. Not
10  known by that name.
11      Q.   And what is a WWE Superstar?
12      A.   It's an individual who has achieved a
13  certain level of stardom as a performer under our
14  umbrella.
15      Q.   Under what name has Mr. Chris Irvine
16  achieved that level of stardom?
17      A.   As Chris Jericho.
18      Q.   How long have you known Mr. Irvine?
19      A.   Time flies, I don't know, six years,
20  you know, something like that.
21      Q.   Is Mr. Irvine an employee of WWE?
22      A.   He's an independent contractor, I
23  believe.
24      Q.   Do you know if he would have signed
25  the independent contractor agreement with
```

Page 25

```
1              Vince McMahon
2   Mr. Irvine?
3       A.   If I would have?
4       Q.   Yes, if you personally would have?
5       A.   I don't recall.
6            Jim Ross is in charge of talent
7   relations. It could very well have been Jim Ross
8   who signed it.
9            MR. BRODHEAD: I would also like a
10  copy of that independent contractor
11  agreement, if that is acceptable.
12           MR. KRASIK: We'll take that under
13  advisement.
14           (Production request for copy of
15  independent contractor agreement indexed.)
16      Q.   Have you ever signed an independent
17  contractor agreement with a, with any individual who
18  was a wrestler for WWE?
19           MR. KRASIK: Object. I'm not sure
20  what that has to do with jurisdiction, what
21  it really has to do with this case, but if
22  you can answer.
23      A.   If I ever signed a contract with one
24  of our performers?
25      Q.   An independent contractor contract
```

7 (Pages 22 to 25)

Page 26

Vince McMahon

1  with one of your performers, yes.
2      A.   I believe all of our contracts are
3  with independent contractors. And I could very well
4  have signed a number of them, especially in the
5  earlier days. I don't make a habit of signing them
6  these days, but I could very well have.
7      Q.   Do you know if Chris Irvine performed
8  in Atlanta at the Royal Rumble on January 20th of
9  2002?
10     A.   Let me just look here. I think he
11 did, yes.
12         MR. KRASIK: This isn't a memory test,
13     right?
14         MR. BRODHEAD: It is not a memory
15     test.
16     A.   Yes.
17     Q.   Was there a point in time when Chris
18 Irvine's character became the champion of the WWE?
19     A.   Yes.
20     Q.   Do you know what event that was at?
21     A.   It was not this event, I don't
22 believe.
23     Q.   Do you know what event it was?
24     A.   I'm sorry, I can't remember.

Page 27

Vince McMahon

1      Q.   Okay. Do you know what character
2  Chris Irvine used when he wrestled on January 20th,
3  2002 in Atlanta?
4      A.   What character he used?
5          MR. KRASIK: Objection.
6      Q.   I'm sorry, what character name?
7      A.   Chris Jericho.
8      Q.   And character name, is that a proper
9  term within the industry, if I say "character name"?
10     A.   Yes, sure.
11     Q.   Would you tell us what a character
12 name is?
13     A.   The character name is the name of the
14 television personality, and not necessarily the name
15 of the actual human being playing the part of that
16 personality. In this case, Chris Jericho is the
17 personality. Chris Irvine is the human being who
18 plays that part.
19     Q.   What's the purpose of using a
20 character name?
21     A.   Stage names, sometimes -- this name
22 actually came to us. It was not anything that we
23 had invented, because Jericho was working at WCW as
24 Chris Jericho. He was known as Chris Jericho. So

Page 28

Vince McMahon

1  there was no reason for us -- although we reserved
2  the right, there was no reason for us to change the
3  name when he came here.
4      Q.   Is there an approval process that an
5  individual has to go through before a specific
6  character name is used?
7      A.   An approval process?
8      Q.   Does WWE approve character names?
9      A.   Yes, there's a whole legal process
10 which you go through before names are approved.
11     Q.   What's the legal process that is gone
12 through before names are approved?
13     A.   There is a search, for instance, going
14 back to whether it's an individual name or the name
15 of a Pay-Per-View like Royal Rumble. Our legal
16 people will do a search and tell us whether or not,
17 in their legal opinion, it will "clear" legally, and
18 if it does or whatever encumbrances there may be,
19 and what areas there may be problems, or it's
20 totally clear, go about and register it. That's the
21 preliminary.
22         And then you go for some sort of
23 formal thing, and you may or may not run into more
24 problems there.

Page 29

Vince McMahon

1      Q.   Does the WWE enter into an agreement,
2  or is there any document that authorizes an
3  individual to use a particular character name?
4          MR. KRASIK: Objection to form. Do
5      you understand the question?
6      A.   Sometimes our contracts are signed,
7  obviously by the human being that is playing the
8  part, but sometimes the part changes. We have
9  performers be four or five different personalities
10 with four or five different names going forward.
11 And each time that occurs, it's legal's
12 responsibility to make sure that, that that is okay
13 legally. And secondly, that proper releases are
14 done with the talent.
15     Q.   Do you have personally any input on
16 how your talent, or what character name your talent
17 might use?
18     A.   Sometimes I do, yes.
19     Q.   What's the extent of your input? I
20 mean, what's the most extent you've had, the most
21 input you've had?
22     A.   The most input I've had?
23     Q.   Well, such as, an example would be
24 coming up with a name, name and then telling an

8 (Pages 26 to 29)

Page 30

Vince McMahon

1
2  individual that that would be the name that he'll
3  use.
4         MR. KRASIK: Objection.
5     A.    We always work with our talent to make
6  sure they're comfortable with whatever names we come
7  up. And conversely, when the talent comes up with
8  the name, we have to be comfortable with that, as
9  well corporately and it's a joint effort. It's not,
10  okay, you're playing this part. Here's your name
11  and go get dressed and don't even say hello. We
12  encourage interaction with our talents to make sure
13  they're comfortable with everything we give them.
14         I guess maybe the most emphatic
15  character perhaps that would fit where you're trying
16  to go would be The Undertaker played by Mark
17  Callaway.
18         The Undertaker was a concept that
19  originated from the office, and the name, as well,
20  and then presented to Mark Callaway who liked it.
21  And he is now known as The Undertaker.
22         Other times we've come up with names
23  that did not suit characters, such as Stone Cold
24  Steve Austin.
25         When Steve Williams -- his real

Page 31

Vince McMahon

1
2  name -- came here, he was The Ringmaster. And that
3  was the name given to Steve Williams to use. And he
4  did for a while. And he just came to me one day and
5  said "I'm not The Ringmaster. I can't get into
6  that. And I'm really Stone Cold."
7         I said "You're who?"
8         He said "I'm Stone Cold."
9         So he came up with Stone Cold Steve
10  Austin. And we cleared and everything was
11  successful. He and we together made that a very
12  successful name and identity.
13     Q.    Have you personally ever instructed a
14  wrestler that he could not use a particular name or
15  phrase in reference to himself?
16     A.    I may have.
17     Q.    Do you know if Mr. Irvine ever used
18  the phrase "Living Legend" in reference to himself?
19     A.    Yes.
20     Q.    And he did?
21     A.    Yes.
22     Q.    How many times do you know of that
23  Mr. Irvine has used the phrase Living Legend to
24  refer to himself?
25     A.    I don't know.

Page 32

Vince McMahon

1
2     Q.    Do you know when Mr. Irvine first used
3  the phrase Living Legend to refer to himself?
4     A.    Oh, it was for a brief period of time
5  a couple of years ago.
6     Q.    Did Mr. Irvine have to go through an
7  approval process to use the term Living Legend in
8  reference to himself?
9         MR. KRASIK: Objection to form.
10     A.    No. Best I recall, Chris used that
11  one night describing himself as a Living Legend,
12  describing his character as a Living Legend. I
13  didn't think it was terribly creative because it had
14  been used before. But he liked it, stuck with it
15  for a while, although that wasn't the only one he
16  used.
17         He uses a lot of terms to describe
18  himself all of which relate to Chris Jericho as
19  larger than life. And there has been two or three
20  others, as well.
21     Q.    Did you ever authorize Mr. Irvine's
22  use of the phrase Living Legend in reference to
23  himself?
24         MR. KRASIK: Objection to form. Do
25         you understand what he means by "authorize"?

Page 33

Vince McMahon

1
2  THE WITNESS: Yes. I do.
3     A.    And I think that in terms of -- first
4  of all, it was not my idea for him to use Living
5  Legend, because that was something that my dad in
6  promoting Bruno Sammartino asked Bruno to start
7  using. We started calling Bruno The Living Legend.
8         Subsequent to that, we did what's
9  known as a program, which was a series of matches
10  with Larry Zbyszko who allegedly was from Pittsburgh
11  and allegedly trained by Bruno, and it was a
12  pupil/student battle-type thing.
13         So then Larry started using Living
14  Legend; of course at my dad's behest, as well.
15         So that's why I wasn't terribly
16  enamored with Living Legend. But at the same time,
17  had I said "Chris Jericho, don't use" -- or Chris
18  Irvine -- "don't use Living Legend," he wouldn't
19  have.
20         So whether that's tacit approval or
21  whatever it might be. You might say it is, because
22  I do have the ability to say "Don't use that."
23         And again, we try to give our talent
24  some leeway as to how to describe themselves and so
25  forth. And my only objection to it was one of it

Page 34

Vince McMahon

1  had been done before.
2     Q.   Does WWE enter into licensing
3  agreements with other companies?
4
5     A.   Other companies? Yes, we do.
6     Q.   And does WWE license character names
7  and phrases used in reference to particular
8  wrestlers?
9     A.   Yes, we do. There is a process by
10  which that goes forward with licensees.
11     Q.   And are those license agreements in
12  writing?
13        MR. KRASIK: Let me just object to
14     your last question, and now you can ask your
15     new question. I'm sorry, could you repeat
16     that?
17     Q.   The question is: Are those license
18  agreements in writing?
19     A.   Yes.
20     Q.   Do you ever personally sign those
21  license agreements?
22     A.   I don't believe so, no.
23     Q.   Do you know who does?
24     A.   Probably Donna Goldsmith now. Prior
25  to Donna Goldsmith, I think it was Jim Bell.

Page 36

Vince McMahon

1  everything, be everything, et cetera. So the idea
2  of me looking at every single license and all that
3  sort of stuff is sort of an absurd notion.
4
5     Q.   Did WWE ever license the phrase Living
6  Legend in reference to Mr. Irvine?
7        MR. KRASIK: Objection.
8     A.   I don't believe so.
9        MR. BRODHEAD: Could you just mark
10     this as McMahon 2, please.
11        (McMahon Exhibit 2, Xerox copy of
12     packaging for action figure, was marked for
13     identification as of this date.)
14     Q.   That is a, a copy, the best copy we
15  could get of a box that was for a particular action
16  figure. And included in those action figures was a
17  representation of Chris Jericho.
18        Are you familiar with what that
19  product might be, or does that allow you to
20  recognize what the product would be?
21     A.   I've never seen this before.
22        MR. KRASIK: For the record, we aren't
23     looking at the product. We are looking at a
24     black and white Xerox copy of packaging
25     without the product present.

Page 35

Vince McMahon

1
2     Q.   Were the license agreements entered
3  into since January 1 of 2001 have been signed by
4  either Donna Gold (sic) or Jim Bell?
5     A.   What's the date?
6     Q.   January 1 of 2001?
7     A.   I think it would be Donna.
8        MR. KRASIK: It's Goldsmith.
9        MR. BRODHEAD: Goldsmith, I'm sorry.
10        THE WITNESS: Right.
11     Q.   Do you personally approve the
12  licensing of character names and phrases used to
13  describe particular wrestlers?
14        MR. KRASIK: Objection.
15     A.   No. Again, there is a process here.
16  Once someone is known by a certain name, you would
17  assume then that that's the name that's going to be
18  licensed.
19     Q.   In your capacity as Chairman,
20  obviously, you would have the ability to veto the
21  use of any name in a license; is that correct?
22        MR. KRASIK: Objection to form.
23     A.   That's technically correct. However,
24  there is a certain amount of business that goes on
25  at World Wrestling Entertainment, and I can't see

Page 37

Vince McMahon

1
2        It's been represented by counsel to
3  be, among other things, a doll of Chris
4  Jericho; however, that is not with us right
5  now.
6     Q.   Are you familiar with any action
7  figures that were made of wrestlers?
8        MR. KRASIK: Objection to form.
9     A.   Am I familiar with action figures?
10     Q.   That were made of wrestlers, that were
11  WWE wrestlers?
12     A.   That were?
13     Q.   Or that are.
14        Have any WWE wrestlers been, had
15  action figures produced of the character?
16     A.   Of course, yes.
17     Q.   Okay. Has Mr. Irvine's character,
18  Chris Jericho, ever been produced as an action
19  figure, to your knowledge?
20     A.   Yes.
21     Q.   Has that action figure ever been
22  described on the packaging, as far as you know of,
23  as a Living Legend?
24     A.   On -- if I assume correctly, that this
25  is a copy of a package, which we don't have before

10 (Pages 34 to 37)

Page 38

Vince McMahon

1
2  us, someone -- whether it was our company or the
3  licensee who manufactures and distributes, in this
4  case it would be Jakks. Jakks has our license for
5  articulated action figures.
6       As I'm reading this, I'm seeing that
7  Rick Flair, that there is a word "Woooooo!" next to
8  Rick Flair. And then on top of Chris Jericho, a
9  shot of Chris Jericho, there is a quote: "I am a
10 Living Legend." So I'm reading what I'm seeing here
11 for the first time. Whether or not this is approved
12 by my company or not, I don't know.
13      Q.   Who would be in charge of the
14 approval— let me back up.
15      Would the use of the term, or the
16 phrase "I am a Living Legend" have to be approval by
17 the WWE?
18      A.   By contract, yes. So would
19 "Wooooow," so would "Fueled by Fury," whatever is
20 here in writing.
21      There are approval processes that we
22 ask for in our licensee program that hopefully are
23 carried out.
24      Q.   Would you have personally signed any
25 of those licensing agreements? I think we might

Page 39

Vince McMahon

1
2  have just covered that. That would have been Donna
3  Goldsmith that would have signed those licensing
4  agreements?
5       A.   Right. Although I may have signed one
6  years ago or something. I don't know.
7       Q.   But since January of 2001?
8       A.   I don't think I signed them. I sign a
9  lot of things that are just put in front of me, you
10 know, with a blind faith that I'm signing the right
11 things. I don't think I sign license agreements.
12 That's not my forte.
13      MR. BRODHEAD: We would obviously also
14      like the license agreement for that product
15      with Jakks.
16      (Production request for license
17      agreement with Jakks indexed.)
18      MR. KRASIK: Take that under
19      advisement.
20      Q.   I apologize if I asked this before,
21 but I just want to get clarification so we can move
22 on with it.
23      Have you ever approved the licensing
24 of the phrase "Living Legend" in reference to
25 Mr. Irvine or his character Chris Jericho?

Page 40

Vince McMahon

1
2       A.   No, not to my knowledge.
3       MR. KRASIK: You're right, it was
4       asked before, so I object.
5       MR. BRODHEAD: I'm just trying to move
6       on.
7       Q.   Did the licensing agreements entered
8  into by WWE contain geographic restrictions? By
9  that I mean, would there be a license agreement that
10 said perhaps Jakks could sell articulated action
11 figures west of the Mississippi, and somebody else
12 could sell them east of the Mississippi, or produce
13 them east of the Mississippi? Is there a geographic
14 location restriction, as far as you're aware?
15      A.   I'm not certain about international.
16 There may be some geographic restrictions on
17 international. This is a global brand. And under
18 normal circumstances, there may be some. But from a
19 United States standpoint, I would doubt it very
20 seriously.
21      Q.   Do you have any ownership in Jakks
22 Pacific, personally?
23      A.   No.
24      Q.   Does WWE have any ownership in Jakks
25 Pacific?

Page 41

Vince McMahon

1
2       A.   I don't believe so. They gave us some
3  warrants at one time. I think it's called, but we
4  cashed them in.
5       Q.   Do you have any other control over
6  Jakks Pacific?
7       MR. KRASIK: Objection to form. What
8       control has been established?
9       Q.   Do you have any other way of
10 controlling? It's not meant to imply that there was
11 some control that has been established so far.
12      Let me ask you this way: Do you have
13 any control over Jakks Pacific, personally?
14      A.   Personally, no.
15      Q.   Does WWE have any control over Jakks
16 Pacific?
17      A.   Only as it relates to our licensing
18 agreement and the rights that we have.
19      Q.   Am I correct that as Chairman of WWE,
20 you could have prevented the WWE from entering into
21 an agreement with Jakks Pacific?
22      MR. KRASIK: Objection to form.
23      A.   Hold on a second. As the Chairman, I
24 could have objected from the company entering into
25 an agreement with Jakks; is that the question?

SULLIVAN REPORTING
Sullivan Reporting

Page 42

Vince McMahon

1
2       Q.   Actually, could you have prevented it?
3    Could you have said "Let's not enter into an
4    agreement," and kept the WWE from entering into an
5    agreement with Jakks?
6            MR. KRASIK: That's a hypothetical
7    question. I object on that basis.
8        A.   I don't understand that, at all.
9        Q.   Did you have authority to prevent an
10   agreement?
11       A.   To prevent?
12       Q.   To prevent agreements?
13       A.   We don't try to prevent agreements.
14   We try to make agreements. We're not attorneys.
15   That's what attorneys do. We try to make things
16   happen.
17           I don't understand the phraseology, at
18   all. I don't try to prevent things. I try to make
19   things happen.
20           Would we try to enter into an
21   agreement with a bona fide licensee? Yes, we would
22   have. Did we enter into one with Jakks? Yes, we
23   did. With our own free volition, our own free will?
24   Yes, we will. Does it help you?
25       Q.   It does, but it's not necessarily what

Page 43

Vince McMahon

1
2    I was asking.
3            If WWE, through other employees, was
4    working on an agreement with Jakks, and if you
5    didn't like that agreement with Jakks, could you
6    have vetoed the agreement?
7            MR. KRASIK: Same objection.
8        A.   I wouldn't be vetoing an agreement.
9    There wouldn't be an agreement.
10       Q.   So you would be able to prevent an
11   agreement from forming?
12           MR. KRASIK: Objection to form.
13       A.   I would assume that whoever would be
14   running our licensing program, as long as they were
15   doing it on a bona fide basis, and not in cahoots
16   with Jakks, or any other licensee or something like
17   that, then my job is to agree to things, not to
18   disagree to something before it happens. So we
19   would agree to enter into that.
20           So if the implication is we could have
21   disagreed, obviously, that's your answer.
22       Q.   And I'm not trying to -- I apologize
23   if my question is not artful. I apologize if my
24   question is inartful. It's not meant to address
25   anything other than your authority within the

Page 44

Vince McMahon

1
2    organization.
3            And my understanding of your authority
4    within the organization is if you want an agreement
5    to occur, you have the authority to make it occur.
6    If there is an agreement that's being negotiated
7    that you don't want to occur, you have the authority
8    to stop it from occurring. That's my understanding;
9    is that correct?
10       A.   The correct answer is: As the
11   Chairman, I let everyone do their jobs. So whoever
12   is in charge of our licensing program, if they bring
13   what I consider and presented as a bona fide
14   contract with someone, then I'm going to accept
15   their recommendation that this is the thing to do,
16   that this is the generally accepted rule, et cetera.
17   And I'm going to accept their position, generally
18   speaking, and support them and enter into an
19   agreement. If someone came to me and said -- who
20   was in charge of our license department -- "Don't
21   enter into an agreement," I would have accepted
22   that, as well.
23       Q.   If someone came to you with an
24   agreement that you did not feel was a bona fide
25   agreement --

Page 45

Vince McMahon

1
2        A.   That I felt?
3        Q.   Yes. You make the decisions.
4        A.   Again I'm going to get back, whoever
5    is in charge of the licensing program at the time, I
6    allow people to do their jobs. If they are going to
7    present an agreement and say "This is a good
8    agreement, and this is what we should do as a
9    company," I'm going to say "fine." If they bring
10   me an agreement or a proposal and say "We should not
11   do this one," then I'm going to say "fine." That's
12   their jobs. That's what they do.
13       Q.   Do you have final approval of
14   licensing agreements?
15       A.   I don't think I've ever looked at a
16   licensing agreement in my life. I'm not, I'm not an
17   attorney. I'm a Chairman of the Board. I want
18   people to do their jobs.
19           MR. KRASIK: Are we going to move on
20   from this line?
21           MR. BRODHEAD: Yes.
22       Q.   Do you know whether -- well, we're
23   about to move on. I think we're two questions away
24   from moving on.
25           Do you know whether or not the

12 (Pages 42 to 45)

Page 46

Vince McMahon

1
2  agreement with Jakks Pacific allowed Jakks Pacific
3  to distribute products within Georgia?
4      A.   I would assume it would.
5          Again, you seem to ask the same
6  questions over. My response earlier was from the
7  United States standpoint. I don't think there was
8  any restrictions geographically from the United
9  States. There may be some on an international basis
10 that I am unaware of. So Georgia is part of the
11 United States.
12     Q.   Is there a term, a term "story line"
13 that's ever used in the wrestling industry or within
14 WWE?
15     A.   Story line? Yes.
16     Q.   What is a story line?
17     A.   A story line in our business is no
18 different than a story line in a soap opera or
19 drama. Same thing. Come up with a concept,
20 involves characters. It could be a story line or
21 subject matter about anything in life, pregnancy,
22 jealousy, inheritance, all sorts of things, you name
23 it. And we've probably done it at one time or
24 another.
25     Q.   What's the purpose of having a story

Page 47

Vince McMahon

1
2  line for the wrestling entertainment industry?
3      A.   To generate interest. And you want to
4  make sure your story line is one that obviously
5  involves a lot of people or as many people as
6  possible so that you can capitalize on it, either in
7  a match or some sort of other culmination.
8      Q.   Do you have input regarding the story
9  lines used by WWE?
10     A.   Yes, I do.
11     Q.   How long does a story line usually
12 last?
13     A.   It really depends. Some of them fall
14 flat on their face first time you try it and others
15 continue.
16     Q.   What would be -- I guess the range
17 would be from a one episode to how long?
18     A.   A couple of years.
19     Q.   So the story lines would be used to
20 attract viewers; is that correct?
21     A.   Yes, again, Mr. McMahon, Stone Cold
22 type situation which lasted a long time, that's one
23 I think has lasted the longest so far and actually
24 can continue. It's the disgruntled employee and the
25 overbearing and overzealous boss. So that's the

Page 48

Vince McMahon

1
2  story line
3          But again, it takes two to tango. If
4  I can go in and cut to the chase and help you out
5  here, Living Legend is not a story line. Living
6  Legend was a description of Chris Jericho, in my
7  view, in his own words who he thought he was as a
8  character; one of the many that he used. Didn't
9  enhance his character anymore than any others that
10 he used, and maybe less because it's been used
11 before.
12         And it wasn't a story line, because
13 you make sure you can capitalize on it. Larry
14 Zbyszko who is the complainant here, he would have
15 to be under contract to us for that to have been a
16 story line, notwithstanding Larry's attempts on many
17 occasions to want to be a part of our story line.
18         Larry attempted to call Jim Ross, who
19 is in charge of talent relations, and gain
20 employment here in one form or another many, many
21 times, but it didn't happen. So that wasn't a story
22 line, because a story line is something when you
23 have wrestler A and wrestler B, or personality A and
24 personality B under contract, and so you can bring
25 them together in some sort of culmination as a story

Page 49

Vince McMahon

1
2  line.
3          Living Legend was not a story line,
4  unless Bruno Sammartino was going to come out of
5  retirement, and I wouldn't think that would be too
6  likely.
7      Q.   The story lines are used to keep
8  viewers watching future events, as well; is that
9  correct?
10         MR. KRASIK: Objection to form.
11     A.   Story lines are, again, they are there
12 to create interest in the product.
13     Q.   And it's to keep a continuing interest
14 in the product; is that correct?
15     A.   We have new story lines all the time.
16 And the product has continued for many years, and
17 will many years after I'm gone.
18     Q.   The WWE has events that take place all
19 over the U.S.; is that correct?
20     A.   That's correct.
21     Q.   And the story lines can be continued
22 from one event to the next event; is that correct?
23     A.   They can.
24     Q.   So the story line can be used and
25 continued at several different events in several

13 (Pages 46 to 49)

Page 50

Vince McMahon

1  different states; is that also correct?
2
3      MR. KRASIK: Objection to form. Did
4  you understand the question?
5      THE WITNESS: No.
6  Q.   Well, a story line -- let me see if
7  you can tell me what part you don't understand.
8  I'll state the question again.
9      And I guess what I'm asking you is:
10 Can a story line be used and continued during
11 several different events that take place in several
12 different states?
13 A.   Again, this is a global brand. Not
14 just can a story line be capitalized in one
15 particular city, but it can be capitalized on in
16 other states and other countries.
17 Q.   Is the rise of one character to the
18 level of champion of WWE a story line?
19 A.   Not necessarily.
20 Q.   Is the rise of one character to the
21 level of champion of WWE a planned event?
22 A.   Oh, sure.
23 Q.   When did the planning begin to elevate
24 the character Chris Jericho to the level of WWE
25 champion?

Page 51

Vince McMahon

1
2  A.   Sometime before he became champion.
3  Q.   Yes. Would that have been in 2001, or
4  would that have been earlier than 2001?
5  A.   Well, you will have to tell me when he
6  was champion. And then I could probably back up
7  from there, when he first became champion.
8  Q.   It was prior to the Royal Rumble.
9  Probably would have been December of 2001.
10 A.   This is a, an evolving soap opera.
11 And you try to have all talent grow as much as
12 possible to achieve as large a stardom as possible
13 on all fronts.
14     But at the same time, a lot of
15 decisions, quite frankly, are made at the last
16 minute, as well. Even the day before Chris Jericho
17 became champion, there was debate as to whether or
18 not he should be. That's how close that came.
19     But on one particular occasion, which
20 was a Pay-Per-View, there were two matches: Jericho
21 versus Rock and Jericho versus Stone Cold. And
22 Jericho "won" both of those matches, thus becoming
23 the first undisputed champion. But that wasn't a
24 decision that was made until the last minute.
25 Q.   Were you personally involved in that

Page 52

Vince McMahon

1  decision?
2
3  A.   Yes.
4  Q.   Were you personally involved in the
5  decision to elevate Chris Jericho through the ranks,
6  as well, as he became elevated on his way up to
7  becoming champion?
8      MR. KRASIK: Objection. Do you
9  understand? Can you answer that?
10 A.   I try to be involved as much as I can
11 with all talent in terms of their elevation.
12     It's a very vague question. A lot of
13 these questions are very vague. I'm doing the best
14 I can.
15 Q.   I understand. I don't mean to be
16 vague. It's just this is an industry that I don't
17 have a whole lot of knowledge on. So if I ask you
18 something that is not understood, like I mentioned
19 in the beginning, please tell me and I will do my
20 best to correct it. It's not my goal to ask
21 anything that's a trick question or a vague
22 question. It's just simply that I have to get to
23 the information so I can narrow it.
24     Am I correct that you said that you
25 did have -- you do have input in the story lines?

Page 53

Vince McMahon

1
2  A.   Yes. I do.
3  Q.   And you were aware that during
4  Mr. Irvine's rise as the character Chris Jericho
5  that he was using the phrase Living Legend in
6  reference to himself?
7      MR. KRASIK: Objection. I think that
8  misstates the record.
9  A.   That was one of the phrases he was
10 using. In no way, in my professional opinion, do I
11 think that enhanced his image in any way. It was a
12 trite expression that had been used and given by my
13 dad to Bruno Sammartino, and given by my dad to
14 Larry Zbyszko to create interest in the
15 Zbyszko/Sammartino matchup, and in no way did it
16 enhance Chris Jericho's image.
17 Q.   Why was it used if it didn't enhance
18 his image?
19     MR. KRASIK: Objection.
20 A.   Again, we try to give our talent some
21 degree of autonomy. Chris liked that in referring
22 to himself. I told him it had been done before by
23 Bruno. And didn't think it really enhanced -- I
24 didn't think it hurt him, but it didn't help.
25 Larger than life is the one he's using now. And

Page 54

Vince McMahon

1
2  he's used several others and they were okay.
3        But a lot of times a phrase like that
4  doesn't necessarily enhance someone's character.
5  You try to, you try to reach out to everything you
6  see what you can to do to enhance your character.
7  And in my personal opinion. I don't think that one
8  necessarily helped him.
9        And it was subsequently dropped.
10  otherwise he would still be using it today. If it
11  was successful, we would definitely be using it
12  today.
13        MR. KRASIK: We've been going for an
14  hour. Do you want to take a break?
15        THE WITNESS: Just a little bit of
16  water, but let's keep going.
17     Q.   And as I recall previous testimony,
18  you did say that you claim a trademark in the name
19  Vince McMahon; is that correct?
20     A.   Boy, you say you don't do trick
21  questions.
22        MR. KRASIK: Objection.
23     A.   Either that or you're dumb as a post.
24  and I don't think you're dumb.
25        You want to go back and have her

Page 55

Vince McMahon

1
2  repeat my answer, or do you want me to tell you that
3  answer again?
4     Q.   Why don't you tell me the answer
5  again.
6     A.   I don't know.
7     Q.   Do you use the name Mr. McMahon or
8  Vince McMahon to promote yourself?
9     A.   As a character on television. I use
10  Mr McMahon.
11     Q.   And have you used the name Mr. McMahon
12  in Georgia to promote yourself?
13     A.   As part of every other state, I would
14  do the same in Georgia as I would in any other state
15  or any other country.
16     Q.   That's a yes?
17     A.   That's a yes.
18     Q.   And then, I assume that you used the
19  name Mr. McMahon on January 20th of 2002; is that
20  correct, the Royal Rumble?
21     A.   The Royal Rumble in Georgia?
22     Q.   Yes.
23     A.   Sure I did.
24     Q.   Now, you've used the name Larry
25  Zbyszko. Are you familiar with Larry Whistler who

Page 56

Vince McMahon

1
2  is the same person as Larry Zbyszko?
3     A.   Yes.
4     Q.   How do you know of him?
5     A.   I worked with him for several years.
6     Q.   When did you first meet him?
7        MR. KRASIK: Let me just interrupt for
8  a second. I'm not sure what that has to do
9  with the jurisdictional issue.
10        MR. BRODHEAD: It's going to be one
11  question.
12        MR. KRASIK: If it's one question,
13  answer the question.
14     A.   I would guess 30 years ago.
15     Q.   Are you familiar with where he
16  currently lives?
17     A.   No.
18     Q.   And I think you've clearly testified
19  that you were aware that Mr. Whistler used the
20  phrase Living Legend in reference to himself in the
21  past?
22        MR. KRASIK: Objection to form.
23     A.   When Bruno and Larry were working
24  under the banner of the old World Wrestling
25  Federation with my dad, my dad came up with the name

Page 57

Vince McMahon

1
2  Living Legend, gave it to Brunoto use in terms of
3  identifying himself as a marketing scheme. It
4  caught on big time.
5        Subsequent to that, as I stated
6  before, then we had a pupil/student matchup-type
7  thing. Larry Zbyszko being the pupil. He then
8  wanted to refer to himself as The Living Legend for
9  the purposes of building up that match, and we did
10  and it was successful.
11     Q.   And beyond the time of that match, are
12  you aware that Mr. Whistler continued using the name
13  Living Legend?
14     A.   I think he did.
15     Q.   Are you aware that Mr. Whistler has
16  actually used the phrase Living Legend for more than
17  20 years now?
18        MR. KRASIK: Objection to form.
19     A.   I wouldn't have any idea how many
20  years he's used it and in what capacity, and I think
21  he's out of the business
22     Q.   Am I correct that the WWE has entered
23  into agreements with companies to broadcast WWE
24  events?
25     A.   Yes.

Page 58

Vince McMahon

2    Q.    With which companies -- I'm sorry,
3  with which type of companies would WWE have entered
4  into agreements to broadcast? And by that I mean,
5  I'm assuming that it would be individual stations,
6  networks and Pay-Per-View companies; and I'm
7  wondering if that's correct, and if there are any
8  others?
9          MR. KRASIK: Object to the question.
10   A.    The only people relating to the
11 broadcast industry. Why would we enter into paper
12 goods manufacturer for broadcast? I don't
13 understand the question.
14   Q.    I'm just making sure I hit the
15 categories.
16          Has WWE entered into agreements to
17 broadcast WWE events with individual TV stations?
18          MR. KRASIK: Do you know what he means
19 by "individual TV statements"?
20   A.    I think you would be referring to
21 syndication.
22          Actually, I don't think you have a
23 clue as to what you're referring to and you're
24 asking me to describe it for you. So I would
25 suggest, if you ask me the question: "Mr. McMahon,

Page 59

Vince McMahon

2  explain distribution to us and how you distribute
3  the product and with whom," I would say, if that's
4  your question --
5    Q.   I'll ask that question.
6    A.   Great. Then from a broadcast and
7  cablecast standpoint, we do business with cable
8  companies, in this case, Viacom. And a part of
9  Viacom would be TNN, MTV. Another part of Viacom is
10 broadcast, would be UPN, which is broadcast, network
11 broadcast. In addition to that, we also have a
12 syndicated arm which we syndicate our own television
13 shows. That's done with individual stations as an
14 independent syndicator. We also have numerous
15 contracts with international distributors, including
16 cable broadcast and satellite distribution.
17   Q.    Do you participate in the negotiation
18 of these broadcast agreements?
19   A.    Some.
20   Q.    Do you sign some of these broadcast
21 agreements?
22   A.    I don't believe so, no.
23   Q.    Are you able to identify, as we sit
24 here today, the companies with which WWE had
25 broadcast agreements between January 1 of 2001 and

Page 60

Vince McMahon

2  the present?
3          MR. KRASIK: I think he just did.
4          MR. BRODHEAD: I think there were more
5  individual companies than what he named,
6  but --
7    A.   We're talking on a global basis?
8    Q.   Let's talk with the U.S. basis, sorry.
9    A.   On a U.S. basis, that would be it,
10 what I just said.
11   Q.    From January 1 of 2001 until the
12 present, have WWE events been broadcast in Georgia?
13   A.    By that you mean individual
14 syndication, or do you mean the cablecast and
15 broadcast elements, or all of the above?
16   Q.    All of the above.
17   A.    I'm not certain about individual
18 syndication, but part of the footprint of the
19 network would be a UPN affiliate somewhere in
20 Georgia, I'm sure probably in Atlanta. And I'm sure
21 TNN is also carried with cable distributors in the
22 State of Georgia as it is all over the country.
23   Q.    Do you know whether there are some WWE
24 events that were broadcast in some states, but not
25 in Georgia?

Page 61

Vince McMahon

2    A.   Let's see. If I understand your
3  question correctly, I think I said earlier that we
4  would, in all likelihood, do one televised event per
5  year in the State of Georgia. And since we do a lot
6  more television than that, then the vast
7  preponderance of all of our television is done
8  outside of the State of Georgia. Does that help you
9  with answering the question?
10   Q.    I think so.
11          Are there any states in which WWE --
12 United States, states in which WWE does not
13 broadcast television shows?
14   A.    We haven't broadcasted from Alaska. I
15 don't think we've broadcast from Hawaii, either.
16          MR. KRASIK: Let me clarify something
17 for the record. I think Mr. McMahon is
18 answering where taped television shows have
19 appeared as opposed --
20          MR. BRODHEAD: Where they've aired.
21          THE WITNESS: Where they've aired?
22          MR. BRODHEAD: Yes.
23          THE WITNESS: And your question again?
24   Q.    Are there any states where WWE events
25 or television programs have not been aired?

Page 62

Vince McMahon

2   A.   No.
3       Q.   Regarding syndicating shows, would
4   those agreements for the syndication be made with
5   individual stations?
6   A.   Yes.
7       Q.   Would there have been individual
8   syndication agreements made with individual stations
9   within Georgia?
10  A.   Possibly, or it could be a part of a
11  chain.
12      At one time, you know, there wasn't a
13  lot of group ownership. The business has changed so
14  much. There is so much group ownership. You make a
15  deal with a group and they may have a station in
16  Georgia. But there's a possibility that there may
17  be one station in Georgia that's independent from a
18  group, not likely.
19      Q.   But that's not something that you
20  would have specific knowledge of?
21  A.   No.
22      Q.   Does WWE have the ability to black out
23  programing in one state? Let's say, for instance,
24  if WWE wanted to show programing in all states of
25  the United States except for Georgia, would WWE have

Page 63

Vince McMahon

2   that ability?
3   A.   No.
4       Q.   Why not?
5   A.   Because if you're doing business with
6   networks, you don't dictate to the network. They
7   dictate to you, and they want to have as broad a
8   platform as possible for exposure.
9       So for us to say -- Georgia is a
10  good-sized state with a good-sized population, for
11  us to say we want to go to every place except
12  Georgia, it wouldn't make any sense. And the
13  network sure as hell wouldn't go along with that. I
14  don't know why we would not want to broadcast in the
15  State of Georgia.
16      Q.   Are there promotions that are run for
17  WWE events prior to the airing of that event?
18      MR. KRASIK:  I'm not sure what you
19  mean by "promotions."
20      Did you understand that?
21      MR. BRODHEAD:  Let's see if I can go
22  with advertising spots.
23  A.   Sure. You have to promote an upcoming
24  event. That would be radio, perhaps television,
25  perhaps newsprint, fliers, posters, whatever it is

Page 64

Vince McMahon

2   we wouldn't normally do to promote an upcoming event.
3       Q.   Do these efforts to promote an
4   upcoming event include references to specific
5   wrestlers?
6   A.   It depends, it can.
7       Q.   Do you have any input regarding the
8   promotion of WWE events?
9   A.   Therein do I approve specific spots
10  for specific locations? No.
11      Again, I, I can't be all things to all
12  people. I expect them to do their job. Whoever is
13  handling promotion should be handling it, and
14  handling it well.
15      Q.   Do you know if Mr. Irvine's character
16  Chris Jericho was used to promote the WWE event
17  Royal Rumble that took place on January 20th of
18  2002?
19  A.   No, I don't.
20      Q.   Do you know if the phrase Living
21  Legend was used in reference to Mr. Irvine's
22  character or anyone else's character in order to
23  promote the Royal Rumble that occurred in Georgia on
24  January 20th of 2002?
25  A.   I wouldn't know.

Page 65

Vince McMahon

2       MR. BRODHEAD:  We're getting pretty
3   close, if you want to take a few minute break
4   here.
5       THE VIDEOGRAPHER:  We'll go off the
6   record. The time is approximately 4:43 p.m.
7       (Off the record.)
8       THE VIDEOGRAPHER:  We are back on the
9   record. The time is approximately 4:54 p.m.
10      Q.   And I think previously I had asked you
11  if you were familiar with Larry Whistler's address,
12  and you had said that you were not.
13      I need to broaden that question. Are
14  you aware that Larry Whistler lives in Georgia?
15  A.   I believe he does. I'm not certain.
16      Q.   Regarding you personally or your
17  character, your character Mr. McMahon, do you have a
18  fan following as Mr. McMahon?
19  A.   A fan following?
20      Q.   Do fans follow your career as
21  Mr. McMahon?
22  A.   Well, Mr. McMahon is not a very
23  likable character. So in the sense of like the hero
24  worship or something like that, I don't have that
25  I'm -- in the parlance of our industry, I'm known as

17 (Pages 62 to 65)

Page 66

Vince McMahon

1    a heel, which is not a very nice person.
2    Q.   Are there some fans who tune in to
3    watch the heel characters, as far as you're aware?
4        MR. KRASIK: Objection.
5        A.   Just on their own. I don't know
6    anymore, so than to tune in -- I could see someone
7    tuning in to watch the super hero type, baby face,
8    as we call them, characters. But it's the
9    interaction of these characters that becomes the
10   dynamic, not like one or the other, it's the
11   interaction.
12   Q.   Do you think people tune in to watch
13   your character and your character's interaction with
14   others?
15       A.   Again, I think it's important that we
16   know where we're going. And it's the interaction
17   that really, it's really important. So, yes, I do
18   Q.   And some of those who would watch your
19   character's interaction with others are living in
20   Georgia?
21       MR. KRASIK: Objection, you're saying
22   do people watch WWE shows?
23   Q.   Some of the people who are following
24   the interaction of the character Mr. McMahon with

Page 67

Vince McMahon

1    other characters are watching the shows in Georgia;
2    would you be aware that that's occurring?
3        MR. KRASIK: I object to the question,
4        because Mr. McMahon can not speak as to why
5        people in the State of Georgia may or may not
6        be watching WWE programs. I think we can
7        agree that people in Georgia watch WWE
8        programs and some of them may watch because
9        of the interaction of characters.
10       A.   I specifically recall one individual
11   who lives in the State of Georgia who watches
12   Mr. McMahon's character. And that's Larry Zbyszko
13   who proposed to Jim Ross that he be gainfully
14   employed by us in some way as to interact with the
15   Mr. McMahon character. That's what he wanted to do.
16   It's one of the things he wanted to do. There's one
17   person in the State of Georgia that I'm certain is
18   watching.
19   Q.   Okay. Have you ever personally used
20   the phrase Living Legend to refer to Mr. Irvine or
21   his character during any WWE broadcast?
22       A.   I might have. I don't recall. If I
23   did, I certainly didn't make a habit of it.
24   Q.   If you had used it, you would have

Page 68

Vince McMahon

1    known it was being broadcast Georgia, as well as
2    other states, correct?
3        A.   Oh, sure.
4        Q.   Prior to the Royal Rumble, you also
5    knew that WWE licensed products were being sold in
6    Georgia, correct?
7        A.   Again, to my knowledge, there is no
8    restriction as to why our licensed items would not
9    be sold in the State of Georgia. I would expect
10   them to be like they were sold everywhere else.
11       MR. BRODHEAD: If we could have this
12   marked as McMahon 3.
13       (McMahon Exhibit 3, letter, was marked
14   for identification as of this date.)
15       MR. BRODHEAD: Please let the record
16   reflect I'm showing the deponent what's been
17   marked as Exhibit McMahon 3.
18       MR. KRASIK: I'm going to object to
19   this Exhibit. I don't see what this has to
20   do with whether Mr. McMahon is subject to
21   jurisdiction in Georgia.
22       MR. BRODHEAD: There is just going to
23   be one or two questions and then we'll be all
24   the way done.

Page 69

Vince McMahon

1        MR. KRASIK: Okay.
2    Q.   Are you familiar with that letter?
3        A.   Would you allow me to read it first?
4    Q.   Certainly, go right ahead.
5        (Witness peruses document.)
6        A.   Just for the record, I've never seen
7    this letter before, so that's why I want to read it.
8    Q.   That's fine.
9        A.   Okay, read it.
10   Q.   But you've not seen that letter before
11   today?
12       A.   Let's see. I just asked you for time
13   to read this letter because I stated the reason I
14   wanted to read it is because I've never seen it
15   before.
16   Q.   And after completing your reading of
17   it, you maintain that opinion, that you've never
18   seen it before?
19       A.   I've never seen it before, including
20   the name of the town Alpharetta, Alpharetta,
21   Georgia -- that's a mouthful -- as to where
22   Mr. Whistler a/k/a Larry Zbyszko lives.
23   Q.   Are you familiar with Edward L.
24   Kaufman?

18 (Pages 66 to 69)

Page 70

```
 1          Vince McMahon
 2     A    Yes, I am.
 3     Q.   Were you aware that Mr. Kaufman was
 4  sending a letter or any correspondence to
 5  Mr. Whistler?
 6     A.   I don't recall, no.
 7     Q.   Okay.
 8          MR. BRODHEAD: Let me actually just
 9     check over a couple of notes here.
10     Q.   When was the last time you've spoken
11  to Mr. Whistler, if you've ever spoken to him?
12     A.   I think there was a telephone
13  conversation a couple of years ago in which Larry
14  again was looking for a job. I may have had a
15  conversation with him concerning that in terms of --
16  but I don't recall. I may not have, either. I
17  don't recall. There may have been a telephone call
18  like hey, how are you doing, that type of deal. I
19  know he called my office several times. I always
20  directed him to Jim Ross who is in charge of talent
21  relations. It would be JR's decision as to whether
22  or not we bring Larry on.
23          Larry also wanted to be a broadcaster
24  for us because he had been one at Ted Turner's WCW
25  before we bought it. And that was another
```

Page 71

```
 1          Vince McMahon
 2  suggestion that he had as far as joining our
 3  company's concern.
 4          MR. BRODHEAD: I believe that's all I
 5     have.
 6          THE VIDEOGRAPHER: That will conclude
 7     the recording of this deposition. We are off
 8     the record 5.03 p.m., January 29th, 2003.
```

Page 72

WITNESS'S CORRECTION SHEET
PAGE \ LINE \ CORRECTION

_____
VINCE MCMAHON

Subscribed and sworn to before me
this _____ day of _____, 2003.
_____, Notary Public.

Page 73

```
 2  STATE OF CONNECTICUT )
 3                      ) SS:
 4  COUNTY OF STAMFORD)
 5       I, VINCE MCMAHON, a Defendant herein,
 6  do hereby certify that having been first duly sworn
 7  to testify to the truth, the whole truth and
 8  nothing but the truth, gave the above deposition
 9  which was recorded stenographically and reduced to
10  this original transcript
11
12       I FURTHER CERTIFY that the foregoing
13  transcript of the said deposition is a true and
14  correct transcript of the testimony given by me at
15  the time and place specified hereinbefore.
16
17       I FURTHER CERTIFY that any corrections
18  or changes to this testimony have been made by me on
19  the page provided for that purpose captioned
20  "Witness's Correction Sheet," which has also been
21  signed by me before a Notary Public.
22
23       _____
         VINCE MCMAHON
24  Subscribed and sworn to before me this _____ day
    of _____ 2003.
25
    _____, Notary Public.
```

19 (Pages 70 to 73)

SULLIVAN REPORTING
Sullivan Reporting

Page 74

```
1
2              CERTIFICATE
3
4          I, DAWN TEDESCO, a Registered
5     Professional Reporter and Notary Public
6     within and for the State of Connecticut, do
7     hereby certify:
8          That VINCE MCMAHON the witness whose
9     deposition is hereinbefore set forth, was
10    duly sworn by me and that the within
11    transcript is a true record of the testimony
12    given by such witness.
13         I further certify that I am not
14    related to any of the parties to this action
15    by blood or marriage and that I
16    am in no way interested in the outcome
17    of this matter.
18         IN WITNESS WHEREOF, I have hereunto
19    set my hand this _____ day of _____,
20    2003.
21
22
23         _____
24              Dawn Tedesco, RPR
25
```

Page 75

```
1
2              INDEX
3                      PG LN
4     VINCE MCMAHON ..            4  13
      EXAMINATION BY MR. BRODHEAD    ..  .4  17
5
      McMahon Exhibit 1, copy of cover of the
6     Royal Rumble video        ...  19  19
7     McMahon Exhibit 2, Xerox copy of packaging
      for action figure .    .  .....36  11
8
      McMahon Exhibit 3, letter   ...   68  14
9
      Production request for contract between
10    Mr  McMahon and WWE for appearing
      as a wrestler.    ................11   7
11
      Production request for copy of independent
12    contractor agreement       .  .  .. 25  14
13    Production request for license agreement
      with Jakks . . . . ...........39  16
14
15
16
17
18
19
20
21
22
23
24
25
```

SULLIVAN REPORTING
Sullivan Reporting







# 30 MEN
# ONE MATCH
# ONE W1NNER




Atlanta, Georgia          January 20, 2002

**ROYAL RUMBLE**

Triple H™ completes his return to the ring in the biggest brawl of them all, and not everyone is happy to see him. 30 Superstars duke it out in the squared circle...29 are leaving over the top rope and one is going to the main event at WrestleMania®

**30-MAN ROYAL RUMBLE™ MATCH**
Winner Gets Undisputed Title Shot
At WrestleMania® X8

| | | |
|---|---|---|
| Rikishi™ | Maven™ | Test™ |
| Goldust™ | Scotty 2 Hotty™ | Triple H™ |
| Boss Man™ | Christian™ | The Hurricane™ |
| Bradshaw™ | DDP™ | Faarooq™ |
| Lance Storm™ | Chuck Palumbo™ | Mr. Perfect™ |
| Al Snow™ | Godfather™ | Kurt Angle™ |
| Billy Gunn™ | Albert™ | Big Show™ |
| Undertaker® | Perry Saturn™ | Kane™ |
| Matt Hardy™ | Stone Cold Steve Austin™ | Rob Van Dam™ |
| Jeff Hardy™ | Val Venis™ | Booker T™ |

UNDISPUTED WF CHAMPIONSHIP
Chris Jericho™ vs. The Rock®

STREET FIGHT (no DQ, no countout)
Vince McMahon™ vs. Ric Flair™

WF WOMEN'S CHAMPIONSHIP
Trish Stratus™ vs. Jazz™
with Special Referee Jacqueline™

WF INTERCONTINENTAL CHAMPIONSHIP
Edge™ vs. William Regal™

WF TAG TEAM CHAMPIONSHIP
Spike™ & Tazz™ vs. the Dudley Boyz™
with Stacy Keibler™



**WF•com**

WF HOME VIDEO™

Approx. running time: 3 hours. Recorded in stereo.
© 2002 World Wrestling Federation Entertainment, Inc. All Rights Reserved.



EXHIBIT
McMahon
2 Fre ID



World Wrestling
Federation
Entertainment, Inc.

1241 East Main St.
Stamford, CT 06902
Tel: 203 352 8600

**VIA FEDERAL EXPRESS**

February 15, 2002

Mr. Larry Whistler
425 Red Jacket Way
Alpharetta, GA 30005

Dear Mr. Whistler:

Per our discussion on February 1, 2002, we wish to confirm the following:

1.    that you acknowledge that we have been using the mark THE LIVING LEGEND in connection with products and services in connection with sports entertainment, and that we intend to continue to do so; and

2.    that you will not interfere with our use and registration of this mark anywhere in the world, and that we may license or assign our rights as necessary.

Please confirm that you concur with the above statements by dating and signing below, where indicated, and returning it to us. We thank you in advance for your cooperation.

EXHIBIT
McMahon
13 FOR ID
1-29-03 DC

World Wrestling Federation
Entertainment, Inc.

EDWARD L. KAUFMAN,
Senior Vice President,
General Counsel

_Read, and Agreed to, by:_

_____                    Dated: _____, 2002
LARRY WHISTLER
a.k.a. Larry Zabyszko



# EXHIBIT / ATTACHMENT

## 5

(To be scanned in place of tab)

**Exhibit 5** is filed separately.



# EXHIBIT / ATTACHMENT

## 6

(To be scanned in place of tab)

1

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION
 3   LARRY WHISTLER a/k/a
     LARRY ZBYSZKO a/k/a THE
 4   LIVING LEGEND, an individual
 5              Plaintiff,
                                    Civil Action No.
 6   Vs.                            1 02-CV-1008-CC
 7   WORLD WRESTLING ENTERTAINMENT,
     INC., a Delaware corporation;
 8   VINCE MCMAHON, an individual;
     CHRIS IRVINE a/k/a CHRIS JERICHO
 9   a/k/a JERICHO, an individual,
10              Defendants.
11
             VIDEOTAPED DEPOSITION OF CHRIS IRVINE
12
13   Counsel for Plaintiff:
14       BEN C. BRODHEAD, ESQUIRE
         Ben C. Brodhead, P.C.
15       235 Peachtree Street, NE
         Suite 400
16       Atlanta, Georgia  30303
17       JOEL D. MYERS, ESQUIRE
         Myers & Kaplan, LLC
18       1827 Powers Ferry Road
         Building 3, Suite 200
19       Atlanta, Georgia  30339
20   Counsel for Defendants:
21       JOHN L. TAYLOR, JR., ESQUIRE
         Chorey, Taylor & Feil, P.C.
22       The Lenox Building, Suite 1700
         3399 Peachtree Road, N.E.
23       Atlanta, Georgia  30326
24
     Thomas Hallahan                  Patty Starks
25   Videographer                     February 4, 2003
```

2

I N D E X

1
2
3    CHRIS IRVINE                        PAGE
4
5    Direct Examination by Mr. Brodhead        5
6
7    Stipulations                61
8    Reporter's Certificate of Oath        64
9    Reporter's Deposition Certificate     65
10
11
12        E X H I B I T S
13   Exhibit No. 1 .............................. 38
14   Exhibit No. 2 .............................. 46
15   Exhibit No. 3 .............................. 47
16   Exhibit No. 4 .............................. 54
17
18
19
20
21
22
23
24
25

---

3

1        PURSUANT TO NOTICE for the taking of the
2    videotaped deposition of CHRIS IRVINE, upon oral
3    examination in the above-styled cause, at the
4    instance of the Plaintiff, for the purposes of
5    discovery or evidence, or both, permitted under the
6    Florida Rules of Civil Procedure and other
7    applicable law, proceedings therefor were held
8    before Patty Starks, Notary Public in and for the
9    State of Florida at large, at the Doubletree Hotel,
10   4500 West Cypress Street, Gardenia Room, Tampa,
11   Florida, on February 4th, 2003, at 11 a.m.
12       THEREUPON, the following proceedings were
13   had and taken:
14       THE VIDEOGRAPHER:  Good morning, ladies and
15   gentlemen.  Today's date is Tuesday,
16   February the 4th of 2003.  The time is
17   approximately 11 a.m.  My name is Thomas
18   Hallahan.  I'm the videographer.  The court
19   reporter is Patty Starks.
20       We are present at the Doubletree Hotel,
21   4500 Cypress Street, Tampa, Florida.  We're
22   here for the purpose of taking the deposition
23   of Chris Irvine.
24       The case is instituted in the United
25   States District Court for the Northern

---

4

1    District of Georgia, Atlanta Division.  The
2    case is entitled Larry Whistler also known as
3    Larry Zbyszko also known as The Living Legend
4    versus World Wrestling Entertainment.
5    Incorporated; Vince McMahon; Chris Irvine also
6    known as Chris Jericho also know as Jericho.
7        I will now ask the attorneys to introduce
8    themselves, starting with the plaintiff's
9    attorney.
10       MR. BRODHEAD:  This is Ben Brodhead,
11   attorney for plaintiff.
12       MR. MYERS:  Joel Myers, attorney for
13   plaintiff.
14       MR. TAYLOR:  My name is John Taylor, and
15   I'm the attorney for the defendants.
16       THE VIDEOGRAPHER:  Would the court
17   reporter please swear in the witness.
18       CHRIS IRVINE, called as a witness by the
19   Plaintiff, having been first duly sworn, testified
20   as follows:
21       MR. BRODHEAD:  This will be the deposition
22   of Chris Irvine taken for the purposes of
23   discovery and cross-examination and all other
24   purposes permissible under the Federal Rules
25   of Civil Procedure.  It is taken pursuant to

---

5

1    the Federal Rules of Civil Procedure.
2        By agreement of counsel, all objections
3    except as to the form of the question and
4    responsiveness of the answer will be reserved
5    until the time of the use of the deposition.
6    Also by agreement of counsel, formalities such
7    as time and place of taking and notice are
8    hereby waived.
9        Are those stipulations agreeable?
10       MR. TAYLOR:  They are.
11           DIRECT EXAMINATION
12   BY MR. BRODHEAD:
13   Q.  Would you please state your name for the
14   record.
15   A.  Chris Irvine.
16   Q.  And have you ever given a deposition
17   before?
18   A.  No.
19       MR. TAYLOR:  Ben, let me interrupt.  I
20   understood we were limiting the scope of this
21   deposition somewhat to issues involving
22   personal jurisdiction --
23       MR. BRODHEAD:  That is correct.  That is
24   my understanding as well.
25       MR. TAYLOR:  Okay.  I'm sorry.  I didn't

6

1    mean to interrupt you.
2       MR. BRODHEAD: No. That's no problem at
3    all.
4    BY MR. BRODHEAD:
5       Q.  As you have been doing, I'll ask that you
6    give a verbal answer to a question rather than an
7    uh-huh or an uh-uh or a nod of the head or a shaking
8    of the head. The reason for that is -- although we
9    are on video, most of the record will be referred to
10   on paper, and uh-uh or uh-huh might not be
11   translated properly. Is that agreeable?
12      A.  Yes.
13      Q.  I try to ask clear questions, but being an
14   attorney sometimes I do not. Will you agree with me
15   that if you do not understand a question you will
16   tell me?
17      A.  Yes.
18      Q.  Are you currently under the influence of
19   any drugs or alcohol?
20      A.  No.
21      Q.  Is there anything that would prevent you
22   from truthfully and completely answering my
23   questions today?
24      A.  No.
25      Q.  I'll be referring throughout this

7

1    deposition to the organization of WWE.
2       MR. BRODHEAD: Can we agree that if I refer
3    to WWE that would also include its predecessor
4    name WWF and so forth? Is that okay with
5    everyone here?
6       MR. TAYLOR: Okay with me.
7       THE WITNESS: Yes.
8    BY MR. BRODHEAD:
9       Q.  Is it correct that you're also -- as well
10   as being known as Chris Irvine, you're also known as
11   Chris Jericho?
12      A.  Yes.
13      Q.  How long have you been known as Chris
14   Jericho?
15      A.  13 years.
16      Q.  When did you first begin using the name
17   Chris Jericho?
18      A.  Um, 13 years ago.
19      Q.  I'm sorry. And for what purpose did you
20   begin using the name Chris Jericho?
21      A.  For wrestling purposes.
22      Q.  And with what organization was that or were
23   you independent?
24      A.  Independent.
25      Q.  Are you familiar with what a trademark is?

8

1       A.  Yes.
2       Q.  Is the name Chris Jericho trademarked?
3       A.  Yes.
4       Q.  And who owns that trademark?
5       A.  Chris Irvine.
6       Q.  When do you contend that the trademark was
7    established?
8       MR. TAYLOR: Object to the form of the
9    question insofar as it calls for a legal
10   conclusion. You can answer that if you know.
11      A.  I don't really understand the question.
12      Q.  How about this. Do you believe that your
13   trademark for Chris Jericho began when you started
14   using the name Chris Jericho?
15      A.  Legally?
16      Q.  Yes.
17      A.  No.
18      Q.  Have you gone through the process of
19   registering the name Chris Jericho?
20      A.  Yes.
21      Q.  When did you go through that process?
22      A.  1998.
23      Q.  That was the federal registration of the
24   trademark?
25      A.  Yes.

9

1       Q.  Did you use any attorneys to help you with
2    that registration?
3       A.  Yes.
4       Q.  Where were those attorneys located?
5       A.  Minneapolis.
6       Q.  Do you have any ownership in any
7    corporations?
8       A.  Um, I don't understand the question.
9       Q.  Well, do you hold any stock in any
10   companies, first of all?
11      A.  Yes.
12      Q.  Do you hold entire ownership of any
13   company, all the stock in any company?
14      A.  No.
15      Q.  And have you ever incorporated the name
16   Chris Jericho?
17      A.  Have I ever incorporated the name
18   Chris Jericho?
19      Q.  Yeah, like Chris Jericho, Incorporated,
20   or --
21      A.  Um, no.
22      Q.  Okay. Have you ever incorporated your own
23   name, Chris Irvine?
24      A.  Yes.
25      Q.  When did you do that?

10

1    A. Um, approximately three years ago.
2    Q. And what is the proper name that you
3    incorporated?
4    A. Chris Irvine, Incorporated.
5    Q. Is it "incorporated" spelled out or
6    abbreviated?
7    A. Abbreviated.
8    Q. In what state did you incorporate?
9    A. Florida.
10   Q. Did you use Florida attorneys to assist in
11   that incorporation?
12   A. I don't recall.
13   Q. Have you registered that corporation in
14   Georgia?
15   A. No.
16   Q. What is your current address?
17   A. 9817 Compass Point Way, Tampa, Florida.
18   Q. And the ZIP code?
19   A. 33615.
20   Q. How long have you been at that address?
21   A. Three years.
22   Q. What was your address previous to that?
23   A. Um, somewhere in Clearwater. I don't
24   recall the exact address.
25   Q. Do you know how long you were at the

11

1    location in Clearwater?
2    A. One year.
3    Q. And what about previous to that?
4    A. Orlando, Florida, for one year and a
5    half -- no, one year.
6    Q. What's your current work address?
7    A. Work address?
8    Q. Do you have a work address?
9    A. No.
10   Q. What's your current employment?
11   A. WWE.
12   Q. And do you know whether you're an employee
13   of WWE or an independent contractor?
14   A. Independent contractor.
15   Q. How long have you been an independent
16   contractor at WWE?
17   A. Three and a half years.
18   Q. And that independent contractor agreement,
19   is there a specific written independent contractor
20   agreement?
21   A. I don't understand the question.
22   Q. Is your independent contractor agreement
23   with WWE in writing?
24   A. Yes.
25   Q. Is that contract renewed annually or is it

12

1    just one contract you've had your entire time there
2    or is it renewed at any other time frame?
3    A. Um, there's a three-year contract, and then
4    I'm currently under another three-year contract.
5    Q. Do you know if the terms of the first and
6    second contract are the same?
7    A. Yes, I do know. I know they're not the
8    same.
9         MR. BRODHEAD: Do you have the copies of
10   the contracts? Okay. I assume there wouldn't
11   be an objection to producing the contracts?
12        MR. TAYLOR: I'll take it under
13   advisement. Have we produced them?
14   BY MR. BRODHEAD:
15   Q. Under your contract, do you perform as a
16   wrestler for WWE?
17   A. Yes.
18   Q. And you receive compensation for your
19   performances as a wrestler?
20   A. Yes.
21   Q. Do you own any residences in Georgia?
22   A. No.
23   Q. Do you own any property in Georgia?
24   A. No.
25   Q. Do you have ownership of any businesses in

13

1    Georgia?
2    A. Um, it's possible. I don't know for sure.
3    Q. Okay. Can you explain that further, by
4    what you mean "it's possible"?
5    A. I have a band, and we have an LLC. I don't
6    know if it's based in Georgia or not.
7    Q. Now, that band, is it Fozzy?
8    A. Yeah.
9    Q. Is that how it's pronounced, Fozzy?
10   A. Yes.
11   Q. What is your position with that band?
12   A. Singer.
13   Q. What is the name of the LLC?
14   A. I believe it's Fozzy, LLC, but I don't
15   recall for sure.
16        MR. TAYLOR: How do you spell that?
17        THE WITNESS: The band? F-o-z-z-y.
18   BY MR. BRODHEAD:
19   Q. Do you know when the LLC was formed?
20   A. I don't recall.
21   Q. Who has ownership in the LLC?
22   A. Myself and one other -- another guy named
23   Rich Ward.
24   Q. Did you handle forming the LLC?
25   A. Not directly, no.

14

1    Q. Did you hire attorneys to do that?
2    A. The band has a manager. So I don't recall
3  what he did.
4    Q. Okay. Who is the manager?
5    A. Mark Willis.
6    Q. I apologize. I've just forgot this. When
7  did you say the band became an LLC?
8    A. I said I didn't recall.
9    Q. Oh, okay. Can you tell me within, you
10  know, some time frame? Like was it within the past
11  two years, past five years?
12    A. It would be somewhere between '99 and the
13  year 2000; quite possibly the year 2000.
14    Q. And you're not certain, but Fozzy, LLC, may
15  be a registered LLC in Georgia?
16    A. Yes, it may be. I don't know for sure; so
17  I can't say for sure. I know we have one, and the
18  manager lives in Atlanta, and so that's why I'm
19  saying that.
20    Q. Do you have any other ownership or do you
21  have any ownership in any other businesses in
22  Georgia?
23    A. No.
24    Q. With your manager for Fozzy, LLC,
25  Mark Willis, did you enter into any management

15

1  contracts with Mr. Willis?
2    A. No.
3    Q. Okay. Have you ever entered into any
4  contracts in the state of Georgia?
5    A. Have I ever in my life?
6    Q. Yes.
7    A. Yes.
8    Q. What contracts do you recall entering into
9  in the state of Georgia?
10    A. WCW.
11    Q. And would you state for the record what the
12  abbreviation WCW stands for.
13    A. World Championship Wrestling.
14    Q. What were the dates of your work with WCW?
15    A. August of '96 through July of '99.
16    Q. So in July of '99 you stopped working with
17  WCW?
18    A. That's correct.
19    Q. And why was that?
20    A. I moved to WWF, WWE now.
21    Q. Do you know where the contract with WWF was
22  executed, where you signed it?
23    A. Where I signed it?
24    Q. Yes.
25    A. Where I physically signed it?

16

1    Q. Sure.
2    A. Tampa.
3    Q. Do you own any vehicles registered in the
4  state of Georgia?
5    A. No.
6    Q. When was the last time that you were in
7  Georgia?
8    A. One month ago, maybe.
9    Q. What was the purpose of that trip to
10  Georgia?
11    A. Band, band rehearsal.
12    Q. And where does the band rehearse?
13    A. Um, in Atlanta.
14    Q. Is there a specific location that the band
15  rehearses in Atlanta?
16    A. Yeah, but I couldn't tell you. I don't
17  recall what the address is.
18    Q. Okay. How often do you rehearse with the
19  band in Atlanta?
20    A. Hardly ever. That was the first time.
21    Q. Has your band ever made any CDs?
22    A. Yes.
23    Q. And was that CD recorded in Atlanta?
24    A. Yes.
25    Q. What was the name of the CD?

17

1    A. The first CD is called Fozzy. The second
2  CD is called Happenstance.
3    Q. And were both of those recorded in Atlanta?
4    A. Yes.
5    Q. Do you remember the name of the studio?
6    A. I don't recall.
7    Q. Was Mark Willis your manager for both of
8  those?
9    A. Yes.
10    Q. How long did it take to record Fozzy,
11  meaning the first CD?
12    A. Just my part of the CD or the entire CD?
13    Q. Let's go with just your part of the CD.
14    A. Seven days.
15    Q. And how were -- how long were you in
16  Atlanta in association with your efforts to record
17  the first CD, Fozzy?
18    A. Um, seven days.
19    Q. How long were you in Atlanta in reference
20  to recording Happenstance?
21    A. About the same.
22    Q. Were both CDs, Fozzy and Happenstance,
23  placed on the market for sale?
24    A. Yes.
25    Q. And did you derive income from the sale of

18

1  Fozzy and Happenstance?
2      A.  From the sales, no.  From the recording,
3  yes.
4      Q.  Would you tell me what you mean by -- how
5  were you paid for the recording?
6      A.  You get a lump-sum at the beginning to
7  record the record.  After the record has been
8  recorded and the expenses are taken out, then you
9  get the rest.  Then after a certain amount of sales
10  is reached to recoup that original lump-sum, then
11  you make money on top of that, which could take a
12  long time to finally see it.
13      Q.  And at this point you haven't seen anything
14  beyond the lump-sum --
15      A.  No.
16      Q.  -- on either CD?
17      A.  No.
18      Q.  What was the amount of the lump-sum you
19  received on Fozzy?
20      A.  The band or Chris Irvine?
21      Q.  Chris Irvine, you.
22      A.  I don't recall.
23      Q.  Can you give me an estimate?  Are we
24  talking hundreds of thousands of dollars or tens of
25  thousands?

19

1      A.  Probably around ten to fifteen thousand
2  dollars.
3      Q.  And what was the amount paid to you in the
4  initial lump-sum on Happenstance?
5      A.  $30,000.
6      Q.  Have you ever recorded for any other bands
7  other than Fozzy?
8      A.  No.
9      Q.  Have you received any other payments other
10  than the recording fees for your work with Fozzy in
11  the state of Georgia?
12      A.  Yes.
13      Q.  And what were the ways that you received
14  income from --
15      A.  From playing live shows.
16      Q.  How many live shows did you play in Georgia
17  under the name of -- with the band Fozzy?
18      A.  I don't recall.  Probably half a dozen.
19      Q.  And what would you make per show?
20      A.  It varies.
21      Q.  What's the range that it would vary
22  between?
23      A.  In Georgia?
24      Q.  Yes.
25      A.  Probably somewhere from 500 to $1,000.

20

1      Q.  And that's per show?
2      A.  Yes.
3      Q.  And it was about six shows?
4      A.  Give or take.
5      Q.  Is there any other way other than the
6  lump-sum recording fees and the per-show fees that
7  you received that you have derived income from your
8  work with Fozzy in the state of Georgia?
9      A.  I don't recall.  I don't think so, but I
10  don't recall for sure.
11      Q.  And I apologize if I asked this before.
12  What was the date of the recording of Fozzy, the
13  first CD?
14      A.  June or July of 2000.
15      Q.  And the date of the recording of
16  Happenstance?
17      A.  February of 2002.
18      Q.  Other than income that was derived from
19  your work with Fozzy and your work with the WWE,
20  WWF, and WCW have you derived any income from work
21  in Georgia?
22      A.  Can you repeat the question, please.
23      Q.  Yes.  Other than your work with Fozzy, WWE,
24  WWF, and WCW have you derived any income from work
25  in the state of Georgia?

21

1      A.  No.
2      Q.  Have you ever lived in the state of
3  Georgia?
4      A.  No.
5      Q.  How often do you perform for WWE in the
6  state of Georgia?  We can go on a per-year basis or
7  if you can think of it as in how many times you
8  performed, say, in 2002.
9      A.  I don't recall that.  I'd say approximately
10  four to six times a year.
11      Q.  And are you paid for -- by WWE for each one
12  of those performances in Georgia?
13      A.  Yes.
14      Q.  Is each one of the performances paid
15  pursuant to a separate pay agreement or do they all
16  pay the same?
17      A.  Explain the question, please.
18      Q.  It probably wasn't a very good question
19  actually.  How much do you get paid per appearance
20  for WWE?
21      A.  It depends on how many people show up.
22      Q.  Is it a percentage of ticket sales or do
23  you know how it's calculated?
24      A.  I really don't know.
25      Q.  Okay.  I want to verify some dates and tell

22

1   me if you understand these as correct. My
2   understanding is that you've performed in Georgia on
3   the following events. I'll -- it might be quicker
4   if I just go through all of them, and you can tell
5   me if they're correct or incorrect.
6       A. Okay.
7       Q. Okay. I understand that you performed on
8   February 5th of 2001 in Atlanta, Georgia, on the
9   event Raw is War; July 9th of 2001 in Atlanta,
10  Georgia, in the event Raw is War; January 20th,
11  2002, in Atlanta for the Royal Rumble; May 18th,
12  2002, in Macon, Georgia, for a WWE live event;
13  June 8th of 2002 in Albany, Georgia, for a live
14  event. June 9th in -- of 2002 in Augusta, Georgia,
15  for a live event; July 7th of 2002 in Savannah,
16  Georgia, for a live event; and then December 12th of
17  2002 in Atlanta, Georgia, for a Smackdown. Do those
18  sound accurate?
19      A. No, not entirely.
20      Q. Okay. Which ones do not sound accurate?
21      A. The December 12th Smackdown. I was not
22  there.
23      Q. Were you scheduled to perform at that
24  event?
25      A. No.

23

1       Q. Okay. And were you at all the other events
2   that were mentioned?
3       A. I believe so.
4       Q. And were you paid for all the other events
5   that were mentioned?
6       A. Yes.
7       Q. What is the range of pay that you would
8   receive -- I guess actually that's not a good
9   question. Let me start this over. How much would
10  you have made at an appearance of, let's say,
11  February 5th of 2001, Raw is War? Do you have any
12  idea how much --
13      A. I don't recall.
14      Q. Do you have any idea how much you would
15  have paid July 9th of 2001 for Raw is War?
16      A. I don't recall.
17      Q. Do you recall the amount that you made for
18  Royal Rumble in January 20th of '02?
19      A. No, I don't recall.
20      Q. Is it possible that that amount was
21  somewhere around $50,000?
22      A. Yes.
23      Q. Can you give me a range of what you think
24  you might have made at Raw is War in, say, July of
25  2001?

24

1       A. What's the exact date on that July?
2       Q. July 9th of 2001. And I might be able to
3   show you something to refresh your recollection on
4   these because I think that -- I think we have it
5   here. It might be just a little bit of fumbling
6   through papers. What I'm showing -- what I'm
7   showing is on July 9th of 2001 that your pay would
8   have been $2,000.
9           MR. TAYLOR: Hold on a minute. What are
10      you reading from?
11          MR. BRODHEAD: Reading from documents
12      that were produced by defendant for pay of
13      individuals.
14          MR. TAYLOR: If --
15          MR. BRODHEAD: And it is going to what
16      point he remembers. If he doesn't remember
17      it --
18          MR. TAYLOR: Well, I was just going to
19      say. I mean, if you recognize this document,
20      it refreshes your memory, then I suppose you
21      can say that. But I speculate he's probably
22      never seen this document before. Why don't
23      you show it to him?
24          MR. BRODHEAD: Yeah, why don't we do
25      that. You don't have any personal notes in

25

1   here or anything like that?
2           MR. MYERS: No.
3           MR. BRODHEAD: Okay.
4           MR. TAYLOR: Does it have a Bates number?
5   Is the document identified --
6           MR. BRODHEAD: The document is identified
7   number as Zbyszko/WWE0049.
8           MR. TAYLOR: All right. Mr. Irvine, if
9   you have seen this document before or if by
10  looking at it your personal recollection is
11  refreshed as to what you may have made, you
12  can answer that. But I -- Ben doesn't want
13  you to speculate and neither do I.
14          THE WITNESS: I've never seen this
15  document before.
16  BY MR. BRODHEAD:
17      Q. Okay.
18      A. And it's probably correct. So -- but I
19  didn't --
20      Q. But you don't have an individual
21  recollection of it?
22      A. No.
23      Q. Okay.
24      A. I have the records at home, but I don't
25  have an individual recollection.

26

1    Q.  Okay.  That's fine.  I apologize if I'm
2  covering old ground, but just to make sure I have it
3  on the record here, am I correct that on all the
4  dates that we mentioned, except for December 12th of
5  2002, that you did work as a wrestler, and you were
6  paid for that, and the work was done in Georgia?
7    A.  Yes.
8    Q.  When you would be performing an event in
9  Georgia for WWE or WWF, would there be any separate
10  agreement that you would enter with WWE or anyone
11  else regarding that performance in Georgia?
12    A.  I don't understand the question.
13    Q.  Well, you have one independent contractor
14  agreement with WWE; is that correct?
15    A.  Yes.
16    Q.  When you would perform in Georgia, were
17  there any supplemental agreements or amendments that
18  were made to your independent contractor agreement?
19    A.  No.  Not that I know of, no.
20    Q.  Nothing that you would have signed?
21    A.  No.
22    Q.  Have you ever wrestled under the name
23  Chris Irvine for WCW?
24    A.  No.
25    Q.  Have you ever wrestled under the name Chris

27

1  Irvine for WWF or WWE?
2    A.  No.
3    Q.  Is there also -- I believe we had stated
4  earlier that there was a trademark for Chris
5  Jericho; is that correct?
6    A.  Yes.
7    Q.  Is there also a trademark for Jericho?
8    A.  I don't recall.
9    Q.  Have you had any other names trademarked?
10    A.  Myself personally?
11    Q.  Or trademarks that you might own, yes.
12    A.  No.
13    Q.  Okay.  Is Y2J trademarked?
14    A.  I'm sure it is through the WWE, not through
15  me.
16    Q.  Okay.  So you would not have ownership in
17  that trademark?
18    A.  No.
19    Q.  In all the events that we spoke of earlier
20  that you have wrestled in, you wrestled under the
21  name Chris Jericho; is that correct?
22    A.  In Georgia?
23    Q.  Yes.
24    A.  Yes.
25    Q.  Was there --

28

1    A.  I was just smiling for the camera.
2    Q.  Okay.
3    MR. TAYLOR:  Old habits die hard.
4    Q.  Have you ever used the phrase Living
5  Legend in reference to your self?
6    A.  Yes.
7    Q.  How many times have you used the phrase
8  Living Legend in reference to yourself?
9    A.  I don't recall.
10    Q.  Are you familiar with Vince McMahon?
11    A.  Yes.
12    Q.  Has Vince McMahon ever used the phrase
13  Living Legend in reference to you?
14    A.  I don't recall.
15    Q.  Did you ever discuss using the phrase
16  Living Legend in reference to yourself with
17  Mr. McMahon?
18    A.  I don't recall.
19    Q.  Is there an approval process that you would
20  have to go through in order to use a particular name
21  in reference to yourself during a WWE event?
22    A.  No.
23    Q.  Has the WWE or anyone on behalf of WWE ever
24  told you not to use a specific name in reference to
25  yourself?

29

1    A.  I don't recall.  I don't believe so,
2  though.  Maybe for some guys but not for me.
3    Q.  Are you aware of any specific instances
4  when the WWE told a wrestler that he or she could
5  not use a particular name?
6    A.  No.
7    Q.  Do you also used the term "Living Legend"
8  to refer to yourself at events in Georgia?
9    A.  No, not that I recall.
10    Q.  Do you know if any announcers referred to
11  you as Living Legend -- strike that.  Have any
12  announcers for the WWE during WWE events ever
13  referred to you as Living Legend?
14    A.  I don't recall a specific incident, but
15  it's quite possible.
16    Q.  Do you have control over what -- I'm sorry.
17  Do you have control over how announcers refer to
18  you?
19    A.  No.
20    Q.  Who would suggest to the announcers what to
21  say?
22    A.  I don't know who --
23    Q.  Well, I guess what I'm trying to figure out
24  is, if the announcers might have referred to you as
25  the Living Legend, how would they have known to do

30

1  this?
2      A. Just from watching the TV maybe. I don't
3  know. I mean, I don't understand.
4      Q. But you don't know of anyone who instructs
5  the announcers to use particular names?
6      A. No.
7      Q. Okay. And you don't personally instruct
8  the announcers what name to use when referring to
9  you?
10     A. No.
11     Q. On what instances have you used the term
12 "Living Legend" in reference to yourself?
13     A. I don't understand the complete question.
14     Q. I guess I'm looking for, have you used it
15 during events, magazines, websites? What
16 circumstances -- under what circumstances have you
17 used the name Living Legend in reference to
18 yourself?
19     A. Live shows. Um, other than that, I don't
20 recall specific ones.
21     Q. Are live shows broadcast?
22     A. Are they broadcast?
23     Q. Yes.
24     A. Yes.
25     Q. Do you know if the live shows in which you

31

1  participate are broadcast into Georgia?
2      A. Yes.
3      Q. And were you aware that the events you
4  participated in were broadcast into Georgia when you
5  used the phrase Living Legend to describe yourself?
6      A. I don't know for sure. I mean, I would
7  assume so.
8      Q. Are you aware that some of the events you
9  participated in are sold via Pay Per View in
10 Georgia?
11     A. Am I aware of it?
12     Q. Yes.
13     A. Yes.
14     Q. Did you refer to yourself as Living Legend
15 or did anyone at WWE, as far as you know, refer you
16 to as Living Legend during any events that were
17 available on Pay Per View?
18     A. I don't recall. I didn't.
19     Q. Which events are sold via Pay Per View?
20     A. There's 12 a year.
21     Q. And what are those 12?
22     A. I don't know the names of all of them.
23     Q. Okay. But it would be events such as Royal
24 Rumble?
25     A. Yes.

32

1      Q. Is Smackdown one that's sold by --
2      A. No.
3      Q. -- Pay Per View?
4      A. No.
5      Q. Is Raw is War sold by Pay Per View?
6      A. No.
7      Q. Can you remember any of the other names?
8      A. Wrestle Mania, King of the Ring, Survivor
9  Series, Summer Slam, and then seven other ones.
10         MR. TAYLOR: You must not be much of a fan.
11         THE WITNESS: They change them all the
12 time.
13         MR. TAYLOR: I know more than that.
14 BY MR. BRODHEAD:
15     Q. I'm having trouble coming up with a good
16 question for this, but I'll let you know what I'm
17 trying to find out. I'm trying to find out how you
18 know you did not use Living Legend to refer to
19 yourself -- to refer to yourself in the Pay Per View
20 events.
21     A. In the Pay Per View events?
22     Q. Yes.
23     A. How I know that I didn't?
24     Q. Right.
25     A. Well, because I don't recall doing an

33

1  interview at the Pay Per View or possibly two Pay
2  Per Views when I was using the term.
3      Q. During what period were you using the term
4  "Living Legend"?
5      A. January of 2002, possibly February as well.
6      Q. Were you using it at all in 2001, as far as
7  you recall?
8      A. I don't recall. It's possible, but I don't
9  recall for sure.
10     Q. Are Pay Per View events advertised as far
11 as you know?
12     A. Yes.
13     Q. Do you know if you're ever included in
14 those advertisements for Pay Per View events?
15     A. Sometimes.
16     Q. Do you do any special -- I'm sorry. Do you
17 do any on-camera work for those advertisements for
18 Pay Per View events?
19     A. No.
20     Q. Is it simply they take clips of you from
21 other times and incorporate it into the
22 advertisement as far as you know?
23     A. I believe so. As far as I know.
24     Q. Okay. Do you know if Living Legend was
25 ever used to refer to you in any of the

34

1    advertisements for Pay Per View events?
2        A.   I don't know.
3        Q.   Do you know of any other -- do you know of
4    any times when WWE has used Living Legend in
5    reference to you in either promoting a show or --
6    well, let's go with that.  Do you know of any times
7    that WWE has ever used the name Living Legend to
8    promote a show?
9        A.   No.
10       Q.   Has the name Living Legend ever been used
11   to promote a specific match that you know of?
12           MR. TAYLOR:  This is ever?
13           MR. BRODHEAD:  Yeah.  And actually let me
14   qualify that.
15       Q.   Has the term "Living Legend" ever been
16   used in reference to you in order to promote a
17   particular match?
18       A.   I don't recall.  I don't know.
19       Q.   Are you familiar with Larry Whistler, who
20   is also known as Larry Zbyszko?
21       A.   Yes.
22       Q.   When did you become familiar with him?
23       A.   1996.
24       Q.   In 1996 were you aware that he used the
25   name Living Legend to promote himself?

35

1        A.   Possibly.  Probably in 1997 or so.
2        Q.   So as of 1997 you were aware that
3    Larry Zbyszko, Larry Whistler used the name Living
4    Legend?
5        A.   It's possible.  It may have been 1996, but
6    by '97 for sure.
7        Q.   How did you end up meeting Mr. Whistler?
8        A.   He was a commentator in WCW when I started
9    there.
10       Q.   At that point were you aware that he lived
11   in Georgia?
12       A.   No.
13       Q.   Have you ever become aware that he lived in
14   Georgia?
15       A.   No.  Not until at this moment.
16       Q.   Did you ever have any interaction with
17   Mr. Whistler other than with him announcing matches
18   that you were in?
19       A.   No, not really.
20       Q.   Have you ever entered into any licensing
21   agreements for any reason?
22       A.   I'm not sure I know what a licensing
23   agreement is.
24       Q.   Any agreements where you agree to let
25   others use perhaps the name Chris Jericho?

36

1        A.   Through the WWE you mean or WCW?
2        Q.   Well, that would be fine.  In any way.
3        A.   I believe so, yes.
4        Q.   Is that a -- is the licensing agreement
5    separate from your independent contractor agreement?
6        A.   I believe they're intertwined.
7        Q.   Are you paid anything separate from your
8    wrestling fees for use of your name on products?
9        A.   Yes.
10       Q.   What are you paid for that?
11       A.   I don't recall.
12       Q.   Is it your understanding that products that
13   are licensed with your name on them are sold in
14   Georgia?
15       A.   I assume so.
16       Q.   Have you ever personally signed any
17   licensing agreements for products that you're aware
18   of?
19       A.   I don't think so.
20       Q.   Do you have approval over the character
21   names and phrases that are used to describe you for
22   licensed products?
23       A.   No.
24       Q.   Who makes that determination?
25       A.   I don't know.  The companies that release

37

1    the products maybe.
2        Q.   If there were a phrase being used to
3    describe you on a particular product and you did not
4    approve, would you be able to have that name removed
5    from the product?
6        A.   I don't understand the question.
7        Q.   Well, let me ask you this.  Have you ever
8    seen a licensed product with your name on it?
9        A.   Yes.
10       Q.   Have you ever seen a licensed product with
11   your name on it that included content that you did
12   not approve of?
13       A.   No.
14       Q.   Had you ever seen one that had content that
15   you did not approve of, would you have been able to
16   remove that content?
17       A.   No.
18       Q.   Why not?
19       A.   Because we have no -- nothing to do or no
20   control over things like that.  Half the time we
21   don't even see half the products that are released
22   of us.  By the time we see them, they're already on
23   the shelves.
24       Q.   Have you ever seen a product licensed by
25   WWE or anyone else that used the term "Living

38
1  Legend" reference to you?
2  A. No.
3  MR. BRODHEAD: I assume he's going to say
4  he's not seen this before, and that's fine.
5  What we'll do is call this Exhibit 1. I have
6  a black and white photocopy of it.
7  MR. TAYLOR: No. I want that.
8  MR. BRODHEAD: Okay. We can certainly
9  make that available. Actually I didn't give
10 you this. Let the record reflect I'm having
11 the court reporter mark the exhibit as Irvine
12 1.
13 (Irvine 1 marked for ID purposes.)
14 (An off-the-record discussion was had.)
15 MR. TAYLOR: What are we --
16 MR. BRODHEAD: I'm just going to ask him
17 if he's ever seen this product; that's all.
18 MR. TAYLOR: Okay.
19 MR. BRODHEAD: Let the record reflect I'm
20 showing the deponent what's been marked as
21 Irvine 1.
22 BY MR. BRODHEAD:
23 Q. Do you recognize this product?
24 A. Yes.
25 Q. Have you seen this product before?

39
1  A. I don't recall. I don't believe so.
2  Q. Okay. Is the picture in the lower
3  left-hand corner marked with "I'm a Living Legend,"
4  is that you?
5  A. Yes.
6  Q. Okay. Do you have any ownership in Jakks
7  Pacific?
8  A. No.
9  Q. Do you have any control of Jakks Pacific?
10 A. No.
11 Q. Do you have any involvement in the products
12 that are produced by Jakks Pacific?
13 A. No.
14 Q. Is the term "story line" ever used in the
15 wrestling industry?
16 A. Yes.
17 Q. What is a story line?
18 A. It's pretty much self-explanatory.
19 Q. Basically it's just a series of events that
20 occurs?
21 A. Uh-huh (indicating affirmatively).
22 Q. And that's planned?
23 A. Yes.
24 Q. Do you have any input regarding the story
25 lines used by WWE?

40
1  A. Sometimes.
2  Q. On what occasions have you had input on the
3  story line?
4  A. It's a pretty intricate process but most of
5  the time you have some sort of say in what's going
6  on; not total control, but you can definitely add
7  your two cents in.
8  Q. How long do story lines usually last?
9  A. Now-a-days two weeks, sometimes two months,
10 maybe a little bit longer, three months.
11 Q. At another point in time did they used to
12 last longer?
13 A. Yes.
14 Q. When did they become shorter?
15 A. I don't recall for sure, maybe the last two
16 or three years, four years, five years.
17 Q. Is it your understanding that story lines
18 are used to attract viewers?
19 A. That's the intent.
20 Q. And is it your understanding that the story
21 lines are used to keep viewers watching future
22 events as well?
23 A. That's the idea, yeah.
24 Q. Am I correct that WWE has events that take
25 place all over the U.S.?

41
1  A. Yes.
2  Q. And the story lines might be continued from
3  event to event?
4  A. Yes.
5  Q. Meaning that the story line might be
6  continued in several different states?
7  A. Yeah. It's possible, yes.
8  Q. Is the rise of one character to the level
9  of champion of WWE considered a story line?
10 A. Yes.
11 Q. When did you become -- well, did you become
12 champion of WWE?
13 A. Yes.
14 Q. When was that that you became champion of
15 the WWE?
16 A. December of 2001.
17 Q. And did you defend your title as champion
18 of WWE in the Royal Rumble of January 20, 2002?
19 A. Yes.
20 Q. And did you win that event?
21 A. Of course. I always win.
22 Q. Okay.
23 MR. TAYLOR: You're under oath now.
24 THE WITNESS: You better strike that.
25 Q. And just so I can understand this

42

1   process, when you begin with WWE or when you began
2   with WWE, do they have sort of a ranking system?
3       A.   Not really.
4       Q.   How about this. Can you describe how you
5   rose through the ranks up to the WWE champion?
6       A.   Wrestling is all based on the reaction of
7   the fans; on what's going to make the most money.
8   So when you first come into a company, fans have to
9   get familiar with your character and with your work
10  and build up an emotional attachment to where they
11  love you or they hate you. When you get to a
12  certain point where they love you so much or they
13  hate you so much that you can draw money for the
14  company, then you become a top-level player. When
15  you become a top-level player, that's when you
16  probably will win the championship. Something like
17  that.
18      Q.   Okay. Is that the same progression that
19  you followed?
20      A.   Something along those lines, yeah.
21      Q.   Were you loved or hated?
22      A.   Hated.
23          MR. TAYLOR:   Hard to believe.
24      Q.   How long -- are the wrestling events done
25  on a card basis, basically you have undercards and

43

1   then you have the top card?
2       A.   Yes.
3       Q.   Okay. During 2001, let's say the beginning
4   of 2001, where were you as far as the cards went?
5       A.   Beginning of 2001?
6       Q.   Yes.
7       A.   I think in the Royal Rumble of 2001 I won
8   the intercontinental championship, which was the
9   step below the undisputed championship or the
10  heavyweight championship, whatever you want to call
11  it.
12      Q.   Do you recall how much you would have been
13  paid for that event?
14      A.   Which one?
15      Q.   The Royal Rumble in 2001.
16      A.   I don't recall.
17      Q.   I mean, do you have any rough idea? Was it
18  hundreds, thousands, tens of thousands?
19      A.   Tens of thousands, between fifty and
20  seventy-five -- between thirty and seventy-five
21  maybe; although, you probably have the figures. You
22  can just check it out yourself.
23      Q.   Actually I don't think I have those
24  figures. During the summer of 2001 where would you
25  have been in the card placement?

44

1       A.   Um, summer of 2001? I don't even remember
2   what we were doing then.
3           MR. TAYLOR:   You only need to answer that
4   if you know.
5       A.   Well, I don't recall. I really don't.
6       Q.   Before you became the champion of the WWE
7   in December of 2001, was there a progression of
8   matches where you were consistently being ranked
9   higher in the cards?
10      A.   Yes.
11      Q.   And was it during that time of your
12  ascension through the rankings that you were using
13  "Living Legend" to refer to yourself?
14      A.   No.
15      Q.   Did you use "Living Legend" to refer to
16  yourself before you became champion?
17      A.   No, at least I don't recall saying it then.
18          MR. TAYLOR:   How are you doing? We've been
19  going an hour. We can take breaks.
20          THE WITNESS:   I'm all right.
21          MR. BRODHEAD:   And I apologize for this.
22  This is certainly not a test of endurance. If
23  you need a break for any reason.
24          THE WITNESS:   No, I'm fine.
25          MR. TAYLOR:   That's all I wanted to make

45

1   clear to him. I'm okay, if you are, Chris.
2           THE WITNESS:   No. I just want to get
3   this over with.
4   BY MR. BRODHEAD:
5       Q.   Whose idea was it to use the name Living
6   Legend in reference to you?
7       A.   Mine.
8       Q.   Why did you decide to do that?
9       A.   Because in the story line I had just
10  unified the two world titles from two separate
11  companies which had never been done before. So just
12  a boastful thing.
13      Q.   Did anyone ever -- I'm sorry. Did anyone
14  at WWE ever tell you not to use the term "Living
15  Legend" in reference to yourself?
16      A.   I don't recall.
17      Q.   Now, you stated that you used the name
18  "Living Legend" I think you said in January and
19  February of '02, possibly in December of '01. Is it
20  possible that that name was still being used in
21  reference to you as late as June and July of 2002?
22          MR. TAYLOR:   Object to the form of the
23  question. His answer was what he did, and I
24  think your question is did someone else use
25  it.

46

1    MR. BRODHEAD: That's fine. I'll address
2    that.
3    MR. TAYLOR: And my observation is you
4    can answer that if you know.
5    A. Yeah, I don't really know. If you're
6    looking at a magazine, I guess it's quite possible.
7    MR. BRODHEAD: Let's go ahead and mark
8    these.
9    A. Keep in mind, too, that publishing dates
10   --
11   Q. Right. The publishing date might be
12   later than --
13   A. It might be earlier.
14   Q. Right. Okay.
15   MR. BRODHEAD: If we can mark this as
16   Irvine 2, please.
17   (Irvine 2 marked for ID purposes.)
18   THE WITNESS: Can I see one of those?
19   MR. BRODHEAD: Yes. She's going to give
20   you one right there.
21   THE WITNESS: The official one.
22   BY MR. BRODHEAD:
23   Q. Have you ever seen this story before --
24   A. No.
25   Q. -- Envision of the Gold? On the sort of

47

1    middle right there's a picture of an individual with
2    two belts over -- one belt over each shoulder. Is
3    that you?
4    A. Yes.
5    Q. And to the next of it it says "The
6    self-proclaimed Living Legend."
7    A. Uh-huh (indicating affirmatively).
8    Q. Did you ever proclaim yourself as a Living
9    Legend?
10   A. Yeah. We discussed it. I did,
11   self-proclaimed.
12   Q. Did you have any input in this article or
13   in this publication?
14   A. No.
15   MR. BRODHEAD: Let's mark this as Irvine 3,
16   please.
17   (Irvine 3 marked for ID purposes.)
18   MR. BRODHEAD: Let the record reflect the
19   deponent is being shown what's been marked as
20   Irvine 3.
21   BY MR. BRODHEAD:
22   Q. Do you recognize what this document
23   reflects?
24   A. What it reflects?
25   Q. Do you recognize what it is? It's a

48

1    photo --
2    A. Absolutely I recognize what it is.
3    Q. Okay. And what is that?
4    A. It's a Pro Wrestling magazine.
5    Q. Am I correct that you gave an interview for
6    that Pro Wrestling magazine?
7    A. No.
8    Q. Okay. How was that interview developed as
9    far as you know?
10   A. Pro Wrestling magazines are written by the
11   writers and the editors the same way that a National
12   Inquirer is written, and everybody in the wrestling
13   business knows that, including Mr. Whistler, I'm
14   assuming. So this is like somebody wrote this as
15   like a creative writing assignment, and that's how
16   wrestling magazines are, and they have always been
17   this way.
18   Q. And do you have any input on the content of
19   the articles?
20   A. Absolutely not.
21   Q. Okay. Do you have any ability to change
22   the content in the articles?
23   A. No.
24   Q. And did anybody contact you regarding the
25   use of the term "Living Legend" in reference to you?

49

1    A. No.
2    Q. So this would have been somebody that --
3    well, I'm sorry. Does the WWE have any input into
4    these wrestling magazines as far as you know?
5    A. No. These ones here are by London
6    Publishing, I believe, and these are not WWE
7    magazines. This one, yes.
8    Q. Okay. So what you're stating is,
9    regardless of your input in anything you might have
10   said, they chose to use the term "Living Legend" in
11   reference to you on their own?
12   A. Yes. And this interview is just made up.
13   Q. Okay.
14   MR. TAYLOR: In other words, you never gave
15   such an interview?
16   THE WITNESS: No, no. I never gave this
17   interview, no.
18   BY MR. BRODHEAD:
19   Q. And you had nothing to do with authorizing
20   the publication of the interview?
21   A. No.
22   MR. TAYLOR: Well, I object to calling it
23   an interview.
24   MR. BRODHEAD: Well, I'm sorry. With the
25   story. And I'm not -- I'm not trying to

50

1   contend that it is, in fact, an interview.
2        MR. TAYLOR: Well, I don't know. It took
3   me a while to learn this, that they just make
4   this stuff up. I thought it was just my
5   clients denying that they'd given interviews.
6   It took me a while to figure out they just
7   make it up from start to finish.
8        MR. BRODHEAD: Actually why don't we take
9   a break for just a minute if that's okay with
10  y'all.
11       MR. TAYLOR: Okay. Are we getting close?
12       MR. BRODHEAD: I wish. I think I've
13  got -- it's going to be a little bit longer.
14  I don't know how quick it's going to go.
15       MR. TAYLOR: Let's take a break.
16       THE VIDEOGRAPHER: We're off the video
17  record.
18       (A short break was taken.)
19       THE VIDEOGRAPHER: We're on the video
20  record.
21  BY MR. BRODHEAD:
22       Q. Just one thing I didn't cover. Do you
23  have any idea why Jakks Pacific in manufacturing
24  this game would have used Living Legend in relation
25  to you -- your picture?

51

1        A. No.
2        Q. Okay. And some of these are just sort of
3   cleaning up questions here. I apologize if I'm
4   covering old ground. But you used the name
5   Chris Jericho to promote yourself; is that correct?
6        A. Yes.
7        Q. And you've used the trademark Chris Jericho
8   to promote yourself in Georgia?
9        A. Yes.
10       Q. And I think we've discussed this, but do
11  you have any control over any TV contracts?
12       A. No.
13       Q. Any Pay Per View contracts?
14       A. No.
15       Q. Any distribution of items that are sold
16  with the trademark "Chris Jericho" on them?
17       A. No.
18       Q. Do you have any control over magazine
19  distribution in Georgia?
20       A. No.
21       Q. Have you ever participated in negotiations
22  regarding broadcast agreements in Georgia?
23       A. No.
24       Q. Did you use the phrase "Living Legend" in
25  order to try to promote yourself?

52

1        A. I don't understand the question.
2        Q. Why did you use the phrase "Living Legend"?
3        A. As a boast, but the fans would obviously
4   know it wasn't true.
5        Q. That boast was designed to get a fan
6   reaction; is that correct?
7        A. Yes.
8        Q. And being that you were one of the ones who
9   was disliked, did you expect that that would raise
10  anger in the fans for you to use that phrase?
11       A. Yes.
12       Q. Did it, in fact, do that?
13       A. I think so. Not majorly, though. It
14  wasn't a major part of my act.
15       Q. You do have fans in Georgia, though, is
16  that correct?
17       A. Um, I think so.
18       MR. TAYLOR: At least one.
19       THE WITNESS: Yeah, I've got one there.
20       MR. TAYLOR: I'm talking about me.
21       THE WITNESS: That you know of, one.
22       MR. TAYLOR: My children, I think.
23       THE WITNESS: A couple.
24       MR. TAYLOR: I can get you up to four.
25  BY MR. BRODHEAD:

53

1        Q. Are there any websites that are used to
2   promote you?
3        A. Yes.
4        Q. What websites?
5        A. The WWE website. I have a website.
6        Q. What is your website?
7        A. Chris Jericho dot com.
8        Q. And do you own that website?
9        A. Um, yes.
10       Q. Is there anyone else who has ownership in
11  that website besides you?
12       A. No, I don't believe so.
13       Q. Is there any corporation associated with
14  that website?
15       A. I don't recall. I don't run it; so I don't
16  know for sure.
17       Q. Who does run it?
18       A. My friend.
19       Q. And who is that?
20       A. Lee Wren.
21       Q. Can you spell both of those?
22       A. L-e-e, W-r-e-n.
23       Q. Is that a male or a female?
24       A. Male.
25       Q. And where does Lee Wren live, do you know?

54

1    A.  Winnipeg.
2    Q.  Did Mr. Wren initially set up the website
3    for you?
4    A.  We set it up together.
5    Q.  Did you set it up in Winnipeg?
6    A.  No.
7    Q.  Where did you set it up?
8    A.  Well, he was in Winnipeg.  I was in
9    Orlando.
10   Q.  And when was the website set up?
11   A.  December of '97, I believe.
12   Q.  Is it correct that that website has had
13   more than three million hits since it was developed?
14   A.  I believe so.  I don't know the exact
15   figure, something like that.
16   Q.  Do you have a web counter on the website?
17   A.  Yes.
18   Q.  Okay.  And that web counter counts the
19   number of hits; is that correct?
20   A.  Absolutely.
21      MR. BRODHEAD:  I will just introduce this.
22   Let's mark that as -- we're up to No. 4.
23      (Irvine 4 marked for ID purposes.)
24      MR. BRODHEAD:  Okay.  Let the record
25   reflect the deponent has been shown what has

55

1    been marked as Irvine 4.
2    BY MR. BRODHEAD:
3    Q.  Do you recognize what that would be?
4    A.  Yes.
5    Q.  Is that a screen shot of your website?
6    A.  Uh-huh, home page.
7    Q.  And in the bottom left-hand side it says
8    that there have been 3,477,575 hits since December 4
9    of '97.
10   A.  Right.
11   Q.  Does that seem like an accurate number as
12   far as your aware?
13   A.  I would say so if the counter says it.
14   Computers don't lie, right?
15   Q.  Do you have any ownership in any websites
16   other than Chris Jericho dot com?
17   A.  We have a website for Fozzy, but I don't
18   own it.
19   Q.  Is it owned by Fozzy, LLC?
20   A.  I don't know for sure.
21   Q.  Okay.  Who manages the website for Fozzy?
22   A.  A guy called Ed Aborn.
23   Q.  How do you spell his last name?
24   A.  A-b-o-r-n.
25   Q.  And do you know where Mr. Aborn lives?

56

1    A.  He lives in Tampa.
2    Q.  Did you work with Mr. Aborn in setting up
3    the Fozzy website?
4    A.  Um, yeah -- yes, yes, a little bit.
5    Q.  And what's the web address for Fozzy?
6    A.  Fozzyrock dot com.
7    Q.  Just F-o-z-z-y-r-o-c-k --
8    A.  Yes.
9    Q.  -- no space, dot com?
10   A.  That's correct.
11   Q.  Do you have control over the content of the
12   Chris Jericho dot com website?
13   A.  Yes.
14   Q.  Do you have control over the content of
15   Fozzyrock dot com?
16   A.  Yes.
17   Q.  And I think we've discussed that you're
18   familiar with the content of the website Chris
19   Jericho dot com?
20   A.  Most of it, yes.
21   Q.  Okay.
22   A.  Not all of it, but most of it.
23   Q.  Am I correct that products are sold on the
24   website, Chris Jericho dot com?
25   A.  I think it's just a link to Shop Zone,

57

1    which is the WWE website.
2    Q.  That's what the Y2J Store would be?
3    A.  Yes.  You just click on that; it will link
4    you to the WWE home page, I believe.
5    Q.  There also appears to have a link on the
6    bottom middle there that says "Get the new Fozzy
7    album Happenstance."
8    A.  Uh-huh (indicating affirmatively).
9    Q.  Can that be purchased from -- is that
10   linked to the Fozzy website or where does that go?
11   A.  I'm not sure, either the Fozzy website or
12   maybe Amazon or something like that maybe.
13   Q.  Do you get a royalty on products that are
14   sold from WWE that are related to you?
15   A.  Yes.
16   Q.  Is that a percentage of each product or is
17   each product different or percentage of sales?  How
18   does that work?
19   A.  I believe it's a percentage of per sale.
20   Q.  Do you know what that percentage is?
21   A.  I think it's 5 percent.
22   Q.  And at this point you're not getting any
23   percentage from the sales of Happenstance; is that
24   correct?
25   A.  That's correct.



58

1    Q.  But if at some point sales were great
2    enough you would get a percentage of the sales from
3    Happenstance?
4    A.  Yes.
5    Q.  Does the website help promote your name as
6    well?  Does Chris Jericho dot com help promote your
7    name?
8    A.  I guess, yes.
9    Q.  And is the promotion of your name -- is
10   that a benefit to you?
11   A.  Yes.
12   Q.  Is it correct that the website Chris
13   Jericho dot com is accessible in Georgia?
14   A.  Yes.
15   Q.  And is it your understanding that by
16   pressing the link Y2J Store, Georgia residents can
17   be led to a location where they can purchase items?
18   A.  Yeah, I think so.
19   Q.  And if they purchase your items, then you
20   would receive a financial benefit from those
21   purchases, correct?
22   A.  Yes.
23   Q.  Is it also correct that at least at one
24   point you used the term "Living Legend" to refer to
25   yourself on the website Chris Jericho dot com?

59

1    A.  I don't recall.
2    Q.  Have you ever instructed anyone or -- I'm
3    sorry.  Have you ever -- have you ever instructed
4    the person who is helping on your website,
5    Mr. Wren, to remove particular conduct -- content
6    from your website?
7    A.  No.  I don't recall, but just to change
8    things, you know, put this up, a news commentary or
9    something like that maybe.
10   Q.  Have you ever personally gone on and
11   changed any of the content on the website Chris
12   Jericho dot com?
13   A.  I'm not that technically efficient.
14   Q   Nor am I.  Do you also have a fan club?
15   A.  Not that I'm aware of.
16      MR. BRODHEAD:  We can go off the record for
17   just a second.  That's okay.
18      THE VIDEOGRAPHER:  We're off the video
19   record.
20      (An off-the-record discussion was had.)
21      THE VIDEOGRAPHER:  We're on the video
22   record.
23   BY MR. BRODHEAD:
24   Q.  Do you know whether or not Vince McMahon
25   has ever announced you as Living Legend?

60

1    A.  No, I don't know.
2       MR. BRODHEAD:  That's all I have.
3       MR. TAYLOR:  No questions for the
4    defendants.
5       THE VIDEOGRAPHER:  We're off the video
6    record.
7       THE REPORTER:  Do you want to ask him
8    about reading and waiving?
9       MR. TAYLOR:  We'd like for Mr. Jericho to
10   sign, but we would be willing to stipulate
11   that he do so in any -- in front of any notary
12   public.  Well, send it to me, and I'll handle
13   signature.
14      THE REPORTER:  You're taking the
15   original?
16      MR. MYERS:  Yes.
17      MR. TAYLOR:  I'd like a copy and a copy
18   of the video.
19      THE VIDEOGRAPHER:  The original and copy
20   of the video?
21      MR. MYERS:  Correct.
22      THE VIDEOGRAPHER:  Do you want a copy of
23   the video as well?
24      MR. TAYLOR:  I might as well.
25

61

STIPULATIONS

     THEREUPON, the deposition of
CHRIS IRVINE was concluded at 12:41 p.m.
     NOTE:  The original and one copy of the
foregoing deposition will be held by
Mr. Brodhead; copy to Mr. Taylor.

62

1     DEPONENT'S ERRATA SHEET
2     AND SIGNATURE INSTRUCTIONS
3
4         The Original of the Errata Sheet has been
5     delivered to John L. Taylor, Jr., Esquire.
6         When the Errata Sheet has been completed by the
7     deponent and signed, a copy thereof should be
8     delivered to each party of record and the ORIGINAL
9     delivered to Ben C. Brodhead, Esquire, to whom the
10    original deposition transcript was delivered.
11
12        INSTRUCTIONS TO DEPONENT
13
14        After reading this volume of your deposition,
15    indicate any corrections or changes to your
16    testimony and the reasons therefor on the Errata
17    Sheet supplied to you and sign it. DO NOT make
18    marks or notations on the transcript volume itself.
19
20
21        REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
22    COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.
23
24
25

63

1     ATTACH TO THE DEPOSITION OF CHRIS IRVINE
2     CASE:  WHISTLER V. WORLD WRESTLING
3             SIGNATURE PAGE
4         I, CHRIS IRVINE, have read the foregoing
5     deposition given by me on February 4, 2003, in
6     Tampa, Florida, and the following corrections, if
7     any, should be made in the transcript
8     PAGE    LINE    CORRECTION AND REASON THEREFOR
9
10
11
12
13
14
15
16
17
18
19
20        Subject to the above corrections, if any,
          my testimony reads as given by me in the foregoing
21    deposition.
          SIGNED at _____, Florida, this
22    _____.
23
24
          _____
25            CHRIS IRVINE

64

1         CERTIFICATE OF REPORTER OATH
2
3     STATE OF FLORIDA
4     COUNTY OF HILLSBOROUGH
5
6
7         I, the undersigned authority, hereby
8     certify that the witness named herein
9     personally appeared before me and was duly
10    sworn.
11        WITNESS my hand and official seal this
12    _____.
13
14
15
16
17
18
19
20    _____
21    PATTY STARKS, RPR
22    Notary Public-State of Florida
23    My Commission No. CC859522
24    Expires September 19, 2003
25

65

1     REPORTER'S DEPOSITION CERTIFICATE
2
3     STATE OF FLORIDA
      COUNTY OF HILLSBOROUGH
4
      I, PATTY STARKS, RPR and Notary Public in and
5     for the State of Florida at large, hereby certify
      that the witness appeared before me for the taking
6     of the foregoing deposition, and that I was
      authorized to and did stenographically and
7     electronically report the deposition, and that a
      review of the transcript was requested; and that the
8     transcript is a true and complete record of my
      stenographic notes and recordings thereof.
9
          I FURTHER CERTIFY that I am neither an
10    attorney nor counsel for the parties to this cause
      nor a relative or employee of any attorney or party
11    connected with this litigation, nor am I financially
      interested in the outcome of this action
12
          DATED THIS _____ at
13    Tampa, Hillsborough County, Florida.
14
15
16
17
      _____
18    PATTY STARKS, RPR
      My Commission No. CC859522
      Expires September 19, 2003
19    Transcript ordered 2-4-03
20
21
22
23
24
25

Sclafani Williams Court Reporters
1-800-272-0404

17 (Pages 62 to 65)

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


    I, the undersigned authority, hereby certify

that the witness named herein personally appeared

before me and was duly sworn.

        WITNESS my hand and official seal this

FEB - 5 2003
_____.



                        PATTY STARKS, RPR
Patty Ann Starks         Notary Public - State of Florida
Commission # CC 859522   Commission No. CC 859522
Expires Sep. 19, 2003    Expires September 19, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

```
1              REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA
     COUNTY OF HILLSBOROUGH
4
          I, PATTY STARKS, Registered Professional
5    Reporter and Notary Public in and for the State of
     Florida at large, hereby certify that the witness
6    appeared before me for the taking of the foregoing
     deposition, and that I was authorized to and did
7    stenographically and electronically report the
     deposition; and that the transcript is a true and
8    complete record of my stenographic notes and
     recordings thereof.
9
          I FURTHER CERTIFY that I am neither an
10   attorney nor counsel for the parties to this cause
     nor a relative or employee of any attorney or party
11   connected with this litigation, nor am I
     financially interested in the outcome of this
12   action.

13        DATED THIS _____ FEB - 5 2003 _____
     at Tampa, Hillsborough County, Florida.
14

15

16                              _____
                                PATTY STARKS, RPR
17                              Notary Public - State of Florida
                                Commission No. CC 859522
18                              Expires September 19, 2003

19

20

21

22

23

24

25
```

**Y2J**
**"LEGEND ISN'T STRONG**
**ENOUGH TO DESCRIBE ME!"**

# Inside
# Wrestling

## SPECIAL COMEBACK ISSUE!

### TRIPLE-H
### IT'S OK TO HATE HIM AGAIN!

## PLUS
### CHRIS BENOIT
### DON'T GO AFTER THE NECK!

### KEVIN NASH
### HOW DOES "DXNWO" SOUND?

**JUNE 2002**
$4.95 U.S.   $7.49 CANADA   £3.50 U.K.

Display Until May 14

0 6

THE WRESTLER PRESENTS

0  72246 00389  3



EXHIBIT 3
IRVING
2-4-03   rs



# CHRIS JERICHO

## "LEGEND ISN'T STRONG ENOUGH TO DESCRIBE ME!"

**I**N THE SUMMER of 1999, Chris Jericho became the talk of the wrestling industry. Through exciting feuds with Dean Malenko, Rey Misterio Jr., and Perry Saturn, Jericho had amassed a strong fan base, but WCW management was reluctant to elevate Jericho to the next level. When his WCW contract expired, Jericho vanished from the scene. By the time he finally signed with the WWF, his fan base had grown exponentially—as had expectations. Jericho was heralded as "the next Shawn Michaels" by some people. Anything less than a WWF championship reign would be a failure.

Jericho seemed to be on track when he debuted as Y2J and got into a battle of promos with The Rock. But soon after that much-hyped appearance, Jericho slipped into a mid-card malaise. He feuded with Chyna of all people for the Intercontinental title. He became a fan favorite, but could only stay on the fringe of World title contention. Despite winning four I-C titles and remaining one of the Federation's most popular competitors, it was a struggle for him to live up to the hype.

There were moments when Y2J seemed ready to break through. He appeared to upset Triple-H for the WWF title on **Raw** two years ago, only to have the decision reversed. At King of the Ring 2001, he and Chris Benoit essentially had a two-on-one match against Austin for the title, yet Jericho again came away empty-handed.

When Jericho upset The Rock for the WCW title at No Mercy, Jericho-holics insisted Y2J had finally climbed into the WWF's top tier. Then Rock quickly regained the belt, and many observers feared Jericho would have a difficult time winning another world championship.

Yet Jericho never lost faith. At Vengeance, he scored falls over both The Rock and Austin to become the first undisputed world champion in four decades. Since winning the unified title, Jericho has gotten more and more arrogant, but he keeps finding ways to retain the gold. And he still doesn't feel he's getting the respect he deserves. Senior Writer Dan Murphy caught up with Y2J following a recent **Smackdown**.

---

*"I'm twice the man Ric Flair ever was. It's tearing that man all up inside. Despite all his accomplishments, he has to take a backseat to me, because I unified the titles and he never could. He never made history the way I did."*

---

**Q:** Chris, since this is the first time I've had the opportunity to sit down with you since Vengeance, let me say congratulations on winning both the WWF and WCW World titles and unifying them. It's an accomplishment I never thought I'd see during my lifetime.

**A:** Thank you, Dan. I have to say, it was always my dream to be the man who would do the impossible and become the one, true undisputed champion in wrestling. With this *(he pats the WCW title belt)* and this *(he pats the WWF title)* in my possession, I can now legitimately say I am the greatest wrestler to ever step into the ring. It's really pretty incredible.

**Q:** Well, I'll admit you made history by unifying the titles, but I don't know if I'd make the jump that makes you the greatest wrestler of all-time.

**A:** What else do I have to do to prove it? Seriously. I've beaten Austin, I've beaten The Rock. I've lost track of how many times I've beaten The Rock already. It's become routine for me. I've even defended these belts against Triple-H, and I'm still your undisputed champion. Your undisputed, undefeated, unified champion of the world.

**Q:** You could probably make a stronger case for yourself if you had won your two matches at Vengeance without interference from Booker T and Vince McMahon, and without using the title belts as weapons.

**A:** You listen to me, Murph. Four men in the history of this great sport—this sport of kings—had a chance to become the one undisputed champion. The other three would become a mere footnote in wrestling history. I guarantee you that any man





*"I came out on top in two of the most grueling matches ever, against two of the biggest stars in this business–next to me, of course. And I wrestled those two matches without a second to rest in between. That makes me the greatest, the true 'Living Legend.'"*

in my place would have done exactly what I did. Did you think Austin, Rock, or Angle *were* going to risk losing their chance at the greatest glory in this industry by not taking advantage of every opportunity available? Vengeance was an absolute war, with the ultimate prize in this business at stake. I came out on top in two of the most grueling matches ever, against two of the biggest stars in this business—next to me, of course. And I wrestled those two matches without a second to rest in between. That makes me the greatest, *the* true "Living Legend."

**Q:** What do you think Bruno Sammartino would say about that?

**A:** The moment he'd started babbling, I'd just hold up this belt *(indicating the WCW title)* and ask, quite simply, "Ever win

this one, junior? No? Then why don't you just *shut the hell up!*"

**Q:** In recent weeks, you have formed an alliance with Lance Storm and Christian. Some people have compared this little group to The Four Horsemen. For lack of a better term, is this so-called "Canadian alliance" a marriage of convenience, or is this a stable like the Horsemen?

**A:** First of all, I don't want to have anything to do with The Four Horsemen. For God's sake, Murph, this is 2002, not 1986. Get a damn calendar, why don't you! And second of all, I'm *twice the man* Ric Flair ever was. It's tearing that man all up inside. Despite all his accomplishments, he has to take a backseat to me, be-cause I unified the titles and he never could. He never made history the way I did.

**Q:** But in Flair's defense, he never had much of a chance. The WWF and WCW—or NWA— were separate entities until last year. The only reason you got the opportunity is because the WWF purchased WCW. In fact,

the WCW belt doesn't even *mean a whole lot anymore,* other than being a symbol. WCW as an organization doesn't exist. You were part of the team that destroyed it in the main event of *Survivor Series.*

**A:** Except for the fact that the best wrestlers in the world are here in the WWF, not split among two companies, and I'm the guy who has what all of the best wrestlers in the history of the world have always wanted—hence I am the best. But as I was saying about Lance and Christian, I wouldn't say we're a stable, or a family, or any other stupid term you want to use to de-scribe a clique of pansies not man enough to stand up for themselves. We're three men who aren't getting the respect we deserve. Lance had to work as a janitor to get his job back, and he's one of the top wrestlers in this business. How degrading is that? And Christian is always fighting his way out of his buck-toothed brother's shadow. We're stick-ing together to make sure



no
**Q:** WI
sc
**A:** Ev
th
lio



**It's easy to dispute some of the ridiculous things Jericho says in interviews, but he's right when he says he knows how to beat The Rock (below). But he'd be wise to cease taunt-ing the people's champion, especially by mocking his signature moves (opposite page).**





Because he's so full of himself, Jericho has made a lot of dangerous enemies in just the last few months. Don't think for a second that Steve Austin has forgotten the loss Jericho put on his record at Vengeance.

there, and they're buying my T-shirts and posters. But the WWF marketing department has its pets—Triple-H, Austin, and The Rock, just to name three. You know, all those guys who get fancy music videos of them made. Lance, Christian, and I have had to fight damn hard for everything we have, and we're not going to go down without a fight.

none of us gets screwed over.

Q: Who do you think is trying to screw you over?

A: Everyone, dammit! Believe me, there are millions—and millions—of Jerichoholics out

Q: Why is it that you feel you're not getting the respect you deserve?

A: There are a few reasons. I'm a victim of my own success. I've established a new measurement of greatness in this business. If I was to lose the undisputed title tomorrow and never regain it, I would still be the man who made history and unified those titles. My name is a part of wrestling history forever. No one will ever be able to erase my name as the most influential—and successful—competitor in history. Take Lou Thesz, Bruno, Flair, Hulk Hogan, Bret Hart, Harley Race—take all those legends and bump them

*"If I was to lose the undisputed title tomorrow and never regain it, I would still be the man who made history and unified those titles. My name is a part of wrestling history forever. No one will ever be able to erase my name as the most influential—and successful—competitor in history."*

all down a step on the ladder. As the greatest of all-time, I know people are jealous of me. They want to see me fail. They want to see their manu-factured heroes like Rock or Austin knock me down a peg. Well, guess what. It's not going to happen, because Chris Jericho is not a joke. Chris Jericho is an icon and *the* "Living Legend" in this business. In fact, legend isn't strong enough to describe me!

Q: Final question: Will you still be the unified champion at Wrestle-Mania and perhaps beyond?

A: Anyone who thinks I won't be is an idiot. Y2J isn't a fluke champion. He's not a joke. He's the champion of a new genera-tion. I will be standard-bearer for this industry for years to come, and that's all there is to it. Respect me or else!   □





EXHIBIT

IRVINE 1

2-4-03    PS



**WWE**

WORLD WRESTLING
MAGAZINE

# Appetite for
# DESTRUCTION
# Brock Lesnar: The Next Big Thing!

JULY 2002

$4.99 U.S.    $6.99 CANADA
PRINTED IN U.S.A.



0 71896 47481

PILLAR TO POST

## Notes, Quotes & Anecdotes

# Evolution of the Gold

In honor of the creation of the brand-new undisputed World Wrestling Championship belt, here's a look at how the Heavyweight title belt has developed over the years…



**Bob Backlund, 1983**
This version was created after Superstar Billy Graham destroyed Backlund's previous belt the year before.

**Stone Cold Steve Austin, 1998**
The Rattlesnake had the "Smoking Skulls" belt made specially for himself.





**The Rock, 2000**
The most recent version prior to the unification.



**Hulk Hogan, 1987**
This version was worn exclusively by the Hulkster during his historic first reign.

**Chris Jericho, 2001**
The self-proclaimed "living legend" was the first to unify the World Wrestling Federation and WCW World titles. The WCW belt dates back to 1985.



**Yokozuna, 1993**
This version was created for the *WrestleMania IV* tournament and lasted 10 years, longer than any other.



**Triple H, 2002**
"The Game" was the first recipient of the handsome Undisputed World Championship belt.

# JERICHO
## WWW.CHRISJERICHO.COM



**INFORMATION**
- Commentary
- Jericho News
- Y2J Store
- Championship
- Fav. Matches
- Time - Lion
- Shanks
- Email

**MULTIMEDIA**
- Picture Gallery
- Fozzy Pictures
- Videos & Sounds
- Links
- FozzyRock.com

**FAN SECTION**
- Fan Page
- Fan Art
- Jerichat
- Message Board
- The Body Shop
- Webmaster Lee

Welcome to CHRIS JERICHO'S OFFICIAL WEB PAGE. This page is designed for Jericho fans (or anti-fans) as a soapbox for both yours and my opinions. Feel free to comment on this page, my pro wrestling career, music, hockey or anything else you care to get off your chest; I guarantee I'll read all of the mail I receive.

You can use this site to journey through the slums and mansions of my 12 year career, learn a lot of useless Jericho info (why not, it's my page darn it), travel through my personal photo album (don't worry, there's no boring crap like family pictures and bathing babies), and learn about my favorite matches (did I forget any, you smart marks?). Join me as I rest on my laurels and brag about my previous championship conquests, and even get updated opinions on my recent matches and the general state of the world today from your party host...ME!!!

So sit back in your padded chairs, grab your potato chips, chocolates, licorice, donuts and diet pepsi, adjust your coke bottle lenses and let's mark out together! C'mon BABY ... ARE YOU READY?

**Y2J Jem** - June, 2002- Y2J realizes that cynical internet fans don't know what's good and what's bad anymore. He realizes that if they stopped being so uptight and just allowed themselves to be entertained, that they would enjoy both the WWE and their pathetic little lives a whole lot more.

| FLASH MOVIE | FLASH GAME |
|---|---|
| by Sonyman | by Daniel Echeverri |



 

**3 4 7 7 5 7 5**  Hits since December 4/97

Web Site Powered By:


AUTObahn access

**EXHIBIT**
IRVINE 4
2-4-03        PS



# EXHIBIT / ATTACHMENT

## _____ 7 _____

(To be scanned in place of tab)

## AFFIDAVIT OF MELISSA MANSO

STATE OF CONNECTICUT      )
                             ) ss. Stamford

COUNTY OF FAIRFIELD      )

BEFORE ME, a Notary Public, personally appeared Melissa Manso, who, being duly sworn, deposes and states as follows:

       1.      I am over eighteen (18) years of age and I have personal knowledge of the matters set forth herein.

       2.      I am a Senior Associate Producer of World Wrestling Entertainment, Inc. ("WWE"). I produced the video package broadcast during the 2002 ROYAL RUMBLE *immediately before the match* between CHRIS JERICHO and THE ROCK (the "JERICHO/ROCK Package").

       3.      The JERICHO/ROCK Package was pre-produced at WWE's television production studio in Stamford, Connecticut.

       4.      In producing the JERICHO/ROCK Package, I began by reviewing WWE's records of prior performances of CHRIS JERICHO and THE ROCK for particular audio bytes to tell the desired story for JERICHO/ROCK Package to set the stage for their match at the 2002 ROYAL RUMBLE . The specific audio byte in the JERICHO/ROCK Package referencing the words "living legend" was taken from WWE's RAW television program broadcast from Madison Square Garden in New York City on January 7, 2002.

5.      After selecting and digitally recording the various audio bytes, I selected and digitally recorded music to overlay the audio bytes throughout the JERICHO/ROCK Package. Finally, I selected and digitally recorded video clips of prior WWE programs to match the music of the package.

6.      I then took the JERICHO/ROCK Package to the "edit suite" located in the WWE television production studio in Stamford, Connecticut in which I edited and enhanced the package, including, among other things, the addition of video and sound effects.

7.      Once completed, the JERICHO/ROCK Package was digitally recorded on a "clip reel," which is a single digital beta tape containing all the packages and other pre-produced segments to be used for the production of the 2002 ROYAL RUMBLE.

8.      Immediately before the match between CHRIS JERICHO and THE ROCK, the JERICHO/ROCK Package was broadcast from the "clip reel" by satellite for transmission to various pay-per-view providers and by direct link onto the "jumbotron" video monitor in the arena.

9.      The creation and production of the JERICHO/ROCK Package took place entirely in WWE's television production studio in Stamford, Connecticut. No part of the creation or production of the package took place in the State of Georgia.

10.     Vince McMahon did not direct me to create the JERICHO/ROCK Package. Mr. McMahon had no input or involvement in the creation and production of the JERICHO/ROCK Package. Chris Irvine had no input or involvement in the creation and production of the JERICHO/ROCK Package.

Melissa Manso

Sworn to and subscribed
before me this 14th day of
February 2003.

Notary Public

**SUSAN L. DeROSA**
*NOTARY PUBLIC*
My Commission Expires May 31, 2006

PI-522695.01

ORIGINAL

FILED IN CLERK'S OFFICE

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LUTHER ~ ... Clerk
By _____ Deputy Clerk

LARRY WHISTLER                    )
a/k/a LARRY ZBYSZKO               )
a/k/a THE LIVING LEGEND,          )
an individual,                    )
                                  )
              Plaintiff,          )        Civil Action No. 1 02-CV-1008
                                  )
       vs.                        )
                                  )
WORLD WRESTLING FEDERATION        )
ENTERTAINMENT, INC., a Delaware   )
Corporation, VINCE MCMAHON,       )
an individual, CHRIS IRVINE a/k/a )
CHRIS JERICHO, a/k/a JERICHO, an  )
individual,                       )
                                  )
              Defendants.         )

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS VINCE MCMAHON AND CHRIS IRVINE

Pursuant to Fed.R.Civ.P. 12(b)(2) and this Court's Orders of November 25, 2002 and December 31, 2002, Defendants Vince McMahon and Chris Irvine, by and through their undersigned counsel, respectfully submit this memorandum of law in support of their renewed motion to dismiss.

### I. PRELIMINARY STATEMENT

After two months of jurisdictional discovery, Plaintiff Larry Whistler ("Whistler") has failed to adduce evidence to support this Court's exercise of personal jurisdiction over Defendants Mr. McMahon and Mr. Irvine individually.  Rather, the evidence in the

19

record, to the extent it supports contacts with Georgia in any respect, goes to contacts of WWE with Georgia—for which jurisdiction is not contested—as opposed to contacts of Messrs. McMahon and Jericho individually. The assertion of claims against Messrs. McMahon and Jericho personally, in addition to WWE, thus appears principally designed to harass and inconvenience those well-known individuals in a foreign jurisdiction. Indeed, the jurisdictional evidence fundamentally confirms Defendants' characterization of this action in its original motion to dismiss—this case is being driven by Plaintiff's historical personal animus against Mr. McMahon.

Fatally lacking on the current record is any evidence that Mr. McMahon or Mr. Irvine personally committed any purposeful acts in the State of Georgia from which Plaintiff's cause of action resulted. Because of the critical lack of such evidence necessary for the assertion of personal jurisdiction over non-resident defendants, Messrs. McMahon and Irvine renew their motion to dismiss Plaintiff's complaint in its entirety for lack of personal jurisdiction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are alleged in the Complaint. Although WWE disputes many of these allegations, for purposes of this Motion only, the well-pled factual allegations of the Complaint are assumed to be true as required under Fed.R.Civ.P. 12(b)(2).

As pertinent to this Motion, Whistler claims to be known as a professional wrestler under the name Larry Zbyszko. Since in or around 1980, Whistler claims also to have

2

engaged in wrestling entertainment services using the moniker the Living Legend. Complaint at ¶ 9.  Whistler claims that as a result of his allegedly long-term and continuous use of that moniker, the public has come to recognize the services bearing the Living Legend mark as services of Whistler's. Complaint at ¶¶ 12-13.

Whistler claims that the Defendants adopted the same Living Legend moniker in connection with the wrestling services of WWE's CHRIS JERICHO character. Complaint at ¶ 15.  Whistler further claims that as a result of Defendants' promotion of wrestling services under the Living Legend moniker, there is a strong likelihood of, and there actually has been, confusion in the marketplace between Defendants' use of the Living Legend moniker and Whistler's use.  Complaint at ¶¶ 18-19.  As a result of this alleged confusion, Whistler claims he has been irreparably harmed.  Complaint at ¶ 26. Originally, Whistler had asserted claims against each Defendant for trademark infringement and unfair competition under Sections 32 and 43(a) of the Lanham Act, trademark dilution under Section 43(c) of the Lanham Act and O.C.G.A. § 10-1-451(b), unfair competition under O.C.G.A. § 23-2-55 and the common law, and deceptive trade practices under O.C.G.A. § 10-1-370 *et seq.*  Complaint at ¶¶ 27-59.

In response to Whistler's complaint, Defendants WWE, McMahon and Irvine collectively moved to dismiss Count I of the Complaint under Fed.R.Civ.P. 12(b)(6) as it failed to state a claim upon which relief could be granted.  Defendants also moved to dismiss the Complaint in its entirety as against Mr. McMahon and Mr. Irvine for lack of

3

personal jurisdiction under Fed.R.Civ.P. 12(b)(2).  On November 25, 2002, this Court

entered an order dismissing Count I of the Complaint against all Defendants and granting

a two-month discovery period specifically on the jurisdictional issue upon which

Defendants McMahon and Irvine were invited to renew their motion to dismiss.  After

engaging in written and deposition discovery, Defendants McMahon and Irvine have

renewed their motion to dismiss the Complaint in its entirety because they are not

properly subject to personal jurisdiction in Georgia.

## III. LAW AND ARGUMENT

**A.**     **Legal Standard for Motion to Dismiss**

To survive a motion to dismiss under Federal Rule Civil Procedure 12(b)(2) for

lack of personal jurisdiction, the plaintiff bears the burden of establishing a *prima facie*

case of jurisdiction over the nonresident defendant. See Peridyne Technology Solutions,

LLC v. Matheson Fast Freight, Inc., 117 F. Supp.2d 1366, 1369 (N.D. Ga. 2000), citing

Francosteel Corp. v. M/V Charm, 19 F.3d 624, 626 (11th Cir. 1994);  Robinson v.

Giamarco & Bill P.C., 74 F.3d 253, 255 (11th Cir. 1996); Madara v. Hall, 916 F.2d 1510,

1514 (11th Cir.1990), citing, Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir.1988).  To

establish a *prima facie* case of personal jurisdiction, the plaintiff must present sufficient

evidence to defeat a motion for a directed verdict.  See Robinson, 74 F.3d at 255;

Madara, 916 F.2d at 1514.  Mere "conclusory allegations and unwarranted deductions of

fact are not admitted as true."  South Florida Water Mgmt District v. Montalvo, 84 F.3d

4

402, 409, n. 10 (11th Cir. 1996); see also Oxford Asset Mgmt. Ltd. v. Jaharis, 297 F.3d

1182, 1188 (11th Cir. 2002).  As the record now developed through specific jurisdictional

discovery fails to support this Court's exercise of personal jurisdiction over Messrs.

McMahon and Irvine, Plaintiff fails to carry its burden of proof and the Complaint in its

entirety should be dismissed pursuant to Fed.R.Civ.P. 12(b)(2) against them.

**B.     Georgia's Personal Jurisdiction Standard**

In a diversity action, a federal court has personal jurisdiction over a non-resident

defendant to the extent permitted by the forum state's long-arm statute and the due

process clause of the United States Constitution.  See Nippon Credit Bank, Ltd. v.

Matthews, 291 F.3d 738, 746 (11th Cir. 2002); Sculptchair, Inc. v. Century Arts Ltd., 94

F.3d 623, 626 (11th Cir. 1996); Allegiant Physicians Services, Inc. v. Sturdy Memorial

Hosp., 926 F.Supp. 1106, 1112 (N.D.Ga. 1996).   The pertinent sections of Georgia's

long-arm statute § 9-10-91 are interpreted to the maximum limits of due process.  See

Francosteel Corp. v. M/V Charm, 19 F.3d 624 (11th Cir. 1994); Delong Equipment Co. v.

Washington Mills Abrasive Co., 840 F.2d 843, 849 (11th Cir. 1988); SES Indus., Inc. v.

Intertrade Packaging Mach. Corp., 512 S.E.2d 316, 318 (Ga.Ct.App. 1999).  "Where a

state's long-arm statute confers personal jurisdiction to the limits of Due Process, the

court may pass over analysis of the statute and exercise jurisdiction where the

constitutional requirements are satisfied."  Peridyne Technology, 117 F.Supp.2d 1366,

1370 (N.D. Ga. 2000); Horsley v. Feldt, 128 F.Supp.2d 1374, 1377 (N.D. Ga. 2000).

The Due Process analysis contemplates the application of two types of jurisdiction, general and specific. Peridyne, 117 F.Supp.2d at 1370. "General personal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation." Delong, 840 F.2d at 853. A party is subject to general jurisdiction only when it has continuous and systematic general business contacts with the forum state. Delong, 840 F.2d at 853; Peridyne, 117 F.Supp.2d at 1370. Under general jurisdiction, a party may be haled into court in the forum state on any claim. Peridyne, 117 F.Supp.2d at 1370.

"Specific personal jurisdiction is founded on a party's contacts to the forum state that are related to the cause of action." Delong, 840 F.2d at 853. Specific personal jurisdiction is determined by application of the two-part International Shoe due process analysis: (1) whether the defendant has purposely established minimum contacts with the forum state, and (2) whether the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. Delong, 840 F.2d at 853; Peridyne, 117 F.Supp.2d at 1370. The central concern of the inquiry is the relationship between the defendant, the forum and the litigation. Delong, 840 F.2d at 853, quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579 (1977).

To establish minimum contacts, this Court has ruled that a plaintiff must demonstrate the following three factors: (1) plaintiff's cause of action arises out of or relates to the defendant's contacts with the forum state; (2) the contacts must show that the defendant purposefully conducted activities within the forum state and invoked the

6

benefits and protections of the state; (3) the defendant's contacts demonstrate that the

defendant should reasonably anticipate being haled into court in the forum. <u>Peridyne</u> at

1370; <u>see also</u> <u>Maxwell Chase Technologies</u>, L.L.C., 79 F.Supp.2d 1364, 1368 (N.D. Ga.

1999) (emphasis added).[1]  Without proof of all three elements, jurisdiction fails.

<u>Maxwell</u>, 79 F.Supp.2d at 1368 ("In order to fulfill the minimum contacts requirement, a

plaintiff must demonstrate the presence of three factors."); <u>Railcar, Ltd. v. Southern</u>

<u>Illinois Railcar Co.</u>, 42 F.Supp.2d 1369 (N.D. Ga. 1999).  The touchstone for the exercise

of specific personal jurisdiction, therefore, is whether the defendant committed a

purposeful act in Georgia from which plaintiff's cause of action resulted.

As set forth in his Complaint and discovery responses, Plaintiff has asserted

various purported contacts with Georgia specifically relating to the claims in this action

that allegedly subject Messrs. McMahon and Irvine to this Court's personal jurisdiction.

Accordingly, Plaintiff apparently is claiming that Messrs. McMahon and Irvine are

subject to this Court's specific personal jurisdiction.

## C.    Mr. McMahon Is Not Properly Subject To Specific Personal Jurisdiction In This Court

---

[1] Some courts have analyzed the personal jurisdiction issue under the three factors articulated by the Court of Appeals of Georgia in <u>Shellenberger v. Tanner</u>, 227 S.E.2d 266 (Ga.App.Ct. 1976). See <u>Delong</u>, 840 F.2d at 849.  The <u>Shellenberger</u> test substantially mirrors the three-factor due process test outlined above, requiring evidence that the nonresident (1) purposefully did some act or consummated some transaction with or in the forum resulting in injury; (2) the plaintiff's cause of action must arise out of or result from defendant's purposeful activity and (3) the exercise of jurisdiction must be reasonable.

7

1.   **Personal Jurisdiction Only Attaches To An Officer Of A Corporation Based On Evidence The Officer Purposefully Committed An Act In The Forum For Which He Can Be Held Substantively Liable**

"In general, the activities of an officer do not confer jurisdiction over the officer individually." Chemtall Inc. v. Citi-Chem, Inc., 992 F.Supp. 1390, 1402 (S.D.Ga. 1998), quoting Brady v. Burtt, 979 F.Supp. 524, 529 (W.D.Mich. 1997). See also Delong, 840 F.2d at 851, citing Agra Chemical Distributing Co. v. Marion Laboratories, Inc., 523 F.Supp. 699, 702-03 (W.D.N.Y. 1981) ("An individual's presence [in the forum] in his or her capacity as a corporate officer is not a proper basis of jurisdiction or venue against the individual personally."). An individual officer/director can only be held liable for tortious acts of a corporation if that person personally participated in the tortious activities or specifically directed them to be done. Chemtall, 992 F.Supp. at 1401.

Under those limited circumstances, specific jurisdiction over an individual officer or director must be established separately and independently from the officer or director's corporation. Foxworthy v. Custom Tees, Inc., 879 F.Supp. 1200, 1206 (N.D. Ga. 1996). Specifically, an officer or director is subject to jurisdiction only if that person "commits an act in the forum for which he can be held substantively liable." Delong, 840 F.2d at 851-52 (emphasis added). In other words, "what is needed is a purposeful act [toward the commission of the tort] with or in Georgia." Foxworthy, 879 F.Supp. at 1206. Significantly, the Eleventh Circuit squarely has ruled that "if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the

8

nonresident corporation and if any connection he had with the commission of the tort occurred without the forum state" then jurisdiction does not attach.  Delong, 840 F.2d at 852, quoting Columbia Briargate Co. v. First National Bank, 713 F.2d 1052, 1064-65 (4th Cir. 1983).

### 2. Mr. McMahon Is Not Subject To This Court's Specific Personal Jurisdiction Because Plaintiff's Cause Of Action Does Not Arise Or Result From Mr. McMahon's Specific Purposeful Contacts With Georgia

According to Plaintiff's responses to Defendants' interrogatories and deposition testimony, Plaintiff bases his claim of personal jurisdiction over Mr. McMahon on three arguments:

1)   **Mr. McMahon's appearance at the WWE Royal Rumble event that took place in Atlanta, Georgia on January 20, 2002;**

2)   **The broadcast of various WWE television and pay-per-view programs into the State of Georgia;**

3)   **The distribution of a WWE magazine that referenced the words "living legend" into the State of Georgia.**

See First Interrogatories on Personal Jurisdiction Submitted by Defendants Vince McMahon and Chris Irvine ("First Interrogatories") attached as Exhibit 1; Response No. 1 to Plaintiff's Response to First Interrogatories On Personal Jurisdiction ("Response to First Interrogatories") attached as Exhibit 2; Deposition of Larry Whistler ("Whistler Depo.") at 18:5-20:22 attached as Exhibit 3.

9

### a.   Mr. McMahon Committed No Act In Connection With His Appearance At The January 20, 2002 Royal Rumble From Which Plaintiff's Cause of Action Arose Or Resulted

WWE's Royal Rumble Pay-Per-View event took place in Atlanta, Georgia on January 20, 2002 (the "2002 Royal Rumble"). Deposition of Vince McMahon ("McMahon Depo.") at 16:19-22 attached as Exhibit 4. It is undisputed that Mr. McMahon was in the State of Georgia on that occasion. It is equally undisputed, however, that Mr. McMahon's appearance in Georgia for the 2000 Royal Rumble had absolutely no relation to the alleged basis for Plaintiff's claims in this action.

By Plaintiff's own admission, Mr. McMahon appeared at the 2002 Royal Rumble as a performer in a match with WWE's Ric Flair. Whistler Depo., Ex. 3, at 21:20-22:1. In addition to his position as Chairman of WWE, Mr. McMahon also is an on-air personality who regularly appears in the storylines of WWE's sports entertainment programming. McMahon Depo, Ex. 4, at 18:3-21. Mr. McMahon's appearance at the 2002 Royal Rumble was part of a WWE storyline in which Mr. McMahon and Ric Flair fictionally were battling for ownership of WWE. Whistler Depo., Ex. 3, at 24:1-25:5.

By Plaintiff's further admission, neither the words "living legend," nor Mr. Irvine's character, Chris Jericho, had any connection with Mr. McMahon's performance whatsoever: (i) Mr. McMahon did not speak the words "living legend" at any time; (ii) Mr. McMahon's opponent, Ric Flair, did not speak the words "living legend" at any time; (iii) WWE's announcers did not speak the words "living legend" at any time; (iv) Mr.

10

McMahon's match was not promoted in pre-event advertising by reference to the words "living legend;" (v) the WWE video of the 2002 Royal Rumble contains no reference to the words "living legend" in connection with Mr. McMahon's match; and (vi) Mr. Irvine's Chris Jericho character did not appear during or was mentioned in Mr. McMahon's match in any way. See Videotape of January 20, 2002 Royal Rumble Pay-Per-View ("2002 Royal Rumble Video") attached as Exhibit 5; Whistler Depo., Ex. 3, at 21:20-22:8; 23:6-18; 26:22-27:7; 29:19-31:7; McMahon Depo., Ex. 4, at 20:5-15; Deposition of Chris Irvine ("Irvine Depo.") at 29:23-30:10 attached as Exhibit 6. Significantly, in addition to having no involvement with the words "living legend" during his performance, Mr. McMahon specifically testified that he had no knowledge that the words "living legend" were used in any way in connection with the 2002 Royal Rumble. McMahon Depo., Ex. 4, at 64:20-25. Indeed, the record is undisputed that Mr. McMahon never directed Mr. Irvine to use the words "living legend" in the 2002 Royal Rumble or in any other WWE performance. McMahon Depo., Ex. 4, at 32:6-33:7; Irvine Depo., Ex. 6, at 45:5-7.

In point of fact, the only mention of the words "living legend" in connection with the 2002 Royal Rumble was a single reference in a pre-produced video package (the "JERICHO/ROCK Package") broadcast immediately before Mr. Irvine's match with WWE's THE ROCK. See 2002 Royal Rumble Video, Ex. 5; Whistler Depo., Ex. 3, at 25:24-26:7; 26:17-27:3; Affidavit of Melissa Manso ("Manso Aff.") attached as Exhibit

11

7. The JERICHO/ROCK Package was an audiovisual production that was pre-taped at WWE's television production studio in Stamford, Connecticut.  Manso Aff., Ex. 7, at ¶¶ 2-6.  To tell the desired story for the JERICHO/ROCK Package to set the stage for their match at the 2002 ROYAL RUMBLE, WWE selected particular audio bytes of prior performances of CHRIS JERICHO and THE ROCK.  Manso Aff., Ex. 7, at ¶ 4.  One such audio byte included in the JERICHO/ROCK Package referenced the words "living legend," which was taken from WWE's RAW television program broadcast from Madison Square Garden in New York City on January 7, 2002.  Id.  Mr. McMahon had no involvement in the decision to create the JERICHO/ROCK Package.  Manso Aff., Ex. 7, at ¶ 10.  Mr. McMahon similarly had no involvement in the creation and production of the JERICHO/ROCK Package, including, specifically, the decision to use the audio byte referencing the words "living legend."  Id.

On this record, there plainly is no evidence that Mr. McMahon purposefully committed any act in Georgia in connection with the 2002 Royal Rumble from which Plaintiff's cause of action arose or resulted.  Although Mr. McMahon undisputedly had specific contacts with Georgia by appearing at the 2002 Royal Rumble, it is equally indisputable that Mr. McMahon committed no act that evening for which he can be held substantively liable and, specifically, from which Plaintiff's claims could not have resulted.  See Delong, 840 F.2d at 851-52.  Accordingly, there is no basis to subject Mr.

McMahon to the specific personal jurisdiction of this Court premised upon that specific contact with the State of Georgia.

### b.  Mr. McMahon, Personally, Did Not Purposefully Direct WWE Programming Into Georgia

Plaintiff secondly claims that Mr. McMahon is subject to this Court's specific personal jurisdiction because WWE programming is broadcast into the State of Georgia over broadcast, cable and pay-per-view television.  This argument fails on a number of levels as a matter of fact and law.

To begin with, the record is undisputed that WWE has no capability to broadcast programming on its own and, therefore, enters into agreements with numerous domestic and international television distributors for the broadcast of WWE programming. McMahon Depo., Ex. 4, at 59:6-16.  Domestically, WWE's principal broadcast and cable television partner is Viacom, Inc.  Id.  WWE currently is aired on Viacom's cable networks, TNN and MTV, and Viacom's broadcast network UPN.  Id.  With regard to pay-per-view programming, WWE has agreements with the major cable and satellite pay-per-view providers, including, *inter alia,* In Demand and DirecTV.  The record also is undisputed that through these television outlets WWE programming is available everywhere in the United States and, indeed, throughout the world.  Whistler Depo., Ex. 3, at 34:16-24; McMahon Depo., Ex. 4, at 59:6-16; 61:24-62:2  In fact, Plaintiff conceded that WWE programming is broadcast all over the world and is accessible to

13

viewers everywhere those broadcast or cable television networks are available.  Whistler

Depo., Ex. 3, at 34:16-35:17.  WWE thus has not purposefully directed its programming

to Georgia, but rather Georgia is part of the footprint of the broadcast and cable television

distributors to which WWE has licensed the distribution of its programming.  McMahon

Depo., Ex. 4, at 60:17-63:15.

The record is further undisputed that the television distributors have complete

control over where programming broadcast on their networks is available, "and they want

to have as broad a platform as possible."  McMahon Depo., Ex. 4, at 63:5-15.

Accordingly, WWE, let alone Mr. McMahon personally, has no ability to prevent its

programming from being available in any particular area, including, for instance, in

Georgia.  McMahon Depo., Ex. 4, at 63:5-15.

As a matter of law, therefore, the broadcast of WWE programming into Georgia is

an insufficient basis to subject Mr. McMahon, and indeed WWE, to the specific personal

jurisdiction of this Court.  Controlling authority provides that jurisdiction is proper only

> Where the defendant's contacts with the forum proximately result from
> actions by the defendant *himself* that create a 'substantial connection' with
> the forum state.  Although the concept of forseeability is not irrelevant to
> this analysis, the kind of forseeability critical to the proper exercise of
> personal jurisdiction is *not* the ability to see that the acts of third persons
> may affect the forum, but rather that the defendant's own personal acts will
> have some effect in the forum.

Madara, 916 F.2d at 1516-17 (internal citations omitted)(emphasis in original).  "The

unilateral activity of those who claim some relationship with a non-resident defendant

cannot satisfy the requirement of contact with the forum state." Madara, 916 F.2d at

1516, quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239-40 (1958).

On that basis, recent decisions involving claims of specific personal jurisdiction

over non-resident defendants based on television broadcasts into the forum state have

ruled that such broadcasts by third-party television distributors are legally insufficient to

support specific personal jurisdiction. Overton v. Vanzant, No. CV 01-624-AS, 2001

WL 1911359, at *5 (D. Or. Dec. 13, 2001); Kulik Photography v. Cochran, 975 F.Supp.

812, 813-14 (E.D. Va. 1997); Tristata Technology, Inc. v. Neoteric Cosmetics, Inc., 961

F.Supp. 686, 690 (D. Del. 1997). Even where the courts assumed the defendants "knew"

or could "foresee" that their actions would be broadcast into the specific forum states, the

courts ruled the defendants had not purposefully availed themselves of the forum states.

Overton, 2001 WL 1911359, at *5 ("The mere fact that an individual can 'foresee' that

their actions or products will be distributed or broadcast to a specific state is not

sufficient for an assertion of jurisdiction."); Kulik Photography, 975 F.Supp. at 813

("even assuming that the Defendants knew that their actions would be televised . . . the

Defendants cannot be said to have purposefully availed themselves of the [forum state]").

In those instances—as here—"the television stations were not agents of, nor were under

the control of, the Defendants," Kulik Photography, 975 F.Supp. at 813, and their

broadcasts thus constituted "the unilateral activity of a third-party [which] is not an

appropriate consideration when determining whether a defendant has sufficient contacts

15

with a forum state to justify an assertion of jurisdiction." Overton, 2001 WL 1911359, at
*5. Only where the defendant, itself, specifically targets the forum state and the
plaintiff's alleged injuries arise from those targeted activities is the assertion of specific
personal jurisdiction warranted. Peridyne, 117 F.Supp.2d at 1370 (holding court had
personal jurisdiction over non-resident defendant because "plaintiff's claims arise out of
or relate to the defendant's activities, albeit largely electronic, directed at Georgia"); Lott
v. J.W. O'Connor & Co., Inc., 991 F.Supp. 785, 787 (N.D. Miss. 1998)(absence of proof
that defendants "specifically targeted residents in [forum state] was fatal to claim of
personal jurisdiction"); Tristrata Technology, 961 F.Supp 686 at 690 ("absent proof of a
promotional campaign targeted at [the forum state]" the defendant's television
appearances were insufficient to establish personal jurisdiction over him). Accordingly,
the mere broadcast of WWE programming into Georgia cannot support this Court's
specific personal jurisdiction over Mr. McMahon because it does not demonstrate Mr.
McMahon's personal purposeful contacts directed to Georgia.

    In any event, any jurisdictional implications arising from the broadcast of WWE
programming would only concern WWE as a corporation, not Mr. McMahon personally.
As noted above, Mr. McMahon only could be subject to liability, and thus subject to this
Court's personal jurisdiction, if he personally participated in the alleged infringing
activities or specifically directed the alleged infringing activity to be done through
purposeful conduct with or in Georgia. However, there is no evidence in the record that

Mr. McMahon personally directed or had any involvement in Mr. Irvine's alleged

reference to himself as "living legend." To the contrary, the undisputed evidence is that

Mr. Irvine first spoke the words "living legend" on WWE programming without Mr.

McMahon's knowledge and, thereafter, Mr. McMahon never directed Mr. Irvine to speak

the words "living legend" or had any involvement regarding Mr. Irvine's alleged use of

the words. McMahon Depo., Ex. 4, at 32:2-34:2; Irvine Depo., Ex. 6, 28:4-29:2. There

also is no evidence in the record that Mr. McMahon had any personal involvement in

determining where WWE programming would be available, including, specifically,

directing the broadcast of WWE programming into Georgia.

The critical absence of such evidence fundamentally distinguishes Mr. McMahon

from the officer-defendant in Foxworthy. In Foxworthy, the court found evidence that

the individual defendant, personally, had established the corporate defendant's contacts

with Georgia. Foxworthy, 879 F.Supp. at 1207. Most importantly, the corporate

defendant in Foxworthy only had two employees, the individual defendant and his wife.

Id. The wife's duties were primarily financial, leaving the individual defendant otherwise

responsible for the daily operations of the business. Id. On that basis, the Foxworthy

court reasoned

> it takes no great leap to conclude that, if anything is done on behalf of
> Custom Tees, it is done or caused to be done by [the individual defendant]. .
> . . In short, the record leaves the court with the firm impression that Custom
> Tees' contacts with this state were established by Friedman. Custom Tees
> transacted business in this state, and the strong evidence is that Friedman

directed those transactions.  The court is not faced with a situation where a person is sued because of his title alone.

Foxworthy, 879 F.Supp. at 1207.

In contrast, WWE is a publicly traded corporation with over 400 employees. McMahon Depo., Ex. 4, at 11:10-11; 18:14-21.  As Mr. McMahon specifically testified, "there is a certain amount of business that goes on at World Wrestling Entertainment, and [he] can't see everything, be everything, et cetera."  McMahon Depo., Ex. 4, at 35:23-36:4.  Mr. McMahon, therefore, relies on the people he hires to make operational decisions for their departments.  McMahon Depo., Ex. 4, at 22:3-9; 35:23-36:4. Accordingly, in the absence of specific evidence that Mr. McMahon directed or personally participated in the alleged infringing conduct and purposefully directed that conduct into Georgia, Foxworthy is wholly inapposite and this Court has no basis to assert specific personal jurisdiction over Mr. McMahon.

### c.    Mr. McMahon Did Not Purposefully Direct WWE's Magazine Into Georgia

Plaintiff lastly claims that Mr. McMahon is subject to this Court's specific personal jurisdiction because WWE magazines are available in the State of Georgia, one of which contained a single reference to the words "living legend."  See First Interrogatories, Ex. 1; Response No. 1 to Response to First Interrogatories, Ex. 2.  As with Plaintiff's claim of jurisdiction based on the broadcast of WWE programming into Georgia, however, the record fatally lacks any evidence that Mr. McMahon directed or had any personal

18

involvement in the allegedly infringing magazine reference or that Mr. McMahon personally purposefully directed that allegedly infringing magazine reference into Georgia. Indeed, there is absolutely no evidence in the record that Mr. McMahon has any personal involvement whatsoever in the publication or distribution of WWE's magazine. To the contrary, in fact, Plaintiff conceded that Mr. McMahon has no direct involvement with the WWE magazine, rather that "Vince hires the department and makes sure they do their jobs." Whistler Depo., Ex. 3, at 47:4-5; see also Whistler Depo., Ex. 3, at 46:24-47:14.

In the complete absence of any evidence of Mr. McMahon's personal involvement with the WWE magazine, there again is no basis to assert personal jurisdiction over Mr. McMahon for alleged acts of WWE with which he undisputedly had no personal involvement. Plaintiff's claim of specific jurisdiction over Mr. McMahon personally, therefore, only can be based on the fact that he is Chairman of WWE, which is legally insufficient to sustain jurisdiction under controlling law. See Delong, 840 F.2d at 852.

**D.    Mr. Irvine Is Not Properly Subject To Personal Jurisdiction In This Court**

As with Mr. McMahon, this Court's specific personal jurisdiction over Mr. Irvine must be established separately and independently from WWE. In his responses to interrogatories and deposition testimony, Plaintiff identified the following grounds as the purported basis for this Court's personal jurisdiction over Mr. Irvine:

**1)    Mr. Irvine's appearance at the 2002 Royal Rumble;**

19

### 2)   Mr. Irvine's appearance in WWE programming broadcast into Georgia.

See First Interrogatories, Ex. 1; Response No. 2, Response to First Interrogatories, Ex. 2.

### 1.   Mr. Irvine's Committed No Act In Connection With His Appearance At The 2002 Royal Rumble Form Which Plaintiff's Cause Of Action Arose Or Resulted

Mr. Irvine's appearance at the 2002 Royal Rumble cannot support this Court's specific personal jurisdiction over Mr. Irvine because Mr. Irvine committed no purposeful act in the State of Georgia in connection with that performance from which Plaintiff's cause of action arose or resulted. Simply put, Mr. Irvine never spoke the words "living legend" in the State of Georgia during the 2002 Royal Rumble or in any other WWE performance at which he appeared in Georgia. Irvine Depo., Ex. 6, at 29:7-9. In fact, Mr. Irvine testified he had no knowledge whether the words "living legend" were spoken or referenced in connection with the 2002 Royal Rumble in any manner whatsoever. Irvine Depo., Ex. 6, at 31:14-18.

As discussed above, the only mention of the words "living legend" in connection with the 2002 Royal Rumble was a single reference in the JERICHO/ROCK pre-produced video package broadcast immediately before Mr. Irvine's match with WWE's THE ROCK. See 2002 Royal Rumble Video, Ex. 5; Whistler Depo., Ex. 3, at 25:24-26:7; 26:17-27:3; Manso Aff., Ex. 7, at ¶2. The decision to create the JERICHO/ROCK Package was made by WWE at its Stamford, Connecticut headquarters, and the entire

20

production of the JERICHO/ROCK Package was pre-taped at WWE's television production studio in Stamford, Connecticut. Manso Aff., Ex. 7, at ¶¶ 2-6. As noted above, to tell the desired story for the JERICHO/ROCK Package to set the stage for their match at the 2002 ROYAL RUMBLE, WWE selected particular audio bytes of prior performances of CHRIS JERICHO and THE ROCK. Manso Aff., Ex. 7, at ¶ 4. One such audio byte included in the JERICHO/ROCK Package referenced the words "living legend," which was taken from WWE's RAW television program broadcast from Madison Square Garden in New York City on January 7, 2002. Id. After selecting and digitally recording the various audio bytes, WWE selected and digitally recorded music to overlay the audio bytes throughout the JERICHO/ROCK Package. Manso Aff., Ex. 7, at ¶5. Finally, WWE selected and digitally recorded video clips of prior WWE programs to match the music of the package. Id. The JERICHO/ROCK Package was then edited and enhanced in the "edit suite" located in the WWE television production studio in Stamford, Connecticut, including, among other things, the addition of video and sound effects. Manso Aff., Ex. 7, at ¶ 6. Once completed, the JERICHO/ROCK Package was digitally recorded on a "clip reel," which is a single digital beta tape containing all the packages and other pre-produced segments to be used for the production of the 2002 ROYAL RUMBLE. Manso Aff., Ex. 7, at ¶ 8. Immediately before the match between CHRIS JERICHO and THE ROCK, the JERICHO/ROCK Package was broadcast from the "clip reel" by satellite for transmission to various pay-per-view providers and by

21

direct link onto the "jumbotron" video monitor in the arena.  Manso Aff., Ex. 7, at ¶ 9.

Mr. Irvine had no input or involvement in the creation or production of the

JERICHO/ROCK Package.  Manso Aff., Ex. 7, at ¶ 10.

Accordingly, the sole reference to the words "living legend" in connection with the

2002 Royal Rumble actually was a pre-taped recording, produced by WWE in Stamford,

Connecticut without Mr. Irvine's input, involvement or even knowledge, of Mr. Irvine

speaking the words "living legend" at a prior WWE performance in New York City.  See

2002 Royal Rumble Video, Ex. 5.  Yet, while in the State of Georgia for his appearance

at the 2002 Royal Rumble, neither Mr. Irvine, nor anyone else in Phillips Arena in

Atlanta, Georgia, for that matter, ever spoke the words "living legend."  On this record,

the assertion of jurisdiction over Mr. Irvine, in reality, is based on the unilateral activity

of a third-party—WWE—to produce and broadcast the JERICHO/ROCK Package during

the 2002 Royal Rumble without Mr. Irvine's involvement or even knowledge.  This is an

insufficient basis on which to assert personal jurisdiction under controlling law.  See

Madara, 916 F.2d at 1516-17 (specific personal jurisdiction must arise from specific

tortious act in the forum state, not a performer's general activities in the forum state).

### 2.   Mr. Irvine Is Not Subject To This Court's Specific Personal Jurisdiction As A Result Of The Broadcast Of WWE Programming In Georgia

Plaintiff additionally claims that Mr. Irvine is subject to the specific personal

jurisdiction of this Court because he allegedly spoke the words "living legend" on WWE

22

programming that was broadcast into Georgia. See First Interrogatories, Ex. 1; Response

No. 2 to Plaintiff's Response to First Interrogatories, Ex. 2. It is undisputed that any such

alleged statements were made outside of Georgia. Those out-of-state statements,

however, would be legally insufficient to support this Court's exercise of jurisdiction

because Mr. Irvine did not purposefully direct his acts toward the State of Georgia. See

Peridyne, 117 F.Supp.2d at 1370.

Mr. Irvine testified that he had no control over WWE television or Pay-Per-View

contracts, nor did he have any involvement in the negotiations of agreements for the

broadcast of WWE programming into Georgia. Irvine Depo., Ex. 6, at 51:11-14.; 51:21-

23. Moreover, as Mr. McMahon testified, the television distributors have complete

control over where programming broadcast on their networks is available, "and they want

to have as broad a platform as possible." McMahon Depo., Ex. 4, at 63:5-15. WWE,

therefore, no less Mr. Irvine personally, has no ability to prevent its programming from

being available in any particular area, including, in Georgia. McMahon Depo., Ex. 4, at

63:5-15.

As discussed in detail above, recent decisions involving claims of specific personal

jurisdiction over non-resident defendants based on television broadcasts into the forum

state have ruled that such broadcasts by third-party television distributors are legally

insufficient to support specific personal jurisdiction broadcasts thus constituted "the

unilateral activity of a third-party [which] is not an appropriate consideration when

23

determining whether a defendant has sufficient contacts with a forum state to justify an assertion of jurisdiction." Overton, 2001 WL 1911359, at *5; see also Kulik Photography, 975 F.Supp. at 813-14; Tristata Technology, 961 F.Supp. at 690. Indeed, as an independent contractor, simply under contract with WWE, it would be legally inappropriate and manifestly unfair to impute to Mr. Irvine broadcasting issues over which neither he nor WWE undisputedly have any control.

Similarly, in Madara, the Eleventh Circuit specifically ruled that an individual does not have minimum contacts with a forum when that individual's statements are published in the forum by a third-party. Madara, 916 F.2d 1517-18. Consistent with the television broadcast cases, the Eleventh Circuit held that, even if the individual reasonably could have foreseen that the statement would have reached the forum state, those contacts were not the result of the individual's own personal acts and thus were not purposefully directed at the forum state. Id. at 1518-19, citing Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 107 S.Ct. 1026, 1032-33 (1987)(defendant's mere awareness that some of its products would eventually enter the forum state was not enough to support the exercise of personal jurisdiction). Accordingly, there is no evidence that Mr. Irvine purposefully directed any statements made in the course of WWE television programs into the State of Georgia. In the absence of evidence of that Mr. Irvine purposefully directed the alleged acts to Georgia, this Court cannot assert jurisdiction over a non-resident defendant for statements made outside of Georgia.

24

# IV. CONCLUSION

For all the foregoing reasons, the Complaint in its entirety should be dismissed as against Mr. McMahon and Mr. Irvine pursuant to Fed.R.Civ.P. 12(b)(2).

Respectfully submitted,

| | |
|---|---|
| John L. Taylor, Jr. | Jerry S. McDevitt |
| Georgia Bar No. 700400 | Curtis B. Krasik |
| Celeste McCollough | Julie R. Fenstermaker |
| Georgia Bar No. 487013 | KIRKPATRICK & |
| CHOREY, TAYLOR & FEIL | LOCKHART LLP |
| The Lenox Building, Suite 1700 | Henry W. Oliver Building |
| 3399 Peachtree Road, N.E. | 535 Smithfield Street |
| Atlanta, Georgia 30326 | Pittsburgh, PA 15222 |
| (404) 841-3200 | (412) 355-6500 |
| (404) 841-3221 (fax) | (412) 355-6501 (fax) |

Attorneys for Defendants
World Wrestling Federation Entertainment, Inc.,
Vince McMahon, and Chris Irvine, a/k/a Chris
Jericho, a/k/a Jericho

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1D

Pursuant to Local Rule 7.1D, counsel hereby certifies that this pleading has been prepared with Times New Roman font (14 point).

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LARRY WHISTLER                   )
a/k/a LARRY ZBYSZKO              )
a/k/a THE LIVING LEGEND,         )
an individual,                   )
                                 )          Civil Action No.  1 02-CV-1008-CC
                   Plaintiff,    )
                                 )
        vs.                      )
                                 )
WORLD WRESTLING                  )
ENTERTAINMENT, INC., a Delaware)
Corporation, VINCE MCMAHON, an )
individual, CHRIS IRVINE a/k/a   )
CHRIS JERICHO, a/k/a JERICHO, an )
individual,                      )
                                 )
                   Defendants.   )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served opposing counsel(s) of record with

the foregoing *MEMORANDUM OF LAW IN SUPPORT OF MOTION TO*

*DISMISS CLAIMS FOR LACK OF PERSONAL JURISDICTION BY*

*DEFENDANTS VINCE McMAHON AND CHRIS IRVINE* via First Class Mail,

postage pre-paid to the following address:

Joel D. Myers, Esq.
**Myers and Associates, P.C.**
1827 Powers Ferry Road
Building 3, Suite 200
Atlanta, Georgia 30339

Ben C. Brodhead, Esq.
**Ben C. Brodhead, P.C.**
235 Peachtree Street, N.E., Suite 400
Atlanta, Georgia  30303

This 13th day of February, 2003.

_____
Attorneys for Defendants
Vince McMahon, and Chris Irvine, a/k/a
Chris Jericho, a/k/a Jericho

Celeste McCollough
Georgia Bar No. 487013
CHOREY, TAYLOR & FEIL
The Lenox Building, Suite 1700
3399 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone:  (404) 841-3200
Telecopier: (404) 841-3221